DAVIS & GILBERT LLP
Marc J. Rachman (mrachman@dglaw.com)
Brandie J. Lustbader (blustbader@dglaw.com)
1740 Broadway
New York, NY 10019
(212) 468-4800
(212) 468-4888 facsimile

15 CV 4325

JUDGE DANIELS

Attorneys for Plaintiffs
TCA TELEVISION CORP., HI NEIGHBOR AND
DIANA ABBOTT COLTON

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TCA TELEVISION CORP., HI NEIGHBOR AND DIANA ABBOTT COLTON, <br><br> Plaintiffs, <br><br> v. <br><br> KEVIN MCCOLLUM; BROADWAY GLOBAL VENTURES; CMC; MORRIS BERCHARD; MARIANO V. TOLENTINO JR.; STEPHANIE KRAMER; LAMS PRODUCTIONS, INC.; DESIMONE/WINKLER; JOAN RAFFE; JHETT TOLENTINO; TIMOTHY LACZYNSKI; LILY FAN; AYAL MIODOVNIK; JAM THEATRICALS LTD.; ENSEMBLE STUDIO THEATRE INC.; MCC THEATER; ROBERT ASKINS; KEY BRAND ENTERTAINMENT INC., AND DOES AND ABC COMPANIES 1-10, <br><br> Defendants. | Index No. 15 Civ. _____ <br><br> **COMPLAINT** <br><br> **FOR FEDERAL AND NEW YORK COMMON LAW COPYRIGHT INFRINGEMENT AND INJUNCTIVE RELIEF** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs TCA Television Corp. ("TCA"), Hi Neighbor and Diana Abbott Colton

("Colton") (TCA, Colton and Hi Neighbor are collectively referred to herein as "Plaintiffs"), by

and through their undersigned counsel Davis & Gilbert LLP, for their Complaint against the

defendants named in this action and described below (collectively referred to herein as the "Defendants"), allege as follows:

## NATURE OF ACTION

1.    William "Bud" Abbott and Lou Costello ("Abbott & Costello"), one of the most famous comedy duos in American history, are best known for their iconic comedy routine known as "*Who's on First?*"  Plaintiffs, as heirs to Abbott & Costello, own valid copyrights in *Who's On First?* (collectively the "Copyrights").    Plaintiffs bring this action seeking damages and injunctive relief for the Defendants' infringement of the Federal and common law Copyrights in *Who's on First?* that occurs in the script and performances of the Broadway play, *Hand to God*, and in a video that is being used to promote *Hand to God*.

2.    Defendants are the producers, playwright, and promoters of *Hand to God*, which features a scene enacting Abbott & Costello's *Who's on First?* routine that infringes Plaintiffs' copyrights. The routine is currently being performed eight times per week without license or permission from Plaintiffs.

3.    These Defendants are willfully capitalizing on Abbott & Costello's world-famous reputation and Plaintiffs' copyrighted works in connection with *Hand to God*.

4.    Defendants are using Plaintiffs' property and infringing upon their rights despite requests that they cease and desist from such use.

5.    Plaintiffs seek damages and attorney's fees for copyright infringement under the Copyright Act, 17 U.S.C. § 101 *et seq.*, and under New York copyright common law.

2

## THE PARTIES

6.     Plaintiff TCA Television Corporation is a California corporation, with its principal place of business in Burbank, California. TCA, which is owned by Lou Costello's heirs and owns 50% of the *Who's on First?* Copyrights.

7.     Plaintiff Hi Neighbor is a general partnership formed under the laws of the state of California, with its principal place of business in Sherman Oaks, California. Plaintiff Hi Neighbor, which is owned by heirs of Bud Abbott, owns 25% of the *Who's on First?* Copyrights.

8.     Plaintiff Colton is a resident of Valencia, California. Colton, who is an heir of Bud Abbott, owns 25% of the *Who's on First?* Copyrights.

9.     Upon information and belief, Defendant Kevin McCollum ("McCollum") is located at 8 Barrett Circle Ct., Carmel, New York, 10512. Upon information and belief, McCollum is one of the producers of the infringing Broadway play *Hand to God*.

10.     Upon information and belief, Defendant Broadway Global Ventures ("BGV") is located at 1441 Broadway, Suite 2301, New York, New York, 10018. Upon information and belief, BGV is one of the producers of the infringing Broadway play *Hand to God*.

11.     Upon information and belief, Defendant CMC is located at Booth Theatre, 222 West 45th Street, New York, New York, 10036. Upon information and belief, CMC is one of the producers of the infringing Broadway play *Hand to God*.

12.     Upon information and belief, Defendant Morris Berchard ("Berchard") is located at 527 Hudson Street, New York, New York, 10014. Upon information and belief, Berchard is one of the producers of the infringing Broadway play *Hand to God*.

13.     Upon information and belief, Defendant Mariano V. Tolentino Jr. ("Tolentino Jr.") is located at 8 Mallard Court, Bloomington, Illinois, 61704. Upon information and belief, Tolentino Jr. is one of the producers of the infringing Broadway play *Hand to God*.

14. Upon information and belief, Defendant Stephanie Kramer ("Kramer") is located at 829 Park Avenue, Apartment 7A, New York, New York, 10021. Upon information and belief, Kramer is one of the producers of the infringing Broadway play *Hand to God*.

15. Upon information and belief, Defendant LAMS Productions, Inc. ("LAMS") is located at 156 West 56th Street, Suite 1202, New York, New York, 10019. Upon information and belief, LAMS is one of the producers of the infringing Broadway play *Hand to God*.

16. Upon information and belief, Defendant DeSimone/Winkler ("DeSimone/Winkler") is located at 45 Park Drive South, Rye, New York, 10580. Upon information and belief, Desimone/Winkler is one of the producers of the infringing Broadway play *Hand to God*.

17. Upon information and belief, Defendant Joan Raffe ("Raffe") is located at 2134 Pacific Boulevard, Atlantic Beach, New York, 11509. Upon information and belief, Raffe is one of the producers of the infringing Broadway play *Hand to God*.

18. Upon information and belief, Defendant Jhett Tolentino ("Tolentino") is located at 2134 Pacific Boulevard, Atlantic Beach, New York, 11509. Upon information and belief, Tolentino is one of the producers of the infringing Broadway play *Hand to God*.

19. Upon information and belief, Defendant Timothy Laczynski ("Laczynski") is located at 1838 2nd Avenue, New York, New York, 10128. Upon information and belief, Laczynski is one of the producers of the infringing Broadway play *Hand to God*.

20. Upon information and belief, Defendant Lily Fan ("Fan") is located at 530 East 76th Street, Apartment 26E, New York, New York, 10021. Upon information and belief, Fan is one of the producers of the infringing Broadway play *Hand to God*.

Case 1:15-cv-04325-GBD   Document 1   Filed 06/04/15   Page 5 of 19

21.     Upon information and belief, Defendant Ayal Miodovnik ("Miodovnik") is located at 181 Morningside Avenue, Apartment 6, New York, New York, 10026. Upon information and belief, Miodovnik is one of the producers of the infringing Broadway play *Hand to God*.

22.     Upon information and belief, Defendant Jam Theatricals Ltd. ("Jam") is located at 980 North Michigan Avenue #1590, Chicago, IL 60611. Upon information and belief, Jam is one of the producers of the infringing Broadway play *Hand to God*.

23.     Upon information and belief, Defendant Ensemble Studio Theatre Inc. ("Ensemble") is located at 549 West 52nd Street, New York, NY 10019. Upon information and belief, Ensemble is one of the producers of the infringing Broadway play *Hand to God*.

24.     Upon information and belief, Defendant Manhattan Class Co. Inc. ("MCC") is located at 231 West 29th Street #303, New York, NY 10001. Upon information and belief, MCC is one of the producers of the infringing Broadway play *Hand to God*.

25.     Upon information and belief, Defendant Robert Askins ("Askins") is located at Booth Theatre, 222 West 45th Street, New York, New York, 10036. Upon information and belief, Askins is the playwright of the infringing Broadway play *Hand to God*.

26.     Upon information and belief, Defendant Key Brand Entertainment Inc. ("Key Brand"), owner of the website Broadway.com, is located at 1619 Broadway, 9th Floor, New York, New York, 10019. Broadway.com features video clips of the infringing scene in the Broadway play *Hand to God* on its website.

27.     Plaintiffs are currently ignorant of the true names and capacities of the defendants sued herein as Does and ABC Companies 1 through 10, inclusive, and therefore sue these defendants by such fictitious names. Upon information and belief, these defendants have engaged in direct, vicarious and/or contributory infringement of the *Who's On First?* Copyrights, and Plaintiffs will

5

amend this Complaint to allege their true names and capacities when ascertained.   Upon
information and belief, Defendants Does and ABC Companies 1-10 include individuals and
corporations.

### JURISDICTION AND VENUE

28.      This action arises under the Copyright Act of 1976, 17 U.S.C. §§ 101 et seq.  This Court
has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338(a), and has
supplemental jurisdiction over related New York state law claims.

29.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) because the events
giving rise to Plaintiffs' claims occurred in this district, and Defendants are subject to personal
jurisdiction within this district.

### FACTUAL ALLEGATIONS

#### Fame of Abbott & Costello and *Who's on First?*

30.      Abbott & Costello are one of the most famous American comedy duos of the twentieth
century.  They performed together on stage, radio, television and film from 1935 until 1957.

31.      During their partnership of more than twenty years, Abbott & Costello starred in more
than thirty-five films, hosted their own half-hour comedy television series, and were ranked
among the most popular stars in the United States.

32.      On March 24, 1938, Abbott & Costello first performed *Who's on First?*, their most
famous comedy act, live on the popular radio show *The Kate Smith Hour*.

33.      *Who's on First?* revolves around the attempts of Costello (sometimes playing the part of
a peanut vendor and sometimes a rookie baseball player) to learn the names of the players of a
baseball team from its coach, Abbott.  Hilarity soon ensues due to the confusion inherent in the

players' names: first baseman "Who," the second baseman, "What," the third baseman, "I Don't Know," and so on.

34.     Over the following two decades, it is estimated that Abbott & Costello performed *Who's on First?* thousands of times.

35.     An April 17, 1947 episode of Abbott & Costello's radio program, *The Abbott & Costello Show*, ended with a well-known radio broadcast performance of *Who's On First?*, (the "1947 Broadcast").

36.     The Wall Street Journal has called *Who's on First?* "[t]he most famous sketch in American comedy history."

37.     In 1999, it was voted Best Comedy Routine of the 20th century by Time Magazine.

38.     In 2005, the American Film Institute voted the line "Who's on first" from *The Naughty Nineties* as one of the 100 Greatest Movie Quotes of All Time.

39.     Abbott & Costello and *Who's On First?* are synonymous with baseball.  In fact, Abbott & Costello and *Who's On First?* are featured in the Baseball Hall of Fame in Cooperstown, New York.  A gold record of *Who's On First?* has been displayed there since 1956.

40.     Since its inception, *Who's on First?* has been quoted, parodied and licensed innumerable times, and maintains worldwide recognition and acclaim.

41.     The fame of Abbott & Costello together with the fame of *Who's on First?* have resulted in invaluable and incalculable good will to the *Who's on First* Copyrights.

### History of the *Who's on First?* Copyrights

42.     *Who's on First?* was first published for purposes of registration pursuant to the 1909 Act in kthe 1940 Universal Pictures Co. Inc. ("UPC") film *One Night in the Tropics* and then later in

7

a more expanded version closer to what we know today in the 1945 UPC film *The Naughty Nineties*.

43.     On November 6, 1940, Abbott & Costello had signed a work-for-hire agreement with UPC, which granted UPC all rights to the duo's performances of *Who's On First?* in *One Night in the Tropics* and *The Naughty Nineties*. Accordingly, at that time, all rights to Abbott & Costello's enactment of *Who's On First?* in both films belonged to UPC.

44.     UPC registered *One Night in the Tropics* and *The Naughty Nineties* with the United States Copyright Office (the "Copyright Office") under copyright registration numbers LP 10042 (in 1940) and LP 13337 (in 1945), respectively. The original copyright registrations (the "Federal Copyrights") are attached hereto as Exhibit 1.

45.     UPC timely renewed the registrations for both *One Night in the Tropics* and *The Naughty Nineties* with the Copyright Office under copyright registrations numbers R 423759 (in 1967) and R 532048 (in 1972), respectively. The copyright renewals for the Federal Copyrights are attached hereto as Exhibit 2.

46.     Under the 1909 Act, the initial renewals were for twenty-eight years after the first twenty-eight years of copyright registration.

47.     Under the Copyright Act of 1976 and the Sonny Bono Copyright Term Extension Act, because the application for renewals for *One Night in the Tropics* and *The Naughty Nineties* were timely, the renewals were extended to a protection period of a total ninety-five years from the dates of first publication (a total of the first 28 years after publication plus an additional 67 years).

48.     Accordingly, Federal copyright protections for *One Night in the Tropics* and *The Naughty Nineties* do not expire until 2035 and 2040, respectively.

8

49.     While the Federal Copyrights for both works are valid and subsisting, they are no longer held by UPC, but have since been assigned to successors in interest to UPC.

50.     The heirs to Abbott & Costello formed a general partnership known as Abbott & Costello Enterprises ("ACE") whereby they exploited various rights owned by the estates.   In 1984, Universal Pictures ("Universal"), a division of Universal City Studios, Inc., successor to UPC, entered into a quitclaim agreement with ACE, in which Universal granted ACE all rights, title and interest, under copyright or otherwise, in and to the *Who's on First?* performance scenes in both *One Night in the Tropics* and *The Naughty Nineties* (the "*Who's on First?* Copyrights"). Universal retained a perpetual license to both films.

51.     The assignment, dated March 12, 1984, was recorded in the Copyright Office Volume 3437 at page 851.   A copy is attached hereto as Exhibit 3.

52.     Upon execution of the quitclaim agreement between Universal and ACE, ACE became the sole owners of the *Who's on First?* Copyrights.   ACE had no further registration obligations at that time, as the copyrights for *One Night in the Tropics* and *The Naughty Nineties* had already been timely renewed, and do not expire until 2035 and 2040, respectively.

53.     Federal law does not provide copyright protection for sound recordings fixed before February 15, 1972.   However, neither does federal law preempt common law copyright protection provided to such recordings until February 15, 2067.   Accordingly, under New York state law, common law copyright continues to be enforced for pre-1972 sound recordings, and the 1947 Broadcast, as well as all pre-1972 radio broadcast performances of *Who's On First?*, are protected by common law copyrights (the "Common Law Copyrights").

54.     In 1992, ACE was dissolved.   Upon its dissolution, ownership of the *Who's on First?* Copyrights was assigned as follows: 50% to TCA (a corporation formed by the heirs of

Costello); 25% to Vickie Abbott Wheeler, Abbott's daughter; and, 25% to Bud Abbott, Jr., Abbott's son. The assignment is attached hereto as Exhibit 4.

55.     This assignment was recorded in the Copyright Office in Volume 3437 at page 852.

56.     Bud Abbott, Jr. passed away in 1997, leaving his 25% share of the *Who's on First?* Copyrights to his daughter, Diana Abbott Colton. Vickie Abbott Wheeler transferred her 25% share to her company, Hi Neighbor.

57.     TCA retains its 50% share of the ownership of the *Who's on First?* Copyrights.

## History and Critical Acclaim of *Hand to God*

58.     The play *Hand to God* is a dark comedy about an introverted student in religious, small-town Texas who finds a creative outlet and a means of communication through a hand puppet, who turns into his evil or devilish persona.

59.     The play was originally performed as a workshop at the Ensemble Studio Theater, owned and operated by Defendant Ensemble, from October 31, 2011 to April 1, 2012, and then moved off-Broadway to the Lucille Lortel Theatre, owned and operated by Defendant MCC, from February 19, 2014 to March 30, 2014.

60.     The play began Broadway preview performances on March 14, 2015, and officially opened at the Booth Theater on April 7, 2015.

61.     *Hand to God* opened on Broadway to overwhelming critical acclaim. Variety called it a "furiously funny comedy." The New York Times gave it five stars, named it a Critics' Pick and lauded the main character's performance as "flat-out hilarious" and "a true tour de force." The New Yorker called the play "ribald and wickedly funny."

62.     In addition, *Hand to God* has been nominated for five Tony Awards, including Best Actor, Best Actress, Best Featured Actress, Best Director and Best Play.

10

63.     Only after its Broadway opening, when *Hand to God* began to receive widespread press coverage and media attention, did Plaintiffs learn of the key scene within the play, which clearly and unequivocally infringes the *Who's on First?* Copyrights.

## Defendants' Unauthorized and Infringing Use of the *Who's on First?* Copyrights

64.     During a critical scene in *Hand to God*, the shy main character Jason reluctantly performs the heart of the iconic *Who's on First?* comedy sketch with his puppet in order to impress a girl, Jessica. When Jessica asks him if he came up with it all by himself, Jason at first lies and says yes, to uproarious laughter by the audience, who recognizes the sketch very well. Ultimately, Jason admits that it is a "famous routine from the fifties." That routine is *Who's on First?*

65.     The enactment of *Who's on First?* in *Hand to God* is almost a word-for-word copy of the routine, and infringes both the common law copyrights and the *Who's on First?* Copyrights. The names Abbott and Costello are even used in the scene, with the Puppet playing the part of Costello and Jason playing the part of Abbott.

66.     The one minute and seven second performance of *Who's on First?* in *Hand to God* can also be directly tied to the first thirty-seven seconds of the routine from *One Night in the Tropics*, as well as the first minute and six seconds of the routine from *The Naughty Nineties*. Scripts of the *Who's on First?* performances in *Hand to God*, *One Night in the Tropics* and *The Naughty Nineties* are attached hereto as Exhibit 5.

67.     It is abundantly clear that Defendant Askins, who wrote the script, and the producer Defendants who brought *Hand to God* to the stage, have copied the very heart of *Who's on First?*

68.     The portion of the routine that is copied in *Hand to God* is the introductory segment that sets up the rest of the scene, where Abbott & Costello go back and forth misunderstanding each

other about the meaning of who's on first: on the one hand, Costello cannot grasp the name of the player on first base, and on the other hand, Abbott is confused about the question that is being asked. This is the segment of the sketch for which the entire routine is named.

69.    Moreover, the scene copying *Who's on First?* in *Hand to God* can be viewed in a video clip on Broadway.com (a website owned by Defendant Key Brand), another vehicle for infringement that is promoting the show and selling tickets to the show (the "Infringing Video"). Broadway.com has also posted the Infringing Video on YouTube, at the following URL: https://www.youtube.com/watch?v=Tfg-shoiwgY.    A screenshot from the Infringing Video appears below.  Undoubtedly this scene was chosen for the clip because it is a highlight of the play and central to its plot, and is specifically mentioned in many articles and reviews of the play, as further detailed below.



70.    At no time did Plaintiffs give Defendants license or permission to use the *Who's on First?* Copyrights.

12

71.   In fact, upon learning of the use of the routine while *Hand to God* was in previews, counsel for Plaintiffs sent a cease and desist letter to the Booth Theatre, where the play is currently in production.

72.   Plaintiff refused to cease using the routine in the play.

73.   Accordingly, Defendants have no basis to refute their clear and willful infringement of the *Who's on First?* Copyrights.

74.   Although in *Hand to God* the routine is being performed by Jason and his puppet rather than the characters used by Abbott & Costello, there is nothing new, different or transformative about the performance of *Who's on First?* in the play. The purpose of the scene is exactly the same one which Abbott & Costello had—to elicit laughs, at which it succeeds very well, as evidenced by the audio of the Infringing Video, in which you can hear the audience's laughter.

75.   The scene takes place only about fifteen minutes into the one hour and forty-four minute play, and is one of the lighter moments of the production, without which the much darker tone of the rest of the play would be very difficult for the audience to handle. It is this purely comedic scene featuring *Who's On First?*, counterbalanced with the more dramatic and serious themes of the play which are developed later on, that has allowed the play to garner both commercial success and wide audience appeal as a "dark comedy."

76.   It is apparent when viewing *Hand to God* in full that *Who's on First?* was selected not only for its hilarity, but also for another very particular reason—it is immediately recognizable to and beloved by audiences, and can be easily referenced by its famous title. Indeed, in two separate instances after the *Who's On First?* scene in the play, characters make reference back to Jason and the puppet's performance, calling it "*Who's On First?*." For example, Jessica tells Jason, "I liked *Who's on First?*"

77.    The routine is performed, by itself, for an extended period, without interruption or any other action taking place in the scene, and any other comedy routine would simply not have the same impact or appeal.

78.    The play uses a significant portion of the routine (over a minute) and it represents a significant portion of the play (at least 1% by duration).

79.    The use of *Who's on First?* in *Hand to God* is also clearly being made for a commercial purpose as it is being used to promote the play via the Infringing Video and is also a vehicle to make the play more humorous and thus more marketable. Indeed, many promotional references of Hand to God, including those on its official website, found at http://handtogodbroadway.com/, refer to the play as a comedy. It is clear that the use of *Who's on First?* was made to help *Hand to God* make it a comedy.

80.    And, as further detailed below, Defendants' enactment of *Who's on First?* in *Hand to God* has diminished the commercial value of the *Who's on First?* Copyrights.

**Licensing of the *Who's on First?* Copyrights**

81.    Due to the persistent popularity of *Who's on First?* nearly eighty years after its inception, Plaintiffs receive regular requests for licenses of the *Who's on First?* Copyrights.

82.    Plaintiffs regularly license *Who's on First?* for use in live performances, and for television, film and advertising.

83.    Over the past several decades there has been a healthy commercial market for the *Who's on First?* Copyrights, which Defendants flouted by failing to secure a license and profiting from its unauthorized and infringing use of Abbott & Costello's original work, causing harm to the commercial marketplace for future licensing of *Who's on First?*.

**Defendants' Profits**

84.     Defendants have enjoyed substantial commercial success from the gross ticket sales of *Hand to God*.

85.     Since previews began on March 14, 2015, gross ticket sales have steadily grown.  Upon information and belief, in its first week, the show's gross ticket sales were $36,122.  By the week of May 24, 2015, only about two months later, sales had reached $442,073.  A chart from BroadwayWorld.com illustrating gross ticket sales is attached hereto as Exhibit 6.

86.     Upon information and belief, gross ticket sales from *Hand to God's* Broadway run alone thus far total $2,822,848.

87.     A portion of these sales is directly attributable to the unauthorized and infringing performance of *Who's on First?* in *Hand to God*.

88.     Indeed, many of the show's most prominent reviews, including those in The New York Times, The New York Post, The Hollywood Reporter, CurtainUp, and San Francisco Splash, all feature detailed and laudatory descriptions of the *Who's on First?* scene.  Undoubtedly, mention of *Who's on First?* in these reviews, some of which are as recent as the week of May 25, have sparked interest in theatergoers who might not have otherwise bought tickets, as well as in fans of Abbott & Costello.  These reviews are attached hereto as Exhibit 7.

89.     Furthermore, the Infringing Video of the *Who's on First?* scene, which is publicly viewable on Broadway.com and YouTube undeniably helps to stoke interest in *Hand to God*. Indeed, there is a link underneath the video posted on YouTube by which consumers may purchase tickets to the play, no doubt relying on the powerful draw of *Who's on First?*  Tickets to the play are also available for purchase on Broadway.com.

90.     Upon information and belief, Defendant Key Brand also receives advertising revenue from the use of the Infringing Video on its website Broadway.com.

## COUNT I
### (Direct, Contributory and/or Vicarious Copyright Infringement Under The Copyright Act)

91.     Plaintiffs repeat and reallege the allegations stated in the preceding paragraphs of the Complaint as if set forth fully herein.

92.     Plaintiffs own the valid Federal Copyrights in *Who's on First*, which is an original work of authorship.

93.     Defendants had access to Plaintiffs' copyrighted works, and intentionally copied and distributed them, or portions from them, without Plainitffs' consent, and/or had knowledge of infringing activity and induced, caused, or materially contributed to it, and/or induced the infringement, and/or had the right and ability to supervise the infringing activity and had a direct financial interest in the activity.

94.     Defendants' use constitutes direct copyright infringement and/or contributory and/or vicarious infringement under the Copyright Act.

95.     Despite Defendants being put on notice by Plaintiffs of the infringement, Defendants continued to infringe.

96.     Defendants' acts were done intentionally and with knowledge of Plaintiffs' rights, and thus constitute deliberate and willful infringement.

97.     As a result of Defendants' actions, Plaintiffs have suffered irreparable harm. Plaintiffs have no adequate remedy at law and, if Defendants' activities are not enjoined, will continue to suffer irreparable harm and injury to their goodwill and reputations.

98.     Further irreparable harm to Plaintiffs is imminent as a result of Defendants' conduct, and Plaintiffs are without an adequate remedy at law.   Plaintiffs are entitled to an injunction

restraining Defendants, their officers, directors, agents, employees, representatives and all persons acting in concert with them from engaging in further such acts of infringement of the Federal Copyrights.

99.     As a consequence of Defendants' willful misconduct, Plaintiffs are entitled to an award against Defendants in the amount of (i) Plaintiffs' damages and Defendants' profits arising from the infringement, or in the alternative, (ii) statutory damages in the amount of up to $150,000 per work infringed; and Plaintiffs' costs and attorneys' fees incurred in connection with this action.

## COUNT II
### (Direct, Contributory and/or Vicarious Copyright Infringement Under New York Common Law Copyright)

100.    Plaintiffs repeat and reallege the allegations stated in the preceding paragraphs of the Complaint as if set forth fully herein.

101.    Pre-1972 radio broadcast performances of *Who's on First?*, including the 1947 Broadcast, are unique works of intellectual property subject to common law copyright protection.

102.    Plaintiffs are also the owners of the valid Common Law Copyrights in the pre-1972 radio broadcast performances of *Who's on First?*, which are not subject matter protected by the Copyright Act of 1909, or any subsequent Copyright Acts.

103.    Defendants had access to Plaintiffs' copyrighted works, and intentionally copied, distributed and/or reproduced them, or portions from them, without Plaintiffs' consent, and/or had knowledge of infringing activity and induced, caused, or materially contributed to it, and/or induced the infringement, and/or had the right and ability to supervise the infringing activity and had a direct financial interest in the activity.

104.    Despite Defendants being put on notice by Plaintiffs of the infringement, Defendants continued to infringe.

17

105.    Defendants' use constitutes direct copyright infringement and/or contributory and/or vicarious infringement under New York common law.

106.    As a result of Defendants' actions, Plaintiffs have suffered irreparable harm. Plaintiffs have no adequate remedy at law and, if Defendants' activities are not enjoined, will continue to suffer irreparable harm and injury to their goodwill and reputations.

107.    Further irreparable harm to Plaintiffs is imminent as a result of Defendants' conduct, and Plaintiffs are without an adequate remedy at law.   Plaintiffs are entitled to an injunction restraining Defendants, their officers, directors, agents, employees, representatives and all persons acting in concert with them from engaging in further such acts of infringement of the Common Law Copyrights.

108.    As a direct and proximate consequence of Defendants' copyright infringement of Plaintiffs' common law copyrighted works, Plaintiffs have been damaged in an amount to be ascertained at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant an order or orders:

A.    Awarding damages in an amount to be proven at trial, caused by Defendants' copyright infringement and/or vicarious and contributory infringement of the Federal and Common Law Copyrights, and other misconduct as specified herein. In the alternative with respect to the Federal Copyrights, awarding statutory damages in the amount of up to $150,000 per work infringed under the Copyright Act.

B.    Ordering that Defendants make restitution to Plaintiffs for any unjust enrichment caused by virtue of their unlawful conduct.

C.    Awarding Defendants' profits arising out of Defendants' willful copyright, as well as vicarious and contributory infringement.

D.    Awarding ~~Defendants~~ Plaintiffs injunctive relief restraining Defendants, their officers, directors, agents, employees, representatives and all persons acting in concert with them from engaging in further such acts of infringement of the Federal and Common Law Copyrights.

E.    Awarding Plaintiffs interest and costs of this action together with statutory attorneys' fees under the Copyright Act, 17 U.S.C. § 505.

F.    Granting such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated:    New York, New York
          June 4, 2015

DAVIS & GILBERT LLP

By: _____

Marc J. Rachman (mrachman@dglaw.com)
Brandie J. Lustbader (blustbader@dglaw.com)
1740 Broadway
New York, New York 10019
(212) 468-4800

*Attorneys for Plaintiffs*

TCA TELEVISION CORP., HI NEIGHBOR AND
DIANA ABBOTT COLTON