UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
x------------------------------------------------------------x

TCA TELEVISION CORP., HI NEIGHBOR and    :       15 CIV 4325 (GBD)
DIANA ABBOTT COLTON,                     :

                        Plaintiffs,        :

against

KEVIN MCCOLLUM, BROADWAY GLOBAL    :
VENTURES, CMC, MORRIS BERCHARD,           :
MARIANO V. TOLENTINO, JR., STEPHANIE      :
KRAMER, LAMS PRODUCTIONS, INC.,           :
DESIMONE/WINKLER, JOAN RAFFE, JHETT       :
TOLENTINO, TIMOTHY LACZYNSKI,  LILY       :
FAN, AYAL MIODOVNIK, JAM THEATRICALS:
LTD., ENSEMBLE STUDIO THEATER INC.,       :
MCC THEATER, ROBERT ASKINS, DOES, ABC:
COMPANIES, 1-10, HAND TO GOD LLC          :

                  Defendants.        :

x------------------------------------------------------------x

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
JOINT MOTION TO DISMISS THE FIRST AMENDED COMPLAINT
FOR FAILURE TO STATE A CAUSE OF ACTION**

**MARK J. LAWLESS (6570)**
Attorney for Defendants
250 West 57th Street #1316
New York, NY 10107
(212)754-0665

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 2
  *HAND TO GOD* ........................................................................................... 2
  COPYRIGHT HISTORY OF THE ROUTINE ...................................................... 5
    1938 - Broadcast ...................................................................................... 5
    1940 – *One Night in the Tropics* ............................................................ 6
    1944 – Abbott and Costello's Copyrighted Radio Script ............................ 7
    1945 – *The Naughty Nineties* ................................................................. 8
    1947 – Radio Performance and Script ....................................................... 8
    The 1940 Version Contains All of the Copyrightable Elements That Are At
    Issue ......................................................................................................... 9

ARGUMENT ................................................................................................... 10
  POINT I
  THE STANDARD FOR JUDGMENT ................................................................ 10
    A. The Motion can be decided on the basis of the documents submitted ......... 11
    B. Fair use can be determined on this record ............................................. 12
    C. Only copyrighted matter can be considered in the analysis of infringement 12

  POINT II
  THE 1940 VERSION OF THE ROUTINE IS
  IN THE PUBLIC DOMAIN ............................................................................ 13
    A.  Universal Studios did not acquire an ownership interest in the 1940 Version
    ................................................................................................................. 13
    B.  It was incumbent upon Bud Abbott and the heirs of Lou Costello to register
    renewal of the copyright in the 1940 Version in 1968 ................................. 15

  POINT III
  THE MATERIAL IN *HAND TO GOD* THAT IS NOT IN THE PUBLIC
  DOMAIN 1940 VERSION IS  *DE MINIMIS* ............................................... 18

  POINT IV
  THE RECORD ESTABLISHES FAIR USE ........................................................ 19
    A.  Purpose and character of the use. ........................................................ 19
    B.  The nature of the copyrighted work ..................................................... 20
    C.  The portion of the allegedly infringed work that was used ....................... 21
    D.  The effect on the market .................................................................... 22

  POINT V
  THE COMPLAINT PLEADS NO FACTS TO SUPPORT CLAIMS OF
  VICARIOUS OR CONTRIBUTORY INFRINGEMENT AGAINST SEVERAL
  DEFENDANTS ............................................................................................. 22

  POINT VI
  NO CLAIM OF COMMON LAW INFRINGEMENT CAN LIE WITH
  RESPECT TO THE 1947 RECORDING ......................................................... 23

**CONCLUSION** ............................................................................................................ 24

**APPENDIX A**

# TABLE OF AUTHORITIES

## CASES

*Adjmi v. DLT Entertainment Ltd.*, ___ F.Supp.3d ___, 2015 WL 1499575 (S.D.N.Y. 2015). ..........11, 12, 19

*Arrow Prods., Ltd. v. The Weinstein Co.,* 44 F.Supp.3d 359, 366–73 (S.D.N.Y.2014)............................... 12

*Ashcroft v. Iqbal,* 556 U.S. 662, 678–79 (2009). .................................................................................... 10

*Bell Atl. Corp. v. Twombley,* 550 U.S. 544, 559 (2007) ........................................................................... 10

*Blanch v. Koons,* 467 F.3d 244, 253 (2d Cir. 2006), ............................................................................... 19

*Blanch v. Koons,* 467 F.3d 244, 249–50 (2d Cir.2006) ........................................................................... 12

*Boarding Sch. Review, LLC v. Delta Career Educ. Corp.,* 2013 WL 6670584, at *1 (S.D.N.Y.)
   *reconsideration denied,* 2013 WL 6670586 (S.D.N.Y. 2013) ............................................................... 8

*Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 586 (1994). ................................................................ 21

*Campbell v. Acuff-RoseMusic, Inc.,* 510 U.S. 569, at 579 (1994). ............................................................. 19

Carell v. Shubert Organization, Inc., 104 F.Supp.2d 236, 271 (S.D.N.Y.2000)......................................... 23

*Cariou v. Prince,* 714 F.3d 694, 706 (2d Cir.) *cert. denied,*_____ U.S. _____ (2013) ............................... 20

*DiFalco v. MSNBC Cable LLC,* 622 F.3d 104, 111 (2d Cir. 2010). ............................................................. 11

*Duffey v.Twentieth Century Fox Film Corporation*, 14 Fed.Supp.3d 120 (S.D.N.Y. 2014). ...................... 11

*Effie Film,* 932 F.Supp.2d................................................................................................................... 12

*Effie Film, LLC v. Gregory Murphy,* 932 F.Supp.2d 538, 552–53 (S.D.N.Y.2013), *aff'd,* 564 Fed.Appx. 631
   (2d Cir.2014) .................................................................................................................................. 11

Epoch Producing Corp. v. Killiam Shows, Inc., 522 F.2d 737, 746 (2d Cir.1975) (holding no presumption
   of validity attaches to certificate of renewal), cert. denied, 424 U.S. 955 (1976)..................................... 7

*Erie Ins. Exchange v. Columbia Nat. Ins. Co.,* 2013 WL 395982 *4 n. 13 (Tenn.Ct.App. 2013)................. 2

*Ex parte Overton,* 444 S.W.3d 632, 651n. 24 (Tex.Crim.App. 2014) .......................................................... 2

*Faulkner v. National Geographic Society,* 211 F.Supp.2d 450, *confirmed but mod. on other grounds on
   reconsideration* 220 F.Supp.2d 237 (S.D.N.Y. 2002), *modified on other grounds* 409 F............16, 17, 18

*Gershwin Publishing Corp. v. Columbia Artists* Management, 443 F.2d 1159, 1162 (2d Cir. 1971) .......... 22

*Goodis v. United Artists Television*, 425 F.2d 397 (2d Cir. 1970) ............................................................. 17

*In re Vermont Toy Works, Inc.,* 82 B.R. 258, 278 n. 13 (Bkrtcy.D.Vt. 1987) ............................................... 2

*International Film Exch., Ltd. v. Corinth Films, Inc.,* 621 F. Supp. 631, 635 (S.D.N.Y. 1985)................... 16

*Island Software & Computer Serv., Inc. v. Microsoft Corp.,* 413 F.3d 257, 261 (2d Cir.2005).................. 11

*L. Batlin &Sons, Inc. v. Snyder*, 536 F.2d 486,at 492 (2d Cir. *en banc*), cert.den. 429 U.S. 857 (1976). .... 21

*Leibovitz v. Paramount Pictures Corp.,* 137 F.3d 109 (2d Cir.1998)....................................................... 12

Magnoni v. Smith & Laquercia, LLP, 701 F.Supp.2d 497, 501 (S.D.N.Y.2010).......................................... 11

*Morris v. Business Concepts, Inc*., 259 F. 3d 65 (2d Cir. 2001)................................................................ 15

Patsy's Italian Restaurant, Inc. v. Banas, 575 F.Supp.2d 427, 443 n. 18 (E.D.N.Y.2008).......................... 8

Picture Music, Inc. v. Bourne, 457 F.2d 1213, 1214–15 n.3 (2d Cir.) .......................................................... 7

*Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*, 531 F.3d 962, 975-76 (9th Cir. 2008) ........................... 17

Rogers v. Koons, 960 F.2d 301, 306 (2d Cir.1992)................................................................................... 12

Shapiro, Bernstein & Co. v. H.L. Green Co., 316 F.2d 304, 307 (2d Cir.1963) ......................................... 22

*Sofa Entertainment, supra,* 709 F.3d at 1278 ........................................................................................ 19

Tarshis v. Riese Org., 211 F.3d 30, 39 (2d Cir.2000), *abrogated on other grounds, Swierkiewicz
   v. Sorema N.A.,* 534 U.S. 506 (2002) ............................................................................................... 11

*Uproar Co. v. National Broadcasting Co.*, 81 F.2d 373 (1st Cir. 1936) ....................................................... 6

*Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 36 (2d Cir. 2012)......................................................... 22

*Woods v. Bourne Co.*, 60 F.3d 978, 991 (2d Cir. 1995) ........................................................................... 21

## STATUTES

17 U.S.C. § 3 (1909)................................................................................................................................ 17

17 U.S.C. § 410(c)..................................................................................................................................... 7

17 U.S.C. §505 ....................................................................................................................................... 24

## OTHER AUTHORITIES

Pierre N. Leval, *Toward a Fair Use Standard,* 103 HARV. L. REV. 1105, 1111 (1990)). ......................... 19

In this action for infringement of copyright, the Defendants jointly move the Court to dismiss the First Amended Complaint.[1]  The grounds for dismissal can all be traced to the Complaint and documents it incorporates, supplemented by judicial notice of official records the Complaint ignores.  There are several grounds for dismissal.

First, the Complaint recites facts that establish that the core material alleged to have been infringed is, except for insignificant detail, in the public domain.  In short, the Plaintiffs' predecessors in interest failed to secure renewal copyright in that core of the work when its initial term of copyright expired in 1968.

Second, by setting forth the text of both the work sued upon and the work whose infringement is claimed, the Complaint demonstrates that the alleged copying of any elements that are possibly still in copyright outside of that core was *de minimis.*

Third, the Complaint, both in the pleading itself and in the exhibits it incorporates by reference, describes a transformative use, and demonstrates that the *gratis* availability of the text of the allegedly infringed work on the Internet leaves no real financial interest for Plaintiffs to protect as against *Hand to God*. This is sufficient to establish a "fair use" defense on a motion to dismiss.

Fourth, the Complaint fails to plead facts of control, facilitation or direct financial benefit that would be essential to make out a case for vicarious or contributory infringement by most of the extensive roster of defendants, who are referred to simply as "producers".

Fifth, no common law copyright exists to support the Second Cause of Action, because any common law rights in the allegedly infringed material ended with prior publication and federal registration.

---

[1]  For convenience, the First Amended Complaint will be referred to as "the Complaint" or "C."

**INTRODUCTION**

This action involves the use in the play *Hand to God* of a few evocative lines of dialogue from what was one of the nation's most famous comedy routines, Abbott & Costello's *Who's on First*.  Those lines have long been a cultural reference point to describe miscommunication.[2]  The lines are presented to dramatic effect in *Hand to God*, not only as an immediately suggestive token of miscommunication (in this case, between a troubled boy and his sock-puppet alter ego), but also as a reference point to the boy's preoccupation with "golden age" comedy and horror movies, to show his love interest's ignorance of all that, and to anticipate a darkening of the relationship between the boy and his alter ego sock puppet as the play develops.  *Hand to God* is a play with comic elements, but  as the critics' reviews incorporated in the Complaint (C.Ex. 7) show it differs wildly from a comedy review or comedy team's performance of a bit.

***HAND TO GOD***

For purposes of this Motion, one need go no farther than the description of *Hand to God* as it is presented in the Complaint and the Exhibits attached to the Complaint to see that the use made of *Who's on First?*" is part of a sophisticated artistic expression:

> "58.  The play *Hand to God* is a dark comedy about an introverted student in religious, small-town Texas who finds a creative outlet and means of communication through a hand puppet, who turns into his evil or devilish persona" (C.¶58)
>
> ***
>
> "64.  During a critical scene in *Hand to God,* the shy main character Jason reluctantly performs the heart of the iconic *Who's on First?* comedy sketch

---

[2]  For example, courts have used reference to the sketch to make a point about confusing miscommunication, even to the extent of quoting it at far greater length than was done here.  *See, e.g. Ex parte Overton,* 444 S.W.3d 632, 651n. 24 (Tex.Crim.App. 2014); *In re Vermont Toy Works, Inc.,* 82 B.R. 258, 278 n. 13 (Bkrtcy.D.Vt. 1987); *Erie Ins. Exchange v. Columbia Nat. Ins. Co.,* 2013 WL 395982 *4 n. 13 (Tenn.Ct.App. 2013)

with his puppet in order to impress a girl, Jessica.  When Jessica asks him if he came up with it all by himself, Jason at first lies and says yes, to uproarious laughter by the audience, who [sic] recognizes the sketch very well.  Ultimately, Jason admits that it is a 'famous routine from the fifties.'  That routine is *Who's on First?*" (C.¶64)

As the Complaint concedes (C.¶'s68, 75) this exchange is a critical scene, integral to the plot.  But in its summary of the exchange, the Complaint misstates its artistic purpose and value.  In the play, Jessica indeed asks if Jason came up with the lines all by himself.  Jason says yes, and is immediately called a liar by Tyrone, his hand puppet.  Jason tells his hand puppet to shut up.  Tyrone then betrays Jason's lie, telling Jessica that it's a famous routine from the Fifties, and Jason scores a debating point off Tyrone to date it from the Thirties.  Tyrone then insults Jessica (the woman Jason is trying to impress), saying "You'd know that if you weren't so stupid."  Jason and Jessica both tell Tyrone to shut up, but Tyrone again betrays Jason by telling Jessica: "But it doesn't matter 'cause he thinks you're hot."  (C.Ex.5)

In that passage, one sees Jason coming out of his shell by invoking a comedy bit known to all but the nerdy Jessica, the beginnings of his troubled inner relationship *with himself*, and Tyrone's emerging nastiness.  As the Complaint summarizes:

"75.  The scene takes place only about fifteen minutes into the one hour and forty-four minute play, and is one of the lighter moments of the production, without which the much darker tone of the rest of the play would be very difficult for the audience to handle.  It is this purely comedic scene featuring *Who's on First?*, counterbalanced with the more dramatic and serious themes of the play which are developed later on, that has allowed the play to garner both commercial success and wide audience appeal as a 'dark comedy'.

"76.  It is apparent when viewing *Hand to God* in full that *Who's on First?* was selected not only for its hilarity, but also for another very particular reason—it is immediately recognizable to  and beloved by audiences, and can be easily referenced by its famous title***" (C.¶75-76)

The critics whose views are incorporated in the Complaint (C.Ex.7) state the case

of transformative use just as clearly:

ISHERWOOD, N.Y. TIMES (2011):
"The third participant is Margery's baby-faced son, Jason (Stephen Boyer), who seems
the least likely of these 15-year-olds to be the instigator of trouble. But Jason's roiling id
has discovered a convenient escape from the prison of the subconscious: the brown sock
puppet on his agile left hand. Tyrone, as the puppet is called, begins blurting out the
kinds of subversive thoughts that the seemingly docile, naïve Jason would never dare to
utilize.

"***Things begin innocently enough, with Jason trying to impress Jessica by performing
the classic Abbott and Costello 'Who's on first?' routine.

ISHERWOOD, N.Y. TIMES (2014):
"And, by the end of Mr. Askins's play about the divided soul in all of us, poor Jason will
be locked in a duel to the death (or thereabouts) with his own left arm, or rather the evil
spirit that has taken possession of it.

"***Jason has a natural gift for puppetry, which he reluctantly displays to Jessica when
they are alone by performing the classic Abbott and Costello 'Who's-on-First?' routine.
Jessica expresses her admiration, asking if he's come up with this business himself, and
it's then that the impish Tyrone begins speaking up for himself. "You'd know that if you
weren't so stupid,' he snaps, startling Jason, 'but it doesn't matter 'cause he thinks you're
hot.'

"Jason attempts to quell this outburst by clamping right hand over left, but soon more
vulgar expressions are pouring forth from Tyrone's foul felt mouth, leading an
embarrassed Jessica to shuffle out the door, and Jason to stew in self-hatred, or rather
hatred of the unleashed id that has suddenly colonized his left hand."

ZINOMAN, N.Y.TIMES (2015):
"What makes 'Hand to God' such an exciting new play is not its critique of religious
dogma or the psychology of its characters. It's how effectively and self-consciously Mr.
Askins melds comedy with a monstrous center. It is no accident that Tyrone first
emerges while Jason is using him to perform a version of Abbott and Costello's 'Who's
on First?' routine. Or that Jason's bedroom walls are plastered with posters for classic
horror and comedy movies. The play is stuffed with lines demonstrating a playful
affection for both genres, including a knowing 'Exorcist' joke and a mocking reference to
a 'Dr. Jekyll and Miss Piggy act'.

"Horror and comedy easily segue into the other, and crossing the two is a difficult trick:
push the comedy too far, you lose the screams; increase the terror and the smiles flatten.
Yet the genres share so many qualities, often relying on surprise and transgression, not to
mention scenes of building tension and release."

4

## COPYRIGHT HISTORY OF THE ROUTINE

It is alleged, and must be taken as true for purposes of this Motion, that sometime in the 1930's, Plaintiff's respective predecessors in interest William "Bud" Abbott and Lou Costello, performed a comedic routine that has come to be known as the "*Who's On First?*" routine (the "Routine").  (C.¶32).  (There is no allegation of original creation, and C.¶43 refers only to rights to an "enactment")  The Routine has gone through a number of iterations and changes, being expanded or pared as situations for performance presented themselves.(C.¶'s34-41)  The Routine became iconic and celebrated, and its premise a handy metaphor for frustrating failures of communication. (id.)

The Complaint states that "[s]ince its inception, *Who's on First?* has been quoted, parodied <u>and</u> licensed innumerable times" [emphasis added], thus admitting to a virtually uncontrolled market in the text. (C.¶40) Abbott and Costello (the comedy team *per se* will be referred to as "A&C") performed the Routine in one form or another "thousands" of times (C.¶34).

Five of those performances are relevant to this action, but only four have been pleaded and only three are transcribed as Exhibits.  The unpleaded performance—a 1944 radio performance, the script of which Abbott and Costello themselves registered for copyright--- must be considered through judicial notice of the copyright registration pertaining to it, because it is key documentary evidence sufficient to belie the Complaint's claims to a chain of title that is essential to the First Cause of Action.

### The 1938 Broadcast

The first of these performances was in 1938, on the radio program *The Kate Smith Hour.*  (C.¶32) The Complaint does not plead just what rights grant, or rights

retention, attended that performance.[3]  The Complaint establishes that the Routine pre-existed 1940.

**1940 – *One Night in the Tropics***

The second relevant performance was the contribution of a version of the pre-existing Routine to the 1940 movie *One Night in the Tropics¸* produced by Universal Studios,[4] which acquired rights to an "enactment" (C.¶43).

The Complaint presents an entry from the records of the Copyright Office registering copyright in the "photoplay" of that movie. (C.Ex. 1)  The entry does not mention either Abbott or Costello as co-authors.  (Id.)

The 1940 registration by Universal Studios recites a release date for the film of November 14, 1940. (Id.)  The Complaint refers (C.¶43) to an agreement among Universal, Abbott and Costello dated November 6, 1940, a mere eight days before release of the film. The Complaint does not append that Agreement, but reference to the document incorporates it into the Complaint. Although the Complaint (C. ¶43) describes it as a "work for hire" agreement,[5] as will be shown below (and by LawlessDec.Ex.A) the actual document as recorded in the Copyright Office stopped well short of granting

---

[3] This may ultimately be contested by the defendants. *Cf. Uproar Co. v. National Broadcasting Co.*, 81 F.2d 373 (1st Cir. 1936) [issue of ownership of rights in performer's radio scripts dependent upon contracts with sponsor]. It is Plaintiffs' burden to establish ultimate ownership, and the pedigree presented in the Complaint simply doesn't go back far enough. As noted above, the Complaint does not even plead creation. The pleading deficiency might be remediable but only if Plaintiffs can meet the good faith and due investigation test that governs pleadings. A substantive deficiency on  that issue would of course be fatal to Plaintiffs' case.

[4] The confusing transcription of the Routine that the Complaint identifies (C.Ex.5) as from *One Night in the Tropics* fails to break from speaker to speaker and elides introductory patter.

[5]  ¶43 of the Complaint confuses the status of the Routine under the 1940 Agreement, by referring to it as both work made for hire and as the subject of a "grant".  The concepts are inconsistent, and the only possible reconciliation is this: on its face, the 1940 Agreement (see FIFTH) was the *grant of a license* to pre-existing A&C materials, and not a transfer or ownership of the Routine.

Universal the rights to the preexisting sketch.  Under that 1940 Agreement, Universal held only a mere license to incorporate the Routine in its movie. (LawlessDec.Ex.A)  The Complaint pleads nothing to say that the creation of the Routine at least two years prior to 1940 was work made for hire for Universal.

Universal renewed its copyright in *One Night in the Tropics* in 1968. (C.¶45 and C.Ex.2)  It is not pleaded that either Bud Abbott nor Costello's heirs registered a renewal of copyright in the Routine as it was presented in the film.

**1944 – Abbott and Costello's Copyrighted Radio Script**

The third performance that is relevant took place in 1944.  This performance is not even alluded to in the Complaint.  This omission cannot have been inadvertent.  However, the performance must be considered because in 1944 Abbott and Costello elected to register copyright in the script of that performance in their own names (LawlessDec.Ex.B).  That debases any notion that Universal had acquired ownership of the text of the Routine under the 1940 Agreement.  This case is determined by the fact that Abbott and Costello failed to renew their own 1944 copyright registration.[6]  As late as 1986, Plaintiffs cited the 1944 Registration---not Universal's registrations--- in a subsequent registration for added matter. (Lawless Decl.Ex.F)

---

[6] That 1944 certificate of registration serves as *prima facie* evidence of Abbott's and Costello's valid ownership of the copyright, though that presumption is rebuttable. 17 U.S.C. § 410(c); *Rogers v. Koons,* 960 F.2d 301, 306 (2d Cir.1992).  The oddity here is that the Complaint abjures their presumptive ownership.  Plaintiffs must explain how the presumption of ownership arising from a registration can exist for a registration *in another's name*.

The law is clear that no presumption of ownership arises from a certificate of renewal registration, such as that which Universal filed here for the 1940 Version.  *Picture Music, Inc. v. Bourne, Inc.,* 457 F.2d 1213, 1214–15 n.3 (2d Cir.) (explaining Register of Copyrights typically allows conflicting claimants to register for renewal without determining validity of claim), *cert. denied,* 409 U.S. 997, 93 S.Ct. 320 (1972); *Epoch Producing Corp. v. Killiam Shows, Inc.,* 522 F.2d 737, 746 (2d Cir.1975) (holding no presumption of validity attaches to certificate of renewal), *cert. denied,* 424 U.S. 955 (1976).

This performance, on the radio program *Mail Call,* was filmed; it was available and viewed at https://www.youtube.com/watch?v=Ps7HxIgse7Q on June 24, 2015.[7]

**1945 – *The Naughty Nineties***

A substantially longer version of the Routine than that of the 1940 *One Night in the Tropics* was presented in another Universal Studios production, *Naughty Nineties,* produced in 1945. (C.¶42)  Universal registered copyright in its own name.(C.Ex.2)  The registration makes no reference to pre-existing or third-party work contained in the photoplay. (Id.; *see* line 2(b)).  It is not pleaded that either Abbott  or Costello's heirs registered a renewal of copyright in the Routine as presented in *Naughty Nineties*.

It is to be noted that the transcript of the 1945 Version is reprinted in Exhibit 5 to the Complaint in a form that indicates its source as http://www.filmsite.org /whosonfirst.html, with the download dated 5/4/2015.  That same website provided free access to the entire text when last visited on June 24, 2015.  Copies abound on YouTube.

**1947 – Radio Performance and Script**

The fourth relevant performance took place in 1947, on A&C's own radio show. (C.¶35).  It is that performance[8] that is the basis of the claim of common law copyright in

---

[7] The Court generally has the discretion to take judicial notice of internet material, certainly to establish the fact of an Internet posting as opposed to verifying content. *Magnoni v. Smith & Laquercia, LLP,* 701 F.Supp.2d 497, 501 (S.D.N.Y.2010); *see also Patsy's Italian Restaurant, Inc. v. Banas,* 575 F.Supp.2d 427, 443 n. 18 (E.D.N.Y.2008) ("It is generally proper to take judicial notice of articles and Web sites published on the Internet."), *aff'd,* 658 F.3d 254 (2d Cir.2011); *Boarding Sch. Review, LLC v. Delta Career Educ. Corp.,* 2013 WL 6670584, at *1 (S.D.N.Y.) *reconsideration denied,* 2013 WL 6670586 (S.D.N.Y. 2013).

[8]  Reference to "Buck [sic] Harris" in *Hand to God* fixes the date of the source work at Bucky Harris' tenure with the New York Yankees, 1947-1948.   That is also the indicator that it is the 1947 script that is available for *gratis* internet access at, e.g.,  http://freeclownskits.info/abbott-and-costello-skits/whos-on-first/ and http://abbott-and-costello-whos-on-first.info/whos-on-first-script/ , each visited on June 24, 2015.   The Complaint fudges a bit in referring (C.¶53) to pre-1972 recordings generally without mentioning the registration of the 1944 Radio Script.

the Second Cause of Action.  The lines that appear in *Hand to God* track this version of the Routine. This version incorporated language that can be traced to the 1940 *One Night in the Tropics*.  The Complaint claims no registration of copyright in this version, but rather claims that after "thousands" of performances of the skit in movies, radio and television, the common law right of first publication survives that performance.

Oddly, the transcript of the 1947 version of the Routine was not appended to the Complaint.  "Oddly", because the entirety of the 1947 Radio Performance is available *gratis* on a number of locations on YouTube.com, as when last visited on June 24, 2015, e.g., https://www.youtube.com/watch?v=c6ogFYWUlgA, and the full downloadable text transcript was available *gratis* at http://www.baseball-almanac.com/humor4.shtml on the same date.  It is set forth as LawlessDecl.Ex.D.

**The 1940 Version Contains All of the Copyrightable Elements That Are At Issue**

Simple comparison of the various scripts attached as Exhibit 5 to the Complaint demonstrates that the 1940 version constituted a "core", which was added to and changed slightly in subsequent versions.  No new matter from the 1945 version appears in *Hand to God.*  Because all of the alleged copying in *Hand to God* is of matter that appeared in the 1940 version, except insofar as slight rephrasings and repetitions were introduced in 1947, it is the copyright status of the 1940 version only that governs this case.

We attach as Appendix A a chart setting forth the relevant presentations from the 1940 and 1947 renditions of the Routine, as well as the dialogue from *Hand to God,* formatted for convenience.  As the chart demonstrates, the 1940 iteration fixes the premise of the Routine and the initial confusion over the first baseman "Who", which

carried through to the 1947 Version.  *Hand to God* does not present the confusion that ensues over other players' names[9] or Costello's ever mounting and prolonged frustration that is the key comedic element of the Routine.

The new matter and enhancements created after 1940, where not insignificant, could conceivably have protection (much like new entries added to an encyclopedia could obtain separate copyright status), but what was brought within federal copyright protection in 1940 was subject to the rules governing renewal in 1968, and *Hand to God* doesn't present any substantive later-added matter.

As will be shown below, the Complaint does not plead that renewal was effected by an appropriate owner of the copyright in the Routine.

## ARGUMENT

### POINT I
### THE STANDARD FOR JUDGMENT

F.R.C.P. 12 exists precisely to weed out unsound complaints before parties engage in expensive discovery and innocents are exposed to the burdens of unfounded litigation.  *Bell Atl. Corp. v. Twombley,* 550 U.S. 544, 559 (2007).

F.R.C.P. 8 requires that a complaint make a short, plain statement showing that the pleader is entitled to relief. A complaint states a claim for relief if the claim is plausible. *Ashcroft v. Iqbal,* 556 U.S. 662, 678–79 (2009).  To review a complaint for plausibility, the court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in the pleader's favor, *Iqbal,* 556 U.S. at 678–79, but the court need not accept "[t]hreadbare recitals of the elements of a cause of action," which are essentially legal conclusions. *Id.* at 678.  After separating legal conclusions from well-

---

[9] The Routine, as performed from time to time, dealt with as many as eight players.  The right fielder is never named.

pleaded factual allegations, the court must determine whether those facts make it plausible—not merely possible—that the pleader is entitled to relief. *Duffey v.Twentieth Century Fox Film Corporation*, 14 Fed.Supp.3d 120 (S.D.N.Y. 2014).

## A. The Motion can be decided on the basis of the documents submitted

In deciding such a motion, a court must accept as true the facts alleged in the complaint, drawing all reasonable inferences in the plaintiff's favor, "and may consider documents attached to the complaint, incorporated by reference into the complaint, or known to and relied on by the plaintiff in bringing the suit." *Adjmi v. DLT Entertainment Ltd.*, ___ F.Supp.3d ___, 2015 WL 1499575 (S.D.N.Y. 2015). The Court may take judicial notice of public records such as those filed in the Copyright Office, *Island Software & Computer Serv., Inc. v. Microsoft Corp.,* 413 F.3d 257, 261 (2d Cir.2005); *Tarshis v. Riese Org.,* 211 F.3d 30, 39 (2d Cir.2000), *abrogated on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Effie Film, LLC v. Gregory Murphy,* 932 F.Supp.2d 538, 552–53 (S.D.N.Y.2013), *aff'd,* 564 Fed.Appx. 631 (2d Cir.2014). Even when a document is not incorporated by reference, "the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect.' thereby rendering the document 'integral' to the complaint." *DiFalco v. MSNBC Cable LLC,* 622 F.3d 104, 111 (2d Cir. 2010).  In this case, Defendants submit five such items:

1. The 1940 Agreement referred to in the Complaint as the basis for a claim of copyright ownership by Universal Pictures (C.¶43), as filed by Universal Pictures in the Copyright Office (Ex.A),
2. A Certificate of the Copyright Office reflecting  the1944 Copyright Registration for "Baseball Routine" undertaken by Bud Abbott and Lou Costello under Reg D pub.88573, with an effective date of March 13, 1944 (Ex.B),
3. A DVD copy of the film *One Night in the Tropics*, as distributed by Universal Studios (Ex.C),
4. A DVD of *Hand to God* as presented in its 2015 Broadway production (ExD),
5. A 1986 registration for new matter that refers to the 1944 registration (Ex.F)

11

**B. Fair use can be determined on this record**

On the issues of *de minimis* and fair use, the Court's inquiry can---indeed, would ordinarily--- involve little more than a comparison of the matter alleged to infringe and the matter alleged to have been infringed:

> "Courts in this Circuit have resolved motions to dismiss on fair use grounds in this way: comparing the original work to an alleged parody, in light of applicable law. *See, e.g., Blanch v. Koons,* 467 F.3d 244, 249–50 (2d Cir.2006) (affirming the district court's grant of summary judgment on fair use grounds where district court reached that conclusion by comparing the original and potentially infringing paintings); *Leibovitz v. Paramount Pictures Corp.,* 137 F.3d 109 (2d Cir.1998) (affirming district court's grant of summary judgment on fair use grounds where district court reached that conclusion by comparing original photograph to potentially infringing advertisement); *Arrow Prods., Ltd. v. The Weinstein Co.,* 44 F.Supp.3d 359, 366–73 (S.D.N.Y.2014) (finding fair use based on a review of, and subsequent comparison between, two films); *Effie Film,* 932 F.Supp.2d at 545–553 (granting motion on the pleadings based upon a detailed review of two screenplays depicting the same historical events)." *Adjmi v. DLT Entertainment Ltd.,* 2015 WL 1499575  *supra.*

**C. Only copyrighted matter can be considered in the analysis of infringement**

The Court cannot accept editorializations, legal conclusions or characterizations contained in the Complaint to determine this Motion. *Adjmi, supra* at *13.

The naked element of wordplay *schtick* isn't copyright protected.  The notion of such wordplay confusion in a comedy skit is an idea, and ideas, like *scenes a faire*, are not copyrightable matter.  So it is only the articulation of the idea in the Routine that could be protected, not the premise.  Infringement could be found, if at all, only with respect to the elements of that articulation that are copyright-protected.  That limitation factors into fair use analysis, as will be shown below.

## POINT II
## THE 1940 VERSION OF THE ROUTINE IS
## IN THE PUBLIC DOMAIN

**A.  Universal Studios did not acquire an ownership interest in the 1940 Version**

Under the Copyright Act of 1909 ("1909 Act") a work, once it had been "published", secured protection under federal law for an initial term of 28 years.

"Published" (as that term was used in the 1909 Act) was, however a term of art, and performance or broadcast of a work were not deemed to be publication under the 1909 Act.  Until a work came within the protection of the 1909 Act, an author's rights existed at common law.

Two rubrics have been used to describe that common law protection:  "common law copyright" and the more precise "right of first publication."  The issue of whether under state law the right of first publication had ended is an issue of state law, and a work could be published for purposes of exhausting the right of first publication even though it had not been "published" for purposes of bringing it under the 1909 Act.

The Complaint admits (C.¶32) that the Routine was "first performed" in the 1938 *Kate Smith Hour* broadcast.  It preexisted the filming and release in 1940 of *One Night in the Tropics*, and Abbott and Costello retained ownership in the 1940 Agreement.

The pre-existing Routine was therefore not a work made for hire under the 1909 Act.  To have been a work made for hire, the Routine would have had to have been created at the "instance and expense" of Universal at the time of creation:

> "An employment (or commissioning) relationship **at the time the work is created** is a condition for claiming renewal as the proprietor of a 'work made for hire'. *Urantia Found. v. Maaherra*, 114 F.3d 955, 961 (9th Cir. 1997) [emphasis added; citations omitted]

****

13

> "Under the 1909 Act, an independent contractor was an 'employee' and a hiring party an 'employer' if the work was made at the hiring party's "instance and expense," provided also that the employer had the right to exercise control over the manner in which the artist executed the work. 'Once it is established that a work is made for hire, the hiring party is presumed to be the author of the work. **That presumption can be overcome, however, by evidence of a contrary agreement, either written or oral.**'" *Ward v. National Geographic Society,* 208 F. Supp.2d 429, at 435 (S.D.N.Y. 2002) [emphasis added]

The 1940 Agreement was in contemplation of a multi-year, multi-picture relationship, and allowed for some future work by A&C to be taken as work for hire. However, the 1940 Agreement specifically excluded pre-existing comic routines of A&C from work for hire status or other ownership by Universal:

> "FIFTH:  The Artists agree to furnish and make available to the Producer **all literary and dramatic material and routines heretofore used by the Artists either on the radio or otherwise and now owned by the Artists**, and the Producer shall have the right to use said material and routines to such extent as the Producer may desire in connection with any photoplay in which the Artists render their services hereunder and in connection with the advertising and exploitation of such photoplay.\*\*\*The Artists expressly agree that they will not use or license, authorize or permit the use of any of the material and/or routines referred to in this paragraph in or in connection with motion pictures for any person, firm or corporation other than the Producer, at any time prior to the termination of the employment of the Artists under this agreement or one year after the general release of the photoplay in which used, whichever is greater.
>
> "        The Artists **reserve** the right to use on the radio and in personal appearances authorized under the terms of this agreement any material and routines referred to in this paragraph; provided, however, that such material and routines shall have been created or used by the Artists prior to the date of this agreement or created by the artists solely (or by writers employed by the Artists in connection with services other than motion pictures) during the term of this agreement\*\*\*" (LawlessDecl. Ex.A) [emphasis added][10]

---

[10]  *One Night in the Tropics* features A&C performing several set piece routines including the Routine.  Clearly if "heretofore" speaks to the date of the 1940 Agreement, all would have been within the contractual exception from any grant; otherwise Abbott and Costello would have been trading their entire *oeuvre* for what could have been a very short affiliation with Universal.

14

Abbott and Costello's personal registration of the script of the 1944 Radio Version fortifies the conclusion that no ownership of the Routine or of other preexisting A&C routines had vested in Universal Studios.  Further, the March 12, 1984 Quitclaim to Abbott and Costello's heirs upon which the Complaint relies to establish title to the copyrights (C.¶'s 50-51 and Ex.3; filed with the Copyright Office in 1997) contains this conclusive recitation, distinguishing the text of the Routine from its registered performances:

> "RELIANCE:  Universal is executing this QUITCLAIM in reliance upon the representation by Jerome E. Weinstein, attorney for ABBOTT & COSTELLO ENTERPRISES:    ("Enterprises"), that ENTERPRISES is a partnership composed of the successors in interest to the late Bud Abbott and Lou Costello, namely, their respective children, Bud Abbott, Jr., Vicki Wheeler, Carole Costello, Patricia Humphreys and Christine Costello, and **that Enterprises is therefore the owner of copyright in and to the Routine**." [emphasis added]  *Cf.* Lawless Decl.Ex.F [reference to 1944 Registration as previously registered material]

## B.  It was incumbent upon Bud Abbott and the heirs of Lou Costello to register renewal of the copyright in the 1940 Version in 1968

The Routine was a pre-existing, freestanding contribution to a collective work, licensed to Universal for inclusion in the work.  Defendants concede for purposes of this motion that Universal's copyright registration of *One Night in the Tropics* protected the preexisting Routine from entering the public domain for the initial term of copyright, through 1968, but no more.

Just as that registration did not give Universal ownership of the copyright in the Routine sufficient for Universal to sue for infringement, *Morris v. Business Concepts, Inc.*, 259 F. 3d 65 (2d Cir. 2001), *abrogated by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010) [owner of copyright to a collective work has standing to sue for infringement of components only is also the owner of copyright in the component], Universal was not

a proper party to register renewal in the copyright when the time came in 1968.  Rather,

only Abbott or the heirs to Costello could exercise the renewal right.  As a mere licensee,

and given the reservations of rights in the 1940 Agreement, Universal could not renew:

> "A transfer of anything less than a totality of a work is a license and not an
> assignment***Indeed, section 24 of the 1909 Act explicitly states that,
> except in certain limited circumstances, not applicable here, a copyright
> may only be validly renewed in the name of the author." *International
> Film Exch., Ltd. v. Corinth Films, Inc.,* 621 F. Supp. 631, 635 (S.D.N.Y.
> 1985).

The governing case, on facts that could not be closer to those presented here, is

*Faulkner v. National Geographic Society,* 211 F.Supp.2d 450, *confirmed but mod. on*

*other grounds on reconsideration* 220 F.Supp.2d 237 (S.D.N.Y. 2002), *modified on other*

*grounds* 409 F.3d 26 (2d Cir. 2005).

In *Faulkner*, freelance contributors of articles and photographs to *National*

*Geographic Magazine* sued the National Geographic Society for infringement arising

from exploitation of those works by the Society in other media.  Plaintiff Allen, as

successor, claimed infringement of works created by his father that were published in

*National Geographic Magazine* prior to 1964.  Defendant Society had renewed the

copyrights on its issues as collective works, but neither Allen nor his father had registered

for a renewal term as was required by the 1909 Act.[11]  Allen attempted to rely upon the

Society's renewal to avoid having those pre-1964 works found to be the public domain.

---

[11]  "The 1976 Act came into effect on January 1, 1978, but retained the renewal system for works
that were copyrighted before 1978 and still were in their first terms on January 1, 1978. For these
works, the statute provides for a first term of copyright protection lasting for twenty-eight years,
with the possibility of a second term of forty-seven years. In 1992, Congress amended the 1976
Act to make renewal of this second term automatic for works copyrighted between January 1,
1964, and December 31, 1977, leaving works copyrighted prior to January 1, 1964 subject to the
old regime." *Faulkner*, 211 F.Supp.2d at 465

That argument was rejected, and the rejection was emphatically confirmed on reconsideration.  The *Faulkner* court distinguished the situation of renewal from that of gaining initial copyright protection for a contribution to a collective work.  The latter was governed by *Goodis v. United Artists Television*, 425 F.2d 397 (2d Cir. 1970), in which the Court contrived a rule to protect unwary authors from the catastrophe arising from publication without proper notice under the 1909 Act, when the author was relying upon another to supply the notice  (*Faulkner,* 211 F.Supp.2d at 465).  *Faulkner* held that the strict regime of the 1909 Act regarding who could register a renewal trumped any policy considerations that allowed for the *initial* registration of a collective work to protect its contents:

> "Plaintiffs invoke *Goodis* to protect themselves from a failure to renew in the twenty-eighth year following publication, but the concerns underlying the *Goodis* opinion are not implicated in this situation. The *Goodis* plaintiff had to rely on the actions of his publisher in order to obtain copyright protection and, to that extent, was at its mercy. In contrast, the Allens needed no one but themselves to file a claim for renewal. They faced no trap for the unwary—they simply failed to take even the most basic steps to protect the text and photographs for which they now claim to own the copyrights. While *Goodis* does stand for the general proposition that courts should avoid unnecessarily harsh forfeitures when possible, it is not a license for plaintiffs to sit on their hands for no apparent reason." (id.)

Papa Allen and his successor were entitled to register a renewal of the pre-1964 works, and the Society wasn't.  They didn't and the works were therefore in the public domain.[12]

---

[12] *Cf.  Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*, 531 F.3d 962, 975-76 (9th Cir. 2008)
"Though publication of a motion picture with notice secures federal statutory copyright protection for all of its component parts, *see* 17 U.S.C. § 3 (1909), that does not mean that the component parts necessarily each secure an independent federal statutory copyright. The component parts may or may not be copyrightable; they may or may not be the subject of an independent statutory copyright when they are incorporated into the motion picture. As [*Stewart v. Abend*, 495 U.S. 207 (1999)] demonstrates, the author of a work at common law must secure a federal copyright for that work for the right to renew

*Faulkner* is indistinguishable from this case.  The Complaint makes no suggestion that either Abbott or the Costello heirs registered a renewal of the 1940 Version or, critically, the 1944 Version that Abbott and Costello had registered for themselves. Instead, the Complaint rejects the notion that any such renewal by A&C was necessary (C.¶'s 44-48, 52), on the sole and demonstrably false premise that Universal Studios had acquired ownership of the Routine as work for hire.

### POINT III
### THE MATERIAL IN *HAND TO GOD* THAT
### IS NOT IN THE PUBLIC DOMAIN 1940 VERSION
### IS *DE MINIMIS*

Simple comparison of the 1940 Version and the relevant passage from *Hand to God*, establishes that "there is no there, there" in terms of a difference.  As Appendix A demonstrates, the difference between those versions is *de minimis*.  See C.Ex.5 and Appendix A. [13]

The overlap between the 1940 Version and *Hand to God*'s slice of the 1947 Version is exceeded only by this:  reference to Bucky Harris, the additional set-up premise of being a coach, and two extra exchanges of "Who? The guy on first."  That is the equivalent of adding an extra "dooby dooby do" to Sinatra's *Strangers in the Night*. This is so minimal and insubstantial an addition as not to exceed even a very strict operation of the *de minimis* doctrine

---

to vest in either him or his heirs. The statutory copyright of a motion picture precludes the public from copying or otherwise infringing upon the statutory rights in the motion picture, including its component parts."

[13] *Hand to God* does not mimic the characteristic personae of Bud Abbott or Lou Costello, so integral to the popularity of the Routine.  Even if it had done so, mere intonation and movement—charisma-- is not copyrightable. *See Sofa Entertainment, Inc. v. Dodger Productions, Inc.,* 709 F.3d 1273, 1279 (9th Cir. 2013).

POINT IV
**THE RECORD ESTABLISHES FAIR USE**

Although the Court is not limited to the "four factor" test in assessing fair use, on this record the finding can be made conclusively.

**A.  Purpose and character of the use.**

>  "[T]he central purpose of this investigation is to see ... whether the new work merely 'supersede[s] the objects' of the original ... or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning or message ...." *Campbell v. Acuff-RoseMusic, Inc.,* 510 U.S. 569, at 579 (1994).

Courts now refer to this property by the shorthand "transformative." *See, e.g., Campbell,* 510 U.S. at 579 (citing Pierre N. Leval, *Toward a Fair Use Standard,* 103 HARV. L. REV. 1105, 1111 (1990)). Transformative use is alone neither a sufficient nor exclusive means to establish fair use, but "[s]uch works ... lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright ... and the more transformative the new work," the greater the likelihood of a finding of fair use. (Id.) This is in keeping with "the general calculus of copyright law: promoting the arts and sciences by rewarding ingenuity, without stifling creativity." *Adjmi* 2015 WL 1499575 at *17.

As shown above, there was an enormously different purpose in the presentation of a snippet from the Routine in *Hand to God* than that of A&C's "thousands" of vaudeville, radio, film and live performances.  Just as a literal snippet from an *Ed Sullivan Show* episode established a historical context for the history of The Four Seasons musical group, *Sofa Entertainment*, *supra,* 709 F.3d at 1278, and a fashion  photo incorporated in a collage established a cultural touchpoint, *Blanch v. Koons,*  467 F.3d 244, 253 (2d Cir. 2006), and  the "happy, light-hearted, run-of-the-mill, sometimes almost slapstick situation comedy" of *Three's Company*, *Adjmi* 2015 WL 1499575 at *17 provided a

touchstone for the contrasting darkness of the play *3C,* so the invocation of a

recognizable innocent past with perfectly innocent wordplay creates a background for the

ever more sinister character development of Tyrone, the alter-ego sock puppet.  The

transformative context need not consist of comment upon the work that is appropriated:

> "The law imposes no requirement that a work comment on the original or
> its author in order to be considered transformative, and a secondary work
> may constitute a fair use even if it serves some purpose other than those
> (criticism, comment, news reporting, teaching, scholarship, and research)
> identified in the preamble to the statute. Instead, as the Supreme Court as
> well as decisions from our court have emphasized, to qualify as a fair use,
> a new work generally must alter the original with 'new expression,
> meaning, or message.' (original must be employed 'in the creation of new
> information, new aesthetics, new insights and understandings')."  *Cariou
> v. Prince,* 714 F.3d 694, 706 (2d Cir.) *cert. denied,*_____ U.S. _____
> (2013) [citations omitted]

Nevertheless in *Hand to God,* the context of the invocation of the Routine is a comment

on the age of innocence that the Routine reflects, in addition to serving as the setup for

character and plot development.  It's there for a lot more than laughs.

## B.  The nature of the copyrighted work

As performed by A&C the Routine is clearly a comedy bit—like a joke, really---

that is played only for laughs and not as an instructional piece.  It remains a remarkably

successful riff on a classic theme, like a PG version of the notorious *The Aristocrats.*

(This refers only to the text, of course, and does not detract from the unique talents that

Messers. Abbott and Costello brought to their particular recorded and filmed renditions.)

As the Court of Appeals has written in the analogous context of song stylings:

> "[There must be] something of substance added making the piece to
> some extent a new work with the old song embedded in it but from
> which the new has developed. It is not merely a stylized version of the
> original song where a major artist may take liberties with the lyrics or
> the tempo, the listener hearing basically the original tune. It is, in

short, the addition of such new material as would entitle the creator to a copyright on the new material." *Woods v. Bourne Co.*, 60 F.3d 978, 991 (2d Cir. 1995)

## C.  The portion of the allegedly infringed work that was used

As can be seen from Appendix A, only the introductory "set-up" of the Routine is used in *Hand to God*.  Only one of the eight players referred to in the full-fledged Routine ("Who") is referred to in the play.  The snippet in the play is actually little more than the introductory premise of the bit, captured in three repeated lines:  "Who's on first." "Who?" "The first baseman".  That is hardly more than the way the Routine is generally referred to (C. ¶'s 34-41).[14]

*Hand to God* suggests, but does not begin to copy, the increasing lack of communication and frustration that occurs in the Routine, which in the 1945 Version in *Naughty Nineties* lasts almost 9 minutes, and in Abbott and Costello's 1944 copyrighted Version over 3 minutes (with A&C speaking much faster than the characters in *Hand to God; see* https://www.youtube.com/watch?v=1mRzshZjAaM.).

The significance of any use of a portion is not so much mathematical as it is subjective, and here the appropriate analog is that long-developed by the courts with respect to parody:  has no more been invoked than is necessary to recall the original? *Cf. Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 586 (1994).

---

[14]  "To extend copyrightability to minuscule variations would simply put a weapon for harassment in the hands of mischievous copiers intent on appropriating and monopolizing public domain work." *L. Batlin &Sons, Inc. v. Snyder*, 536 F.2d 486,at 492 (2d Cir. *en banc*), cert.den. 429 U.S. 857 (1976).  The same consideration applied to a copyright owner's efforts to circumvent the term limits of the 1909 Act by asserting the right of first publication to edits.

**D.  The effect on the market**

The ready availability of various versions of the Routine, in text and as filmed, has been described throughout this Memorandum.  No use has been made in *Hand to God* that appropriates A&C's various personal performances of the Routine, but it cannot be denied that the text of the Routine is generally available, *gratis*, to anyone who has a computer, or for that matter, anyone who has access to law reports.  All of that publication has apparently been tolerated by the Plaintiffs. Indeed, the Complaint invokes that unlicensed ubiquity to argue the fame of the bit (C.¶40).   The Complaint pleads no specific threat to the commercial viability of the Routine by displacement or otherwise.

### POINT V

### THE COMPLAINT PLEADS NO FACTS TO SUPPORT CLAIMS OF VICARIOUS OR CONTRIBUTORY INFRINGEMENT AGAINST SEVERAL DEFENDANTS

Many of the defendants are identified in the Complaint (C.¶'s  by nothing than the word "producer".  That word alone does not automatically suggest the satisfaction of the standard for contributory infringement : "with knowledge of infringing activity, induces, causes or materially contributes to the infringing conduct of another",  *Gershwin Publishing Corp. v. Columbia Artists* Management, 443 F.2d 1159, 1162 (2d Cir. 1971).

Similarly, it doesn't plead vicarious infringement:

> "When the right and ability to supervise coalesce with an obvious and direct financial interest in the exploitation of copyrighted materials***." *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 36 (2d Cir. 2012) quoting *Shapiro, Bernstein & Co. v. H.L. Green Co.,* 316 F.2d 304, 307 (2d Cir.1963).

For that pleading deficiency to be remedied, Plaintiff would have to allege the facts of control, facilitation and direct financial benefit, and would have to have to certify to a good faith basis for the allegations.

In the case of passive investors ("angels"), that claim cannot be made out.  *See Carell v. Shubert Organization, Inc.,* 104 F.Supp.2d 236, 271 (S.D.N.Y.2000) [dismissing copyright infringement claim against individual defendant where "[a]bsent from the Complaint is any description of acts that could lead to the conclusion of direct copyright or trademark infringement, or allegations of authorization or participation that would indicate vicarious liability or contributory infringement"]; reference to one defendant as "producer" with a sizable investment inadequate); *accord, Warren v. John Wiley & Sons, Inc.*, 952 F. Supp. 2d 610, 619-20 (S.D.N.Y. 2013).

In the meantime, the angels are subjected to all of the problems that arise from being named in a lawsuit.  There is no good reason for the Court to permit baseless snaring of those bystanders.  The failure of the Complaint should relieve them.

**POINT VI**
**NO CLAIM OF COMMON LAW INFRINGEMENT CAN LIE WITH RESPECT TO THE 1947 RECORDING**

The 1947 Version is an elaboration of the 1940 Version, which the Complaint concedes (C.¶42) has been subject to the conditions for federal copyright.  Common law copyright on everything that appeared in the 1940 Version ended.  To be clear, there is extensive new material in the 1947 Version that might qualify for common law copyright under the rules that existed under the 1909 Act.  That said, the rule is that no assertion of common law copyright can revive a dead statutory copyright; and copyright in the 1940 Version, as well any anything of the 1944 Radio Script, were mummified by reason of

nonrenewal in 1968.  *Hand to God* presents formerly copyrighted material that the 1947 Version repeated that has long since gone into the public domain.

## CONCLUSION

For the reasons stated above, the Amended Complaint should be dismissed, with costs including reasonable attorneys' fees under 17 U.S.C. §505.

| Dated: July 7,  2015 | /s/ MARK J. LAWLESS (6570)<br>Attorney for Defendants<br>250 West 57th Street #1316<br>New York, NY 10107<br>(212)754-0665<br>Fax (212)810-2430<br>Mark.Lawless79@gmail.com |
|---|---|

APPENDIX A

| *Hand to God* | 1940 *One Night in the Tropics* | 1947 Radio Performance |
|---|---|---|
| Well Costello, I'm goin to New York with you.  You know Buck Harris the Yankee's manager gave me a job as coach as long as you're on the team | [Introductory material not presented in Exhibit 5] | Well Costello, I'm going to New York with you. You know Bucky Harris, the Yankee's manager, gave me a job as coach for as long as you're on the team. |
| Look Abbott, if you're the coach you must know all the players. | | Look Abbott, if you're the coach, you must know all the players. |
| I certainly do. | | I certainly do |
| Well I've never met the guys.  So you'll have to tell me their names and then I'll know who's playing on the team. | | Well you know I've never met the guys. So you'll have to tell me their names, and then I'll know who's playing on the team. |
| Oh I'll tell you their names, but you know it seems to me they give these ball players now-a-days very particular names. | They give ballplayers today very peculiar names | Oh, I'll tell you their names, but you know it seems to me they give these ball players now-a-days very peculiar names |
| You mean funny names? | Funny names? | You mean funny names? |
| | Nicknames.  Like Dizzy Dean. Daffy Dean.<br><br>His brother Daffy | Strange names, pet names...like Dizzy Dean...<br><br>His brother Daffy.<br><br>Daffy Dean...<br><br>And their French cousin.<br><br>French?<br><br>Goofé.<br><br>Goofé Dean. |

| | | |
|---|---|---|
| Well let's see.  We have on the bags, Who's on first, What's on second, I don't know is on third | Let's see.  Who's on first, What's on second.  I Don't Know's on third | Well, let's see, we have on the bags, Who's on first, What's on second, I Don't Know is on third... |
| That's what I want to find out | That's what I wanna find out. | That's what I want to find out. |
| I say Who's on first, What's on second, I don't know's on third | I'm saying Who's on first, What's on second, I Don't Know's on third | I say Who's on first, What's on second, I don't know's on third |
| Are you the manager? | Are you the manager?  You know the fells' names? | Are you the manager? |
| Yes | | Yes |
| You gonna be the coach too? | | You gonna be the coach too? |
| Yes | | Yes |
| And you don't know the fellows' names | | And you don't know the fellows' names |
| Well I should | Well I should | Well I should |
| Then who's on first | Who's on first | Then who's on first |
| Yes | Yes | Yes |
| I mean the fellow's name | I mean the fella's name.  The first baseman | I mean the fellow's name |
| Who | Who.  Who is on first | Who |
| The guy on first | | The guy on first |
| | That's what I wanna find out | |
| | That's what I'm telling you | |
| | You got a first baseman?  Who's playin', there? | |
| | Certainly | |
| | Yes | |
| | Who.  I mean the fella's name. On first base. | |
| Who | | Who |
| The first baseman | | The first baseman |

| | | |
|---|---|---|
| Who | | Who |
| The guy playing. | | The guy playing |
| Who is on first. | | Who is on first! |
| I'm askin you who's on first | | I'm askin YOU who's on first |
| That's the man's name | That's the man's name | That's the man's name |
| That's whose name? | That's whose name? | That's whose name? |
| Yes | Yes | Yes |
| Well go ahead and tell me | | Well go ahead and tell me |
| I just did | | That's it. |
| Who? | | That's who? |
| Yes. | | Yes |
| | Have you got a contract? with the first baseman? | Look, you gotta first baseman? |
| | Naturally. | Certainly. |
| | Who signed the contract? | Who's playing first? |
| | You wouldn't expect anyone else to sign it. | That's right. |
| | But who? | |
| | Yes. | |
| | When you pay off the first baseman, who gets the money? | When you pay off the first baseman every month, who gets the money? |
| | Every dollar of it.  Yes. | Every dollar of it. |
| | | All I'm trying to find out is the fellow's |

iii

|  |  | name on first base. |
|  |  | Who. |
|  |  | The guy that gets... |
|  |  | That's it. |
|  |  | Who gets the money... |
|  | He does.  Every buck? | He does, every dollar. Sometimes his wife comes down and collects it. |
|  |  | Who's wife? |
|  | Every buck. | Yes. |
|  | He gets every buck. | PAUSE |
|  | Mm-hmm. | What's wrong with that? |
|  |  | Look, all I wanna know is when you sign up the first baseman, how does he sign his name? |
|  |  | Who. |
|  |  | The guy. |
|  |  | Who. |

|  |  | How does he sign... |
|  |  | That's how he signs it. |
|  |  | Who? |
|  |  | Yes. |
|  |  | PAUSE |
|  | All I'm tryin' to find out is what is the fella's name on first base. | All I'm trying to find out is what's the guy's name on first base. |
|  | Now, wait.  What is on second base. | No. What is on second base. |
|  | I'm not askin' who is on second. | I'm not asking you who's on second. |
|  | Who is on first. | Who's on first. |
|  |  | One base at a time! |
|  |  | Well, don't change the players around. |
|  |  | I'm not changing nobody! |
|  |  | Take it easy, buddy. |
|  |  | I'm only asking you, who's the guy on first base? |

| | | |
|---|---|---|
| | | That's right. |
| | | Ok. |
| | | All right. |
| | | PAUSE |
| | | What's the guy's name on first base? |
| | | No. What is on second. |
| | | I'm not asking you who's on second. |
| | | Who's on first. |
| | I don't know. | I don't know. |
| | He's on third. | He's on third, we're not talking about him. |
| | How did I get on third base? | Now how did I get on third base? |
| | You mentioned his name. | Why you mentioned his name. |
| | I mentioned his name?  If I mentioned the third baseman's name, who did I say's on third? | If I mentioned the third baseman's name, who did I say is playing third? |
| | Oh no. Who's on first. | No. Who's playing first. |
| | Never mind first!  I wanna know what's | What's on first? |

| | | |
|---|---|---|
| | the fella's name on third. | |
| | But What's on second.<br>Who's on second? | What's on second. |
| | Who's on first. | |
| | I don't know. | I don't know. |
| | He's on third. | He's on third. |
| | There I go, back on third again. | There I go, back on third again! |
| | I can't help that. | PAUSE |
| | Let's stay on third, don't go off it. | |
| | | Would you just stay on third base and don't go off it. |
| | What is it you wanna know? | All right, what do you want to know? |
| | Who is playing third base? | Now who's playing third base? |
| | Why do you insist on putting who on third base? | Why do you insist on putting Who on third base? |
| | Who am I putting on third? | What am I putting on third. |
| | Yes, but we don't want him there. | No. What is on second. |
| | You don't want who there? | |

| | | |
|---|---|---|
| | | You don't want who on second? |
| | No. | Who is on first. |
| | So what's the guy's name belongs there? | . |
| | What belongs on second. | |
| | Who belongs on second? | |
| | Who is on first. | |
| | I don't know. | I don't know |
| | Third base. | Third base! |
| | Third base?  Now I'm back on third base. | PAUSE |
| | I can't help that. | |
| | You got a pitcher? | |
| | Naturally. | |
| | What's the pitcher's name? | |
| | No.  What is on second. | |
| | Who's on second? | |
| | Who's on first! | |

|  | I don't know!<br><br>Third base!<br><br>I'm a catcher too, you know.<br><br>What about it? |  |
|---|---|---|
|  |  | Look, you gotta outfield?<br><br>Sure.<br><br>The left fielder's name?<br><br>Why.<br><br>I just thought I'd ask you.<br><br>Well, I just thought I'd tell ya.<br><br>Then tell me who's playing left field.<br><br>Who's playing first.<br><br>I'm not... stay out of the infield! I want to know what's the guy's name in left field?<br><br>No, What is on second. |

| | | |
|---|---|---|
| | | I'm not asking you who's on second.<br><br>Who's on first!<br><br>I don't know.<br><br>Third base!<br><br>PAUSE<br><br>The left fielder's name?<br><br>Why.<br><br>Because!<br><br>Oh, he's centerfield.<br><br>PAUSE<br><br>Look, You gotta pitcher on this team?<br><br>Sure.<br><br>The pitcher's name?<br><br>Tomorrow.<br><br>You don't want to tell me today? |

x

| | | I'm telling you now. |
| | | Then go ahead. |
| | | Tomorrow! |
| | | What time? |
| | | What time what? |
| | | What time tomorrow are you gonna tell me who's pitching? |
| | | Now listen. Who is not pitching. |
| | | I'll break your arm, you say who's on first! I want to know what's the pitcher's name? |
| | | What's on second. |
| | | I don't know. |
| | | Abbott & Costello Together: Third base! |
| | | PAUSE |
| | | Gotta a catcher? |
| | | Certainly. |

| | | |
|---|---|---|
| | | The catcher's name?<br><br>Today.<br><br>Today, and tomorrow's pitching.<br><br>Now you've got it.<br><br>All we got is a couple of days on the team.<br><br>PAUSE |

| | | |
|---|---|---|
| | I'll catch on your team.  The heavy hitter gets up.<br>So?<br><br>He bunts the ball.  Me, being a good catcher, I wanna throw the ball to first.. So I throw it to Who? | You know I'm a catcher too.<br><br> So they tell me.<br><br> I get behind the plate to do some fancy catching, Tomorrow's pitching on my team and a heavy hitter gets up. Now the heavy hitter bunts the ball.<br><br>When he bunts the ball, me, being a good catcher, I'm gonna throw the guy out at first base. So I pick up the ball and throw it to who? |
| | Now that's the first thing you've said right!<br><br>That's the first thing I've said right?  I don't even know what I'm talkin' about!<br><br>Mm-mmmm! | Now that's the first thing you've said right.<br><br> I don't even know what I'm talking about!<br><br>PAUSE |

|  |  | That's all you have to do. |
|  |  | Is to throw the ball to first base. |
|  |  | Yes! |
|  |  | Now who's got it? |
|  |  | Naturally. |
|  |  | PAUSE |
|  | When I pick up the ball, I throw it to first, who gets it? | Look, if I throw the ball to first base, somebody's gotta get it. Now who has it? |
|  | Right, right.  Absolutely right.  If you throw it to first, who is bound to get it. |  |
|  | I don't know! |  |
|  | Third base! |  |
|  |  | Naturally. |
|  |  | Who? |
|  |  | Naturally. |
|  |  | Naturally? |

| | | |
|---|---|---|
| | | Naturally. |
| | | So I pick up the ball and I throw it to Naturally. |
| | | No you don't, you throw the ball to Who. |
| | | Naturally. |
| | | That's different. |
| | | That's what I said. |
| | | You're not saying it... |
| | | I throw the ball to Naturally. |
| | | You throw it to Who. |
| | | Naturally. |
| | | That's it. |
| | | That's what I said! |
| | | You ask me. |
| | | I throw the ball to who? |
| | | Naturally. |

|  |  | Now you ask me. |
|  |  | You throw the ball to Who? |
|  |  | Naturally. |
|  |  | That's it. |
|  |  | Same as you! Same as YOU! I throw the ball to who. Whoever it is drops the ball and the guy runs to second. Who picks up the ball and throws it to What. What throws it to I Don't Know. I Don't Know throws it back to Tomorrow, Triple play. Another guy gets up and hits a long fly ball to Because. Why? I don't know! He's on third and I don't give a darn! |
|  |  | What? |
|  |  | I said I don't give a darn! |
|  |  | Oh, that's our shortstop. |