DAVIS & GILBERT LLP
Marc J. Rachman (mrachman@dglaw.com)
Brandie J. Lustbader (blustbader@dglaw.com)
1740 Broadway
New York, NY  10019
(212) 468-4800
(212) 468-4888 facsimile

Attorneys for Plaintiffs
TCA TELEVISION CORP., HI NEIGHBOR AND
DIANA ABBOTT COLTON

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

TCA TELEVISION CORP., HI NEIGHBOR AND
DIANA ABBOTT COLTON,

      Plaintiffs,

  v.

KEVIN MCCOLLUM; BROADWAY GLOBAL
VENTURES; CMC; MORRIS BERCHARD;
MARIANO V. TOLENTINO JR.; STEPHANIE
KRAMER; LAMS PRODUCTIONS, INC.;
DESIMONE/WINKLER; JOAN RAFFE; JHETT
TOLENTINO; TIMOTHY LACZYNSKI; LILY FAN;
AYAL MIODOVNIK; JAM THEATRICALS LTD.;
ENSEMBLE STUDIO THEATRE INC.; MCC
THEATER; ROBERT ASKINS; HAND TO GOD LLC,
AND DOES AND ABC COMPANIES 1-10,

      Defendants.

Civil No. 15-cv-4325(GBD)(JCF)

ECF Case

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................................1

STATEMENT OF FACTS .........................................................................................................2

ARGUMENT ...........................................................................................................................5

I.      LEGAL STANDARD ...................................................................................................5

II.     *WHO'S ON FIRST?* IS PROTECTED BY VALID COPYRIGHT......................................6

        A.      UPC Acquired Rights to *Who's on First?* Through the November 1940
                Agreement or a July 1940 Agreement ....................................................6

        B.      The 1940 Motion Picture Was Properly Renewed by UPC....................................12

        C.      The 1944 War Board Registration Has No Effect on Plaintiffs' Valid
                Copyright ...........................................................................................17

III.    PLAINTIFFS' USE OF *WHO'S ON FIRST?* IS NOT *DE MINIMIS* ..............................19

IV.     PLAINTIFFS' USE OF *WHO'S ON FIRST?* IS NOT FAIR USE ..................................20

        A.      Purpose and Character of Use...............................................................21

        B.      Nature of the Copyrighted Work ..........................................................22

        C.      Amount and Substantiality of Portion Used in Relation to Copyrighted
                Work as a Whole..................................................................................23

        D.      Effect of the Use Upon the Potential Market for the Value of the
                Copyrighted Work ..............................................................................23

V.      DISCOVERY IS NEEDED RE: VICARIOUS/CONTRIBUTORY
        INFRINGEMENT..................................................................................................24

VI.     NO IMPACT ON COMMON LAW COPYRIGHT OF 1947 RADIO
        PERFORMANCE ................................................................................................25

CONCLUSION.......................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................5, 25

*Bill Graham Archives, LLC v. Dorling Kindersley Ltd.*,
386 F. Supp. 2d 324 (S.D.N.Y. 2005), *aff'd* 448 F.3d 605 (2d Cir. 2006) ............................22

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) ..............................................................................................20

*Capitol Records, Inc. v. Naxos of Am., Inc.*,
4 N.Y.3d 540 (N.Y. 2005) .......................................................................................25

*Cariou v. Prince*,
714 F.3d 694 (2d Cir. N.Y. 2013) ............................................................................21, 22

*Faulkner v. Nat'l Geographic Soc'y*,
220 F. Supp. 2d 237 (S.D.N.Y. 2002) ..........................................................................13

*Faulkner v. Nat'l Geographic Soc'y*,
211 F. Supp. 2d 450 (S.D.N.Y. 2002) ...................................................................... *passim*

*FC Online Mktg., Inc. v. Burke's Martial Arts, LLC*,
2015 U.S. Dist. LEXIS 89415 (E.D.N.Y. July 8, 2015) ..........................................................5

*Goodis v. United Artists Television, Inc.*,
425 F. 2d 397 (2d Cir. 1970) ....................................................................................15

*Husbands*,
Copyright Office Board of Appeals Letter, Control No. 10-600-754-2(C)
(May 14, 2002) ..............................................................................................14, 15, 16

*LaChapelle v. Fenty*,
812 F. Supp. 2d 434 (S.D.N.Y. 2011) ..........................................................................20

*N.Y. Mercantile Exch., Inc. v. Intercontinental-Exchange, Inc.*,
389 F. Supp. 2d 527 (S.D.N.Y. 2005) ..........................................................................15

*Petrella v. MGM*,
134 S. Ct. 1962 (2014) ...........................................................................................24

*Picture Music, Inc. v. Bourne, Inc.*,
457 F.2d 1213 (2d Cir. 1972) .....................................................................................7

*Richlin v. MGM Pictures, Inc.*,
531 F.3d 962 (9th Cir. 2008) ..........................................................................9, 16

*Ringgold v. Black Entm't TV*,
126 F.3d 70 (2d Cir. 1997)..........................................................................19, 21

*Ritani, LLC v. Aghjayan*,
880 F. Supp. 2d 425 (S.D.N.Y. 2012).....................................................................5

*Russell v. Price*,
612 F.2d 1123 (9th Cir. 1980) ...........................................................................19

*Scholz Design, Inc. v. Sard Custom Homes, LLC*,
691 F.3d 182 (2d Cir. 2012)..................................................................................5

*Sofa Entm't, Inc. v. Dodger Prods.*,
782 F. Supp. 2d 898 (C.D. Cal. 2010) ................................................................23

*Stewart v. Abend*,
495 U.S. 207 (1990)................................................................................................8

*Sweet v. Sheahan*,
235 F.3d 80 (2d Cir. 2000)....................................................................................5

**Statutes**

Copyright Act of 1909. ................................................................................ *passim*

**Other Authorities**

1 M. & D. Nimmer, *Nimmer On Copyright* (2015) ....................................................3

Compendium of Copyright Office Practices (1973).............................................12, 14

Fed. R. Civ. P. 8(a) ...................................................................................................5

Fed. R. Evid. 201(b)................................................................................................18

Thomas Howell, *The Writers' War Board: U.S. Domestic Propaganda In World War II*, THE HISTORIAN, Summer 1997, Vol. 59, Is. 4 ..........................................18

Plaintiffs TCA Television Corp. ("TCA"), Hi Neighbor and Diana Abbott Colton (collectively, "Plaintiffs") submit this memorandum of law in opposition to Defendants' Motion to Dismiss the Amended Complaint ("Amended Complaint" or "Compl.") for Failure to State a Cause of Action (the "Motion" or "Mot.").

## PRELIMINARY STATEMENT

As pled, Plaintiffs' Amended Complaint more than adequately sets forth claims for copyright infringement against Defendants. Indeed, Defendants' Motion papers admit that they copied almost verbatim in their Broadway play *Hand to God* (the "Play") the classic *Who's On First?* routine made famous by the renowned comedy team Abbott & Costello, and named the best comedy sketch of the 20th century by *Time Magazine*. Not only are Defendants' arguments improper on a motion to dismiss, as they bear on questions of fact that will be the subject of discovery (if discovery is even needed given Defendants' admission of copying without Plaintiffs' authority), but most of Defendants' assertions are unsupported and/or contradicted by the very documents that Defendants have submitted to this Court as "evidence" in supposed support of their Motion, as well as by the Copyright Act of 1909 (the "1909 Act") (the operative statute in this action), and legal precedent interpreting the 1909 Act in the context of motion pictures.

Defendants' principal argument is that the majority of the content in *Who's on First?* that appears in the 1940 motion picture *One Night in the Tropics* (the "1940 Motion Picture") has supposedly fallen into the public domain. This "public domain" argument, however, is based entirely on inapplicable case law and mere conjecture and speculation. Indeed, while the case of *Faulkner v. Nat'l Geographic Soc'y* ("*Faulkner I*"), 211 F. Supp. 2d 450 (S.D.N.Y. 2002), upon which Defendants rely extensively, deals with a **divisible composite** work (a magazine), the case at issue deals with a **unitary work** (a motion picture), and therefore could not have been

1

separately registered or renewed by Abbott & Costello (but only by the production company that properly registered and renewed the motion picture itself). Thus, *Faulkner I* is simply inapplicable, and Defendants' insistence that Abbott & Costello were the proper parties to register and renew the motion picture with the Copyright Office ignores case law directly on point, as well as Copyright Office practices and motion picture industry custom under the 1909 Act.

Defendants also erroneously argue that the lack of renewal of a 1944 registration entitled "Abbott and Costello Baseball Routine" somehow diminishes Plaintiffs' 1940 copyright in *Who's on First?*. Defendants have provided the Court with no record of the content or origin of that 1944 registration, filed "c/o the Writers' War Board" (the "War Board Registration") or whether Abbott and Costello authorized or even knew about it. Even if the 1944 War Board Registration included a derivative version of *Who's on First?*, its expiration had no copyright effect on the version that appeared in the 1940 Motion Picture. Still further, there is no basis for Defendants' claim of *de minimis* use or fair use of the extensive portion of *Who's on First?* that they admit appears in the Play. Defendants admit to copying verbatim 25% of *Who's On First?* as it appears in the 1940 Motion Picture. To argue that such use is *de minimis* or fair use is egregious. Accordingly, as set forth in greater detail herein, Plaintiffs respectfully submit that the Court should deny Defendants' Motion in its entirety.

## STATEMENT OF FACTS

Abbott & Costello, one of the most beloved American comedy duos of the twentieth century, first performed their most famous comedy act, *Who's on First?*, live on the popular radio show *The Kate Smith Hour* in 1938. (Compl. ¶¶ 30, 32).[1] Neither this performance, nor any other performance prior to the release of the 1940 Motion Picture, was published for

---

[1] For purposes of Defendants' Motion, all allegations in the Amended Complaint must be accepted as true.

purposes of registration under the 1909 Act.[2]   Over the next two decades, Abbott & Costello would go on to give thousands of performances of *Who's on First?*, with numerous variations. (Compl. ¶ 34).   The first performance of the routine that was "published," so as to divest that version of the work from common law protection and to invest it with federal copyright protection under the 1909 Act, was in the 1940 Motion Picture produced by Universal Pictures Co. Inc. ("UPC").[3]   (Compl. ¶ 42).   In 1945, Abbott & Costello performed an expanded, derivative version of *Who's on First?* in the UPC motion picture *The Naughty Nineties* (the "1945 Motion Picture").   (*Id.*).   All rights in the duo's performances in both the 1940 Motion Picture and the later 1945 Motion Picture were granted and assigned to UPC as well as any new matter created for the motion picture subject to agreement, either embodied in a November 1940 agreement (the "November 1940 Agreement") (Rachman Decl., Ex. A), or otherwise pursuant to an earlier July 1940 Agreement (the "July 1940 Agreement") (Rachman Decl., Ex. B).[4]   (Compl. ¶ 43).   In 1947, Abbott & Costello performed a well-known version of *Who's On First?* on their radio program (the "1947 Radio Performance").   (Compl. ¶ 35).   As with their earlier performances, this was not a publication under the 1909 Act.

As the author of a work-for-hire motion picture, UPC registered both the 1940 Motion Picture and the later 1945 Motion Picture with the Copyright Office, and timely renewed both

---

[2] Before January 1, 1978, the effective date of the Copyright Act of 1976, "common law copyright existed in a work from the moment of its creation and continued unless and until the work was published.  But upon publication of a work prior to January 1, 1978, the owner's common law protection therein was lost, through a forfeiture imposed by law…Likewise, publication was generally a condition precedent to obtaining statutory protection under the 1909 Act…"  1 M. & D. Nimmer, *Nimmer On Copyright* § 4.01[B] at 4-5 (2015) (footnotes omitted).  "The Copyright Act explicitly provided that 'a public performance… does not of itself constitute publication.'  This codifies the rule adopted by the courts under the 1909 Act."  *Id.*, §4.08[A] at 4.46.2.

[3] See discussion regarding investiture and divestiture in 1 *Nimmer*, §4.13[C] at 4-91.

[4] As discussed in Section II.A *infra*, a July 24, 1940 work-for-hire agreement preceded the November 1940 Agreement.  To the extent that Abbott & Costello's employment for UPC during the production of the 1940 Motion Picture is not covered by the November 1940 Agreement, the grant of all rights in Abbott & Costello's work on the 1940 Motion Picture is covered by the July 1940 Agreement.

registrations.[5]   In 1984, Universal Pictures ("Universal"), a division of the successor to UPC, entered into a quitclaim agreement with Abbott & Costello Enterprises ("ACE"), a general partnership formed by the heirs of Abbott & Costello (the "Quitclaim Agreement"), under which Universal granted ACE all rights, title and interest to the protected versions of *Who's on First?* in both the 1940 Motion Picture and the later 1945 Motion Picture, while Universal retained a perpetual license to distribute both motion pictures.  (Compl. ¶ 50).  In 1992, when ACE was dissolved, the rights granted by the Quitclaim Agreement passed to TCA (a corporation formed by Costello's heirs), and Abbott's son and daughter.  (Compl. ¶ 54).  Abbott's son transferred his share of the rights to his child, Diana Abbott Colton, and Abbott's daughter transferred her share to her company, Hi Neighbor.  (Compl. ¶ 56).

In April 2015, Defendants opened their Broadway Play to widespread critical acclaim. (Compl. ¶ 61-63).  The Play, a dark comedy, features a lengthy and critical scene in which the central character, Jason, and his demonic puppet ***perform*** an almost word-for-word reenactment of one minute and seven seconds of Abbott & Costello's *Who's on First?* routine.  (Compl. ¶ 64-66).  The segment of *Who's on First?* that the Play copies is the very heart of the routine, during which Abbott & Costello go back and forth misunderstanding what the other is saying about the name of the first baseman "Who," and is also the segment for which the entire routine is named. (Compl. ¶ 68).  Although in the Play the routine is being performed by Jason and his puppet rather than the characters used by Abbott & Costello, the tone of the routine is identical to Abbott & Costello's performances, and the purpose of the scene is also exactly the same—to elicit laughs, at which it succeeds very well.  (Compl. ¶ 74; Mot. Ex. D).  Shortly after learning

---

[5] Both motion pictures thereby qualified under the Copyright Act of 1976 and Sonny Bono Copyright Term Extension Act for copyright protection for a period of ninety-five years from the dates of their first publications. (Compl. ¶¶ 44-47).  Accordingly, federal copyright protections for the 1940 Motion Picture and the later 1945 Motion Picture do not expire until 2035 and 2040, respectively.  (Compl. ¶ 48).

of the unlicensed and unauthorized performance of *Who's on First?* in the Play, Plaintiffs brought the current action.

## ARGUMENT

### I.   LEGAL STANDARD

When weighing the evidence on a motion to dismiss, "the Court must limit itself to the facts alleged in the complaint, which are accepted as true; to any documents attached to the complaint as exhibits or incorporated by reference therein; to matters of which judicial notice **may** be taken; or to documents upon the terms and effect of which the complaint 'relies heavily' and which are, thus, rendered 'integral' to the complaint." *FC Online Mktg., Inc. v. Burke's Martial Arts, LLC*, 2015 U.S. Dist. LEXIS 89415, at *10 (E.D.N.Y. July 8, 2015) (emphasis added). Dismissal of the complaint is "inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000).

Fed. R. Civ. P. 8(a) requires only that the complaint make a short, plain statement showing that the pleader is entitled to relief. A complaint states a claim for relief if the claim is plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). In order to make out a claim of copyright infringement "a plaintiff must show ownership of a valid copyright and copying of the protectable elements of the copyrighted work." *Scholz Design, Inc. v. Sard Custom Homes, LLC*, 691 F.3d 182, 186 (2d Cir. 2012). However, "[n]either *Twombly* nor *Iqbal* requires a plaintiff in a copyright infringement action to plead specific evidence or extra facts beyond what is needed to make the claim plausible." *Ritani, LLC v. Aghjayan*, 880 F. Supp. 2d 425, 440 (S.D.N.Y. 2012) (internal quotations omitted).

## II.     *WHO'S ON FIRST?* IS PROTECTED BY VALID COPYRIGHT

The main focus of Defendants' Motion is their erroneous assertion that the version of *Who's on First?* performed in the Play has fallen into the public domain.[6]  This is simply false. First, as evidenced by the November 1940 Agreement, Abbott & Costello expressly granted UPC the right to use *Who's on First?* in the 1940 Motion Picture, and also assigned their rights in the version that appeared in that motion picture, which was created and performed for UPC as a work-for hire.  Second, because UPC was the owner of the 1940 Motion Picture, a unitary work, UPC properly registered and renewed the copyright in it, which included registration and renewal of the version of *Who's on First?* that appeared therein.  Third, since *Who's on First?* was protected by the timely registration and renewal of the 1940 Motion Picture, the non-renewal of the later 1944 War Board Registration, as to which there is no evidence of its contents or coverage, or who filed it, did not cause the protected 1940 version of the routine to fall into the public domain.  Accordingly, as set forth in further detail below, Plaintiffs hold a valid copyright in the material that Defendants use in the Play without license or authorization.

### A.     UPC Acquired Rights to *Who's on First?* Through the November 1940 Agreement or a July 1940 Agreement

On November 6, 1940, Abbott & Costello executed the November 1940 Agreement with UPC.  Under the terms of the November 1940 Agreement, Abbott & Costello granted UPC all rights in the existing versions of the *Who's on First?* routine in connection with the motion pictures that UPC produced, in which Abbott & Costello would perform:

> The Artists agree to **furnish and make available to the Producer all literary and dramatic material and routines heretofore used by the Artists** either on the radio or otherwise and **now owned by the Artists**, and the **Producer shall have the right to use said material and routines** to such extent as the Producer may desire in connection with any photoplay in which the Artists render their

---

[6] Defendants concede that the additional elements of the routine which are included in the 1947 Radio Performance of *Who's on First?*, but are not included in either the 1940 Motion Picture or the 1944 version of the routine, are not in the public domain.  (Mot. at 18).

> services hereunder and in connection with the advertising and exploitation of such photoplay.  The Artists warrant that they know of **no claims that the use of said material and routines or any part thereof as herein permitted will violate or infringe any copyright or any other right or rights** of any other person, firm or corporation whatsoever.

(November 1940 Agreement, § 5 (emphasis added)).  This language represented a clear grant of rights to UPC in all previous acts and routines created by Abbott & Costello, including, of course, the pre-existing versions of their most famous routine, *Who's on First?*, if used in any motion pictures produced by UPC in which Abbott & Costello provided their services.

The November 1940 Agreement was also a work-for-hire agreement:

> [T]he **Producer hereby engages and employs the Artists**, severally and as a team…to **render to the Producer their exclusive services as actors, performers and entertainers** in the portrayal of such roles or parts as may be designated by the Producer in such photoplays as may be designated by the Producer, and **further employs the Artists to render their services in consulting, advising, collaborating with and assisting the Producer in the preparation of stories and screen plays upon which such photoplays are to be based** and in otherwise performing such services as may be required of them pursuant to the provisions of this agreement.

(November 1940 Agreement, § 1 (emphasis added)).  Thus, the very first section of the November 1940 Agreement sets out the services that Abbott & Costello were expected to provide—specifically, to help prepare the content of motion pictures, and to perform that content.  Such content included a version of *Who's on First?*, and as such, was prepared as a work-for-hire for UPC.  Accordingly, UPC was considered the "author" of the version of *Who's on First?* that appeared in the 1940 Motion Picture for purposes of copyrighting the work, as the 1909 Act provided that "the word 'author' shall include an employer in the case of works made for hire."  1909 Act, § 62.  The fact that other versions of *Who's on First?* that had not been published for purposes of the 1909 Act pre-existed the 1940 Motion Picture did not prevent the version of the routine which appeared in the motion picture from being made as a work-for-hire.  *See, e.g., Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213, 1217 (2d Cir. 1972) (*Who's Afraid*

*of the Big Bad Wolf* held to be a work-for-hire where employers had recognized that the existing musical score of a cartoon could be adapted to a popular song and paid a musician to adapt the song). Here, UPC recognized that *Who's on First?* could be adapted to use in a motion picture, and hired Abbott & Costello to craft a revised version of the routine at its direction, which would be published for the first time for copyright registration purposes under the 1909 Act in the 1940 Motion Picture.

The November 1940 Agreement further provided that "[t]he Artists expressly give and grant to the Producer the right to photograph and/or otherwise reproduce any and all of their acts, poses, plays and appearances hereunder…" (November 1940 Agreement, § 4). Thus, Abbott & Costello assigned to UPC all rights to their acts and routines that appear in the motion pictures. And the law is clear that "[t]he author of a pre-existing work may assign to another the right to use it in a derivative work." *Stewart v. Abend*, 495 U.S. 207, 211 (1990).

In addition to the grant of rights in the pre-existing *Who's on First?* routines created by Abbott & Costello, as well as the assignment of all rights in the version written and performed for UPC as a work-for-hire for the 1940 Motion Picture, the November 1940 Agreement provides for a license back to Abbott & Costello of the pre-existing *Who's on First?* routines for uses unrelated to motion pictures:

> The **Artists reserve the right to use on the radio and in personal appearances** authorized under the terms of this agreement any material and routines referred to in this paragraph; **provided, however, that such material and routines shall have been created or used by the Artists prior to the date of this agreement or created by the Artists solely** (or by writers employed by the Artists in connection with services other than motion pictures) during the term of this agreement.

(November 1940 Agreement, § 5 (emphasis added)). In other words, Abbott & Costello were allowed to continue to use and perform, on the radio or in personal appearances, versions of *Who's on First?* that pre-dated the 1940 Agreement, or that were created separate and apart from

the motion pictures produced by UPC thereunder.  This allowed Abbott & Costello the freedom to use their material, while at the same time protecting UPC's investment in the duo and in the copyright in UPC's motion pictures.

While Abbott & Costello performed versions of *Who's on First?* prior to 1940, both on vaudeville and on the radio, under the 1909 Act, none of those performances were deemed a "publication" for copyright purposes.  *See* note 2, *supra*.  Consequently, the first time that *Who's on First?* was published, and therefore the first time that it obtained copyright under the 1909 Act, was in the 1940 Motion Picture.  A motion picture, such as the 1940 Motion Picture, is an integrated work, as it "is a work to which many contribute; however, those contributions ultimately merge to create a unitary whole."  *Richlin v. MGM Pictures, Inc.*, 531 F.3d 962, 975 (9th Cir. 2008).  Accordingly, there can be no dispute that, until the 1984 execution of the Quitclaim Agreement, UPC was the <u>sole</u> owner of the federal copyright in the 1940 Motion Picture and the 1945 Motion Picture, and was therefore the <u>only</u> party eligible to register or renew the *Who's on First?* routines contained therein.

While Defendants argue that the routine could not be both a work-for-hire for UPC, and the subject of a grant or assignment from Abbott & Costello to UPC (Mot. n.5), in fact, that is exactly what it was.  Under the November 1940 Agreement, Abbott & Costello granted their pre-existing common law copyright in *Who's on First?* to UPC, also assigned the right to use the routine in a derivative work, and further agreed to write and perform in such derivative work as a work-for-hire – *i.e.*, the version of the routine written for and performed in the 1940 Motion Picture.  Defendants' assertion that Abbott & Costello would never have made such an assignment, (Mot. n.10), is complete conjecture that is wholly belied by the November 1940 Agreement and the copyright registration filed by UPC.  In fact, Abbott & Costello's relationship

with UPC launched their career to greater heights than it had ever seen before, and, as previously described, the November 1940 Agreement provided for a license of *Who's on First?* back to Abbott & Costello, so that they were free to use the routine to promote themselves in whatever way they wished, as long as the use was unrelated to the motion pictures they made for UPC.

To the extent that Defendants argue that Abbott & Costello's creation of and performance of the *Who's on First?* scene in the 1940 Motion Picture was not covered by the November 1940 Agreement, then alternatively, it certainly was covered by a July 1940 Agreement, which provided that:

> The Artists expressly **give and grant to the Producer the sole and exclusive right to photograph and/or otherwise reproduce any and all of their acts**, poses, plays and appearances of any and all kinds during the term hereof, and further agree to furnish to the Producer, without charge to it, the material and routines heretofore used and now owned by the Artists **for use by the Producer in the photoplay in which they appear hereunder and for which the Producer shall have exclusive motion picture rights**, and to record their voices and all instrumental, musical and other sound effects produced by them, and to reproduce and/or transmit the same, either separately or in conjunction with such acts, poses, plays and appearances as the Producer may desire, and **further give and grant to the Producer solely and exclusively all rights of every kind and character whatsoever in and to the same**, or any of them, perpetually…

(July 1940 Agreement, § 4 (emphasis added)).[7]  This language conveys an absolute grant of all rights in all of Abbott & Costello's acts and performances thereof in motion pictures produced under the July 1940 Agreement for UPC.  Thus, to the extent that Abbott & Costello's contribution to the 1940 Motion Picture in the form of the *Who's on First?* routine appearing therein might not be governed by the November 1940 Agreement, then the July 1940 Agreement still provides that their entire contribution to the motion picture, including pre-existing versions of the routine, is the sole property of UPC.

---

[7] Plaintiffs discovered the July 1940 Agreement after the filing of the Amended Complaint and will seek leave to amend the Amended Complaint to incorporate it therein. *See* Declaration of Marc J. Rachman in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Rachman Decl.").

While the term of Abbott & Costello's employment with UPC was superseded by the November 1940 Agreement, the November 1940 Agreement provided that:

> [s]uch termination [of the employment term of the July 1940 Agreement]…shall not prejudice, impair or affect the ownership by the Producer of all rights heretofore acquired by the Producer in and to any results and proceeds of any services heretofore rendered for the Producer by the Artists or in or to any literary, dramatic or other material furnished or supplied by the Artists to the Producer…

(November 1940 Agreement, § 29).  This language preserves all of UPC's ownership rights in Abbott & Costello's work product, including all rights to the *Who's on First?* routine that were conveyed by the July 1940 Agreement.  This fact is further underscored elsewhere in the November 1940 Agreement, which emphatically states that "[n]othing herein contained shall be construed to vest in or grant to the Artists any right, title or interest whatsoever in or to any photoplay referred to in this agreement or any proceeds derived therefrom."  (November 1940 Agreement, § 25).  The result is clear—Abbott & Costello owned nothing in the *Who's on First?* routine as it appeared in in the 1940 Motion Picture, and UPC owned everything.

Still further, Defendants erroneously argue that the Quitclaim Agreement, under which Universal granted to ACE all rights to the *Who's on First?* routines that appeared in both the 1940 Motion Picture and the 1945 Motion Picture, proves that UPC never acquired ownership of *Who's on First?* in the first place.  (Mot. 15).  Specifically, Defendants note language in the Quitclaim Agreement stating "that [ACE] is therefore the owner of copyright in and to the Routine" as evidence that UPC was not the owner of the routine for purposes of the 1940 Motion Picture and the 1945 Motion Picture federal copyright registrations.  (*Id.*; Compl. Ex. 3).  This is nonsensical and contradicts the plain meaning of the Quitclaim Agreement.  It is clear that this language is referring to ACE as the owner of the *common law* copyright in *Who's on First?*, not the federal copyrights, and that the Quitclaim Agreement served to concentrate the ownership of

the *Who's on First?* rights in one entity – ACE, a partnership composed of Abbott & Costello's heirs.  Furthermore, had UPC not owned all rights to *Who's on First?* in the 1940 Motion Picture and the 1945 Motion Picture, such that it did not have the power to grant the rights to ACE, the Quitclaim Agreement would have been utterly pointless.  Accordingly, Defendants' reading of the Quitclaim Agreement is entirely unfounded.

### B.     The 1940 Motion Picture Was Properly Renewed by UPC

Because UPC was the sole claimant of all rights in the 1940 Motion Picture, and all the content therein, it was the only entity with the right to renew the federal copyright in such motion picture.  Section 23 of the 1909 Act provides that the right of renewal in a work-for-hire rests with the employer for whom such work was made.  As detailed in Section II.A *supra*, the version of *Who's on First?* that was written exclusively for and performed in the 1940 Motion Picture was prepared as a work-for-hire pursuant to the November 1940 Agreement.[8]  However, the *Who's on First?* routine that appears therein is only a small segment of the 1940 Motion Picture, the majority of which contents Abbott & Costello had no part in creating and made no contribution.  Indeed, the Copyright Office's Compendium I, which was in effect during the 1909 Act, describes a motion picture as "ordinarily…embody[ing] a large number of contributions, including those of the author of the story, author of the screenplay, director, editor, cameraman, individual producer, etc.  These persons are not regarded as the 'author' of the film in the copyright sense."  Compendium of Copyright Office Practices (1973) ("Compendium I"), § 2.14.3 (III)(a)(2)(1).  Furthermore, the Copyright Office recognizes that "most films are largely 'made for hire' [and] the employer is usually regarded as the 'author,' [which is i]n most cases…the producing company."  Compendium I, § 2.14.3 (III)(a)(2)(2).  These are the exact circumstances of the instant case.  Thus, despite Defendants' unfounded assertions to the

---

[8] Or, as previously discussed, pursuant to the July 1940 Agreement.

contrary, Abbott & Costello had no right whatsoever to renew the copyright in the 1940 Motion Picture, a full-length motion picture of which they were not the authors, but which instead was solely owned and authored by UPC.

Defendants rely principally on the *Faulkner I* case, *supra*, in which freelance writers and photographers sued the magazine National Geographic for copyright infringement, alleging that the magazine had infringed their copyrights by republishing their written and photographic works outside the limited rights granted to it. The magazine had published the photographs and texts of one of the plaintiffs, Arthur Allen, and then registered them for copyright (as part of the collective works of magazine issues). 211 F. Supp. 2d at 458. Allen's son and heir, David, argued that his father's works had not fallen into the public domain, because the magazine issues containing the works had been timely renewed by the magazine *Id.* at 464. The court, however, found that it was incumbent upon the Allens to have renewed the copyright in their particular photos and texts, because (unlike Abbott & Costello in the present case), theirs was not a case where they were at the mercy of National Geographic; rather, "the Allens needed no one but themselves to file a claim for renewal." *Id.* at 466. Affirming the decision on reconsideration, the court elaborated that:

> [s]ection 24 of the Copyright Act of 1909…gave the proprietor **of a collective work** the right to renew its copyrights in the collective work itself (*i.e.*, the collection, arrangement, and display of constituent parts) and any individual contributions that it initially held copyright ownership in, but it did not create a renewal right for contributions **in which the proprietor had no copyright ownership interest in the initial term**.

*Faulkner v. Nat'l Geographic Soc'y* ("*Faulkner II*"), 220 F. Supp. 2d 237, 239 (S.D.N.Y. 2002) (emphasis added). The court reasoned that, although it was the proprietor of the collective work (the magazine issue), National Geographic's renewal rights in Allen's works were precluded, as it "never had any ownership interest in the individual contributions in the first place," and the

works therefore lapsed into the public domain as a result of the Allens' failure to renew their copyright in their individual contributions. *Id.* at 240.

Defendants' reliance on *Faulkner* is ill-founded and misleading. The work at issue in the instant case is a motion picture, which the law treats as an integrated work where the component elements are indivisible from each other, not a composite work like the magazine in *Faulkner*. Because the articles and photographs that were part of the composite work in *Faulkner* were not owned by National Geographic when they were included in the magazine, but were divisible therein, they could have been renewed separately from the magazine by the plaintiffs. In direct contrast, Abbott & Costello were completely at the mercy of UPC in obtaining a renewal of the *Who's on First?* routine in the 1940 Motion Picture because that routine was <u>not</u> separable from the rest of the motion picture. As noted by the Copyright Office, countless other contributions in addition to Abbott & Costello's went into creating the 1940 Motion Picture in general. *See* Compendium I, § 2.14.3 (III)(a)(2)(1). There is no distinguishing Abbott & Costello's contribution from those of all the others involved in the filmmaking process for purposes of copyright registration or renewal. Consequently, the *only* proper entity to do either was UPC, which owned the sum of all the contributing parts, the 1940 Motion Picture. The photographs and texts at issue in *Faulkner* could literally have been cut out of the magazine issue, a composite work—not so for Abbott & Costello's contribution to the 1940 Motion Picture, a unitary, integrated work. *Faulkner* is thus completely inapplicable to the facts at issue.

By contrast, a Copyright Office Board of Appeals decision which is directly on point, as it deals with renewal rights of an individual contributor to a motion picture (as opposed to a magazine or other composite work), is *Husbands*, Copyright Office Board of Appeals Letter,

14

Control No. 10-600-754-2(C) (May 14, 2002) (attached hereto as Ex. 1).[9]   There, the heirs of

John Cassavetes, author of the screenplay for the motion picture *Husbands*, sought to renew the

registration for such screenplay, which had no separate copyright registration, but had originally

been registered as part of the motion picture by the production company.   *Id.* at 1.   The

Copyright Office refused to grant the renewal, based on "the Office's classification of a motion

picture as an integrated work of authorship requiring the positive step of reserving any separate

original-term copyright for an aspect of, or contribution to, the soundtrack in which separate

ownership was the case."   *Id.* at 8.   The Copyright Office specifically noted that it "did not

consider the authorship of a motion picture to be a composite work, i.e. a work consisting of

distinct and separable contributions which do not merge into a unitary whole."   *Id.* at 2.   The

opinion went so far as to specifically distinguish *Goodis v. United Artists Television, Inc.*, 425 F.

2d 397 (2d Cir. 1970), a case in which the individual contributor's copyright was found to be

protected:

> it is the position of the Office that a motion picture has not been regarded as a composite
> work for registration purposes as was the magazine in <u>Goodis</u>; this position prevents the
> Office from placing the renewal for the screenplay on the public record. The failure of the
> screenplay author Cassavetes…to have reserved via registration the copyright in the
> unpublished version of the screenplay…, thus rendering the screenplay's copyright for
> purposes of the public registration record separate and apart from the copyright in the
> motion picture, means that the Office**, viewing the motion picture as an integrated
> entity, cannot now insert into the public record a claim to renewal rights owned by a
> party different from the owner of record of the rights in the integrated entity, i.e., in
> the motion picture as a whole.**

*Id.* at 6 (emphasis added).   The Copyright Office could not have addressed the issue at hand

more clearly or directly.   While Defendants' Motion rests on its argument that the *Who's on*

*First?* routine contained in the 1940 Motion Picture was injected into the public domain as a

result of Abbott & Costello's failure to separately register or renew its copyright, the plain fact

---

[9] "[T]he policies and interpretation of the [Copyright] Office are entitled to deference."   *N.Y. Mercantile Exch., Inc.*
*v. Intercontinental-Exchange, Inc.*, 389 F. Supp. 2d 527, 543 (S.D.N.Y. 2005).

is, under the law, Abbott & Costello had no right to do so and could not have done so.  Instead, such registration and renewal could only be done by UPC, which did so timely.[10]

But there is more case law on point directly contrary to Defendants' position.  In *Richlin v. MGM Pictures, Inc.*, 531 F.3d 962, 964 (9th Cir. 2008) plaintiff Richlin, coauthor of a story treatment, assigned all rights in the treatment for use by a company producing the motion picture *The Pink Panther*.  Richlin's heirs argued that the previously unpublished treatment was entitled to independent statutory copyright by its inclusion in the copyright registration for the motion picture.  *Id.* at 975.  The Ninth Circuit rejected this argument.  Citing *Husbands* as precedent, and noting the persuasiveness of the logic in that opinion "[e]ven absent the principle of deference to the views of the Copyright Office," the court found that "[a] motion picture is a work to which many contribute; however, those contributions merge to create a unitary whole," and "it is impossible to cleave the story, screenplay and musical score of a motion picture film from the film itself."  *Id.* at 975 (internal quotations omitted).  *Husbands* and *Richlin* completely dispel any notion that *Faulkner,* or any other case dealing with a composite work (such as a magazine), has any applicability to the case at hand (which deals with an integrated motion picture).

Further, in contrast to *Faulkner*, where the works were not created subject to any employment agreement (but were owned by the individuals who actually created them), the *Who's on First?* routine in the 1940 Motion Picture was created and performed as a work-for-hire, such that UPC owned the copyright to it at the time that it was first created.  *Faulkner* is thus distinguishable from the instant case for this additional, independent reason.  Indeed, the *Faulkner* court specifically exempts from its analysis a situation in which Arthur Allen's works were made for hire, in which case the court recognizes that National Geographic would have

---

[10] No doubt had Abbott & Costello purported to register and/or renew the *Who's on First?* routine as it appeared in the 1940 Motion Picture, Defendants would now be arguing (correctly, under *Husbands*) that such registration and/or renewal by Abbott & Costello was improper and injected the routine into the public domain.

been entitled to renew them as the author. *Faulkner I*, at 465. Accordingly, even had Abbott & Costello's individual contribution been part of a composite work, rather than a unitary motion picture, UPC would still have been the appropriate entity to renew the copyright to *Who's on First?* contained in the1940 Motion Picture, as it was created and performed as a work-for-hire.

### C.    The 1944 War Board Registration Has No Effect on Plaintiffs' Valid Copyright

Defendants baselessly argue that the non-renewal of the War Board Registration led to the lapse of copyright protection for the 1940 *Who's on First?* routine, despite that fact that they offer no evidence whatsoever as to the contents of the War Board Registration (Mot. Ex. B), or whether Abbott & Costello authorized its filing.

There is absolutely nothing in the War Board Registration of which the Court may take judicial notice, and it should therefore be disregarded by the Court in connection with Defendants' Motion. The document contains very limited information, except that the registered work is entitled "Abbott and Costello Baseball Routine," by Bud Abbott and Lou Costello of the United States in "Soldier Shows," No. 19, and that it was registered "c/o Writers War Board.*"* There is no deposit accompanying the certificate. Indeed, upon information and belief, the records have been lost to time. Nevertheless, Defendants would have the Court believe that Abbott and Costello filed a copy of script of a radio performance of *Who's on First?*, which they failed to timely renew. This is utter speculation inappropriate for a motion to dismiss or any other motion.

Somehow, perhaps based on the words "War" and "Soldier" in the certificate, Defendants proclaim that the War Board Registration was for a script of *Who's on First?* for a performance on *Mail Call*, a radio program produced by the Armed Forces Radio Service in order to entertain soldiers during World War II. This information is improper to bring on a motion to dismiss, as it

17

is not referenced in the Amended Complaint or the War Board Registration, and is not a matter of which judicial notice may be taken, as it is "subject to reasonable dispute," is not "generally known within the trial court's territorial jurisdiction," and cannot "be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."   Fed. R. Evid. 201(b).

Moreover, Defendants are simply wrong.  In reality, it is far more likely that the deposit was a script of an Abbott & Costello routine – perhaps *Who's on First?* but perhaps not – that was distributed to soldiers by the Writers' War Board, a World War II propaganda organization comprised of writers,[11] to perform for their fellow soldiers.  This was the aim of the "Soldier Shows,"[12] which are specifically referenced in the War Board Registration certificate.  This explanation is supported by the limited information available in the War Board Registration certificate, while there is no justification whatsoever for Defendants' half-baked theory, nor for the Court to consider this registration at all on a motion to dismiss.  Indeed, Defendants have no way of telling whether Abbott & Costello even authorized the War Board Registration.  After all, what little information the certificate does contain states that the registration was filed *care of the Writers' War Board*, and may in fact have been filed by the Writers' War Board, without Abbott & Costello's knowledge or consent – in which case, the War Board Registration would be invalid.  The key point is that *Defendants do not know*, and cannot invalidate Plaintiffs' claim on the basis of mere conjecture.

---

[11] "[T]he little known Writers' War Board (WWB) [was] established to promote government policy and popular support for the war effort while the government itself technically refrained from propaganda."  Thomas Howell, *The Writers' War Board: U.S. Domestic Propaganda In World War II*, THE HISTORIAN, Summer 1997, Vol. 59, Is. 4, at 795.  (Rachman Decl., Ex. C).

[12] Further information about Soldier Shows is available at http://sca.gmu.edu/finding_aids/becher.html.  (Rachman Decl., Ex. D).

Furthermore, regardless of what was or was not included in the actual deposit of the War Board Registration, which may never be known, what is certain is that it had no effect on the registration of the 1940 Motion Picture. Only the new matter in the War Board Registration (which again, is unknown) lapsed into the public domain when it was not timely renewed. *See, e.g., Russell v. Price*, 612 F.2d 1123, 1128 (9th Cir. 1980) (failure to renew derivative "Pygmalion" movie copyright did not put underlying play in the public domain). Accordingly, the *Who's on First?* routine that appeared in the 1940 Motion Picture, which Defendants admit is the version at issue in this infringement action, (Mot. 9), remains protected under a valid copyright.

## III.   PLAINTIFFS' USE OF *WHO'S ON FIRST?* IS NOT *DE MINIMIS*

Defendants baselessly argue that their infringing use of *Who's on First?* in the Play is *de minimis* as it merely contains the additional content in the 1947 Radio Performance which is not in the *Who's on First?* version contained in the 1940 Motion Picture version, based on Defendants' contention that the 1940 version fell into public domain. However, as detailed in Section II *supra*, pursuant to the November 1940 Agreement, UPC acquired the rights to *Who's on First?*, and accordingly, the proper point of comparison on the *de minimis* issue is the version of the routine in the 1940 Motion Picture, not just the new material in the 1947 Radio Performance.

As such, Defendants' claim of a *de minimis* use is meritless. The Play takes almost 25% of the very heart of the *Who's on First?* routine from the 1940 Motion Picture, lasting over a minute. In *Ringgold v. Black Entm't TV*, 126 F.3d 70, 77 (2d Cir. 1997), the Second Circuit found that the use of a copyrighted poster in the background of a television show (the ROC), which in the aggregate appeared for about 26 seconds of the show, was not *de minimis*. The court explained that such use was not *de minimis* because it was sufficient for the viewer to

discern the features of the poster.  Defendants' 1 minute and 7 seconds use of *Who's on First?* in the Play is thus clearly not *de minimis* under this standard.  It is not only discernable, but it is a significant part of the Act in the Play, obtaining big laughs from the audience (which is obviously one of the reasons why it is used), and it is referenced in numerous reviews cited by Defendants in their Motion.  (Mot. 4).

## IV.    PLAINTIFFS' USE OF *WHO'S ON FIRST?* IS NOT FAIR USE

Defendants also baselessly argue that their unauthorized copying of *Who's On First?* is allegedly fair use.  In Act 1, Scene 2, which occurs about 15 minutes into the Play, the lead character Jason and his puppet Tyrone perform and recite virtually verbatim the entire first thirty-seven seconds of the *Who's On First?* routine as it appears in the 1940 Motion Picture, as well as the first minute and six seconds of the routine as it appears in the 1945 Motion Picture, both of which, as previously discussed, are fully protected by federally registered copyrights.  Neither instance is a fair use.

The Supreme Court has endorsed a four-factor test to determine whether use of Plaintiffs' valid copyrights is a fair use, and looks to: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work."  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994).  Determination of this issue is inappropriate on a motion to dismiss, as "the record is insufficient to make such a fact-intensive ruling as a matter of law."  *LaChapelle v. Fenty*, 812 F. Supp. 2d 434, 448 (S.D.N.Y. 2011) (declining to address fair use defense on motion to dismiss).  Nevertheless, as set forth in further detail below, it is abundantly clear from the facts alleged in

the Amended Complaint and the subject works in issue that Defendants' use of *Who's on First?*
in the Play utterly fails the four-factor test.

### A.    Purpose and Character of Use

The first factor, the purpose and character of the use, clearly weighs heavily against a
finding of fair use in this case, as Defendants' use is not transformative, but merely re-enacts the
routine as Abbott and Costello performed it.   As the Second Circuit explained in *Cariou v.
Prince*, 714 F.3d 694, 705 (2d Cir. N.Y. 2013), in determining the first factor, the Court looks to

> whether the new work merely 'supersedes the objects' of the original creation, or
> instead adds something new, with a further purpose or different character,
> altering the first with new expression, meaning, or message . . .

Here, other than the change of the characters from Abbott and Costello to the lead Jason and his
puppet Tyrone, there is nothing in the presentation of *Who's on First?* that adds anything
materially new or provides a different aesthetic.   Indeed, the very purpose of the scene is to elicit
laughs, which it clearly does, just as was the purpose of the original works.   (*See* Mot. Ex. D).
The use is similar to the use in *Ringgold v. Black Entertainment TV*, 126 F.3d 70, 79 (2d Cir.
N.Y. 1997), where the Second Circuit found that the inclusion of a poster in the background of a
television show was not transformative as it was used for the same purpose as the original, as a
decoration.

Although Defendants contend that there "was an enormously different purpose in the
presentation of a snippet from the Routine in the Play than in Abbott & Costello's
performances," (Mot. 19), their analysis is entirely misplaced.   The scene in the Play is
performed in the exact same tone, and for the exact same purpose – for audience laughs, which it
receives in spades.   (*See* Mot. Ex. D).   Unknowingly, Defendants have included the best
evidence of the identical purpose and character of the Play's use in their Motion by citing the
unbiased *New York Times* reviewer's description of "Jason…*performing the classic Abbott and*

*Costello 'Who's-on-First?' routine*." (Mot. 4 (emphasis added)). In point of fact, that is all the scene at issue is – a straight performance of Abbott & Costello's classic routine.[13] The viewer of the scene, the appropriate perspective to consider in determining fair use – *see Cariou*, 714 F.3d at 707 ("we…examine how the artworks may 'reasonably be perceived' in order to assess their transformative nature") – clearly does not view the Play performance as transformative in any way. It is simply a near-verbatim performance of *Who's on First?*.

As to whether the use is a commercial use, this factor becomes more important where the use is not transformative, as here it is not. The Play itself is clearly a commercial enterprise and the infringing use of *Who's on First?* is being used to promote the Play. As alleged, a video of the scene was formerly available on Broadway.com and on YouTube, where viewers were able to buy tickets to the Play through direct links. (Compl. ¶ 69). The scene is also viewable in the NY Times online review of the Play. *See* http://www.nytimes.com/2015/04/08/theater/review-hand-to-god-features-a-foul-talking-puppet.html?_r=0. Clearly, the *Who's on First?* scene is a significant scene in the Play and is being used for a commercial purpose, i.e., to promote the Play.

### B.    Nature of the Copyrighted Work

The second fair use factor, the nature of the copyrighted work, also weighs heavily against fair use. This factor looks at whether the original work is a creative expression that has been published. *Cariou*, 714 at 709-10. There is no question that *Who's On First?* is a creative work that has been published. Defendants' entire argument on this factor is that *Who's on First?* is merely a "riff on a classic theme," and compares Abbott & Costello's creation of the act to "song styling." This assertion hardly bears mention, as there is no comparison between Abbott

---

[13] *Compare Bill Graham Archives, LLC v. Dorling Kindersley Ltd.*, 386 F. Supp. 2d 324, 329 (S.D.N.Y. 2005), *aff'd* 448 F.3d 605 (2d Cir. 2006) (thumbnail use of images placed in chronological order on timeline in biography transformatively different from mere expressive use as posters and tickets).

& Costello's authorship of one of the most famous comedy acts of all time, and the reworking of a song's melody.

### C.      Amount and Substantiality of Portion Used in Relation to Copyrighted Work as a Whole

The third fair use factor, the amount and substantiality of the portion used in relation to the copyrighted work as a whole, also weighs heavily against fair use.  The Play uses about 25% of the entire routine from the 1940 Motion Picture, about 20% of the entire routine from the 1945 Motion Picture and about 21% of the entire routine from the 1947 Radio Performance.  This may be contrasted to the unauthorized use of a seven-second clip of *The Ed Sullivan Show* in the Broadway show *Jersey Boys*, which the Central District of California found to weigh in favor of fair use.  *See Sofa Entm't, Inc. v. Dodger Prods.*, 782 F. Supp. 2d 898, 906 (C.D. Cal. 2010).  There, the plaintiff did not argue that the seven-second clip represented a substantial amount of the entire *Ed Sullivan* episode, whereas here, the infringing scene in the Play is over a minute long, and constitutes between 20-25% of the original works.

While Defendants argue that the scene in the Play "is actually little more than the introductory premise of the bit," (Mot. 21), in fact, it copies the very heart of the routine.  The Play scene features most of the interplay about "Who's on First," which is how the general public references and identifies the routine, including the Play itself.  Indeed, in two separate instances after the *Who's On First?* scene in the Play, characters make reference back to Jason and the puppet's performance, calling it "*Who's On First?*."  All of this clearly shows that the third factor weighs strongly against fair use.

### D.      Effect of the Use Upon the Potential Market for the Value of the Copyrighted Work

Finally, the fourth factor, the effect of the use upon the potential market for the value of the copyrighted work, also weighs heavily against fair use.  As alleged, Plaintiffs have a history

of charging a license fee for the use of *Who's On First?* in other dramatic works, advertising and events.  (Compl. ¶ 82).  For example, Plaintiffs licensed a use of 20 seconds of *Who's on First?* in a scene in the motion picture *Rain Man*, for which the licensee paid a significant fee (which, incidentally prohibited promotional use).  Clearly, by not paying a royalty for a one minute and seven-second section of the routine in a successful Broadway play, as well as in its advertising and promotion, and by not providing any credit or compensation for such use, the value of *Who's On First?* in the potential marketplace has been diminished.

Defendants' sole argument on this factor is that the text of *Who's on First?* is freely available on the internet.  This argument has no merit, and underscores Defendants' dearth of understanding of copyright law:

> It is hardly incumbent on copyright owners, however, to challenge each and every actionable infringement. And there is nothing untoward about waiting to see whether an infringer's exploitation undercuts the value of the copyrighted work, has no effect on the original work, or even complements it. Fan sites prompted by a book or film, for example, may benefit the copyright owner. See Wu, Tolerated Use, 31 Colum. J. L. & Arts 617, 619-620 (2008). Even if an infringement is harmful, the harm may be too small to justify the cost of litigation.

*Petrella v. MGM*, 134 S. Ct. 1962, 1965-1966 (2014).  Plaintiffs cannot police every single instance of infringement of *Who's on First?*, which is widely considered the most famous comedy routine of all time.  The availability of *Who's on First?* on the internet has no bearing on Defendants' culpability for using it in their for-profit Broadway show eight times a week without Plaintiffs' permission.

## V.       DISCOVERY IS NEEDED RE: VICARIOUS/CONTRIBUTORY INFRINGEMENT

Defendants argue that identifying some of the individual defendants as "producers" does not support claims of vicarious and/or contributory infringement, as these defendants are merely "passive" investors.  However, Defendants have produced no evidence to prove, or even identify

the meaning of, "passive" investor.  Accordingly, this issue requires discovery, and is improper on a motion to dismiss.  Furthermore, all that is required of Plaintiffs is that they make a short, plain statement stating a plausible claim for relief.  *Iqbal,* 556 U.S. at 678-79.  Plaintiffs have done so, alleging, upon information and belief, that Defendants are capitalizing on Plaintiffs' valid copyright without authorization or license.  (Compl. ¶¶ 2-4).  Accordingly, Plaintiffs have adequately pled vicarious and contributory infringement.

**VI.    NO IMPACT ON COMMON LAW COPYRIGHT OF 1947 RADIO PERFORMANCE**

Under New York state law, common law copyright continues to be enforced for pre-1972 sound recordings.  *Capitol Records, Inc. v. Naxos of Am., Inc.*, 4 N.Y.3d 540, 562-63 (N.Y. 2005) ("Until 2067, no federal or state statutory impediment constricts this common-law durational component for pre-1972 sound recordings.").  The 1947 Radio Performance of *Who's on First?*, as well as all pre-1972 radio broadcast performances of the routine, are protected by common law copyright.  (Compl. ¶ 53).  Defendants freely admit that "there is extensive new material in the 1947 Version that might qualify for common law copyright under the rules that existed under the 1909 Act," but then go on to assert, without citing to any authority, that the 1947 Radio Performance has fallen into the public domain.  (Mot. 23-24).  Even if it were true that the 1940 and 1945 Motion Picture versions of *Who's on First?* have fallen into the public domain (which they clearly have not for the reasons previously addressed), new material in the 1947 Radio Performance would remain protected under common law copyright.

## CONCLUSION

For all the reasons set forth above, Defendants' Motion should be denied in its entirety.

Dated: New York, New York
      July 31, 2015

Respectfully submitted,

*Marc J. Rachman*      
Marc J. Rachman
mrachman@dglaw.com
Brandie J. Lustbader
blustbader@dglaw.com
Davis & Gilbert LLP
1740 Broadway
New York, New York 10019
(212) 468-4800
(212) 468-4888

*Counsel for Plaintiffs TCA Television Corp., Hi Neighbor and  Diana Abbott Colton*