**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TCA TELEVISION CORP., HI NEIGHBOR, and:
DIANA ABBOTT COLTON,

      Plaintiffs,   :

  -against-      :

KEVIN MCCOLLUM, THE ENSEMBLE STUDIO:
THEATRE, INC., MANHATTAN CLASS:
COMPANY, INC., ROBERT ASKINS, HAND TO:
GOD LLC, and DOES and ABC COMPANIES 1-10,:

      Defendants. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: DEC 17 2015

<u>MEMORANDUM DECISION</u>
<u>AND ORDER</u>

15 Civ. 4325 (GBD)

**GEORGE B. DANIELS, United States District Judge:**

Plaintiffs, TCA Television Corporation, Hi Neighbor, and Diana Abbott Colton, filed this action against Defendants, Kevin McCollum, The Ensemble Studio Theatre, Inc., Manhattan Class Company, Inc., Robert Askins, Hand to God LLC, and Does and ABC Companies 1-10, under 17 U.S.C. § 101 of the Copyright Act of 1976 and New York common law copyright.

This action arises out of Defendants' use of dialogue from the iconic comedy routine, *Who's On First?* ("the Routine"), in their critically-acclaimed Broadway dark comedy, *Hand to God*, as well as in the play's promotional video. (*See* Am. Compl., (ECF No. 3), ¶ 1.)

In their Amended Complaint, Plaintiffs, the heirs of Abbott and Costello, allege that they own valid copyrights in *Who's on First?*, and that despite requests to Defendants to cease and desist their unauthorized use of material from the Routine in *Hand to God*, Defendants continue to "willfully capitalize on Abbott & Costello's world-famous reputation and Plaintiffs' copyrighted works." (*Id.* ¶¶ 4-5.)  Plaintiffs seek damages, restitution, disgorgement, injunctive relief, and attorneys' fees. (*See id.* ¶¶ A-F.)

Defendants move to dismiss the Amended Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing, *inter alia*, that the Plaintiffs have failed to allege a continuous chain of title in the Routine, that the Routine has passed into the public domain, and that they have made fair use of the Routine.  (Am. Mot. to Dismiss, (ECF No. 55); Defendant's Mem. in Supp. of Mot. to Dismiss ("Mem."), (ECF No. 51), at 1.) [1]

Because Plaintiffs have not sufficiently alleged a claim for federal or New York common law copyright infringement, Defendants' motion to dismiss for failure to state a claim is GRANTED.

## I.   **Standard of Review**

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The plaintiff must demonstrate "more than a sheer possibility that a defendant has acted unlawfully"; stating a facially plausible claim requires pleading facts that enable the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678.  Thus, the factual allegations pleaded "must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

A district court must first review the plaintiff's complaint to identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."  *Iqbal*, 556 U.S. at 679.  The court then considers whether the plaintiff's remaining well-pleaded factual allegations, assumed to be true, "plausibly give rise to an entitlement to relief."  *Id.*  In deciding

---

[1] The motion was fully submitted following the filing of Plaintiff's Opposition brief ("Opp'n," (ECF No. 61)) and Defendant's Reply brief ("Reply," (ECF No. 63)).  This Court heard oral argument regarding this motion on September 9, 2015.  *See* September 9, 2015 Oral Argument Transcript ("Tr.").

the 12(b)(6) motion, the court accepts the complaint's well-pleaded factual allegations as true and draws all reasonable inferences in the non-moving party's favor. *See N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 119 (2d Cir. 2013).

"In deciding a motion to dismiss under Rule 12(b)(6), the court may refer 'to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.'" *Fishbein v. Miranda,* 670 F. Supp. 2d 264, 271 (S.D.N.Y. 2009), *aff'd sub nom. Silverman v. Teamsters Local 210 Affiliated Health & Ins. Fund*, 761 F.3d 277 (2d Cir. 2014) (quoting *Brass v. Am. Film Tech., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)); *see also Hayes v. Coughlin,* No. 87 Civ. 7401, 1991 WL 220963, at *1 (S.D.N.Y. Oct. 16, 1991) ("Papers outside a complaint may be incorporated by reference into the complaint when such papers are referred to within the body of the complaint."). "[U]nder Rule 201(b) of the Federal Rules of Evidence, courts may take judicial notice of facts that are 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" *Island Software & Computer Serv., Inc. v. Microsoft Corp.,* 413 F.3d 257, 261 (2d Cir. 2005) (citing Fed. R. Evid. 201(b)). The Second Circuit has held that federal copyright registrations, "as published in the Copyright Office's registry," are among the facts of which a district court may take judicial notice. *Id.*

## II.     Plaintiffs' Federal Copyright Infringement Claims

To state a claim for copyright infringement, Plaintiffs "must allege (1) 'ownership of a valid copyright,' and (2) 'copying of constituent elements of the work that are original.'" *Perrin & Nissen Ltd. v. SAS Grp. Inc.*, No. 06 CIV. 13089 (MGC), 2009 WL 855693, at *4 (S.D.N.Y. Mar. 27, 2009) (citing *Feist Publ'ns v. Rural Tel. Scrv. Co.*, 499 U.S. 340, 361 (1991)). To

withstand Defendants' motion to dismiss, Plaintiffs must "plead[] factual content" for each element of the claim asserted such that "the court [can] draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. However, "[n]either *Twombly* nor *Iqbal* requires a plaintiff in a copyright infringement action to plead specific evidence or extra facts beyond what is needed to make the claim plausible." *Ritani, LLC v. Aghjayan*, 880 F. Supp. 2d 425, 440 (S.D.N.Y. 2012) (internal quotation marks omitted).

Because the Routine and the films that published it, *One Night* and *The Naughty Nineties*, were created before January 1, 1978, they are subject to the 1909 Act.[2] *See* 17 U.S.C. § 301(b)(2); *Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.*, 380 F.3d 624, 633-34 (2d Cir. 2004) (citing *Playboy Enterprises, Inc. v. Dumas,* 53 F.3d 549, 553 (2d Cir. 1995)). Under the 1909 Act, state common law copyright provided protection until first publication. *See Martha Graham*, 380 F.3d at 632-33 (citing 17 U.S.C. §§ 2, 10, 12, 19, 21, 24 (repealed); *Shoptalk,* 168 F.3d at 590). Thereafter the work was entitled to an initial twenty-eight-year term of statutory copyright, provided that adequate statutory notice was given at publication, or appropriate registration and deposit were made. *See id.* In the absence of adequate statutory notice at publication, a work was injected into the public domain. *See id.* If adequate statutory notice was given, then application for renewal made during the last year of the initial term extended the copyright for a renewal term of twenty-eight additional years. *See id.*

---

[2] This Court uses "published" as a term of art. Specifically, "'[P]ublication occurs when by consent of the copyright owner, the original or tangible copies of a work are sold, leased, loaned, given away, or otherwise made available to the general public . . . .'" *Shoptalk, Ltd. v. Concorde-New Horizons Corp.*, 168 F.3d 586, 590 (2d Cir. 1999) (quoting *Bartok v. Boosey & Hawkes, Inc.,* 523 F.2d 941, 945 (2d Cir. 1975)).

**A. Existence and Ownership of a Valid Copyright**

As a threshold matter, a federal infringement claim requires that Plaintiffs allege they possessed a valid copyright at the time of the alleged infringement. *See Perrin*, 2009 WL 855693, at *4. Plaintiffs allege that Abbott and Costello first performed the Routine on March 24, 1938, as a live radio broadcast for *The Kate Smith Hour*. (Am. Compl. ¶ 32.) However, in November 1940, the duo signed a "work-for-hire" agreement with Universal Pictures Company, Inc. ("UPC") that assigned to Universal "all the rights to the duo's performances of *Who's On First* in *One Night* and *The Naughty Nineties*."[3] (*See* Am. Compl. ¶ 43.) Plaintiffs thus allege that upon execution of the November 1940 Agreement, "Abbott and Costello expressly granted UPC the right to use [the Routine] in the 1940 Motion Picture[, *One Night in the Tropics* ("*One Night*"),] and also assigned their rights in the version that appeared in that motion picture." (Opp'n at 6; *see also* Am. Compl.

---

[3] The relevant portions of Abbott and Costello's November 1940 agreement with Universal provide:

> *FIRST:* [T]he producer hereby engages and employs the Artists, severally and as a team . . . to render to the Producer their exclusive services as actors, performers and entertainers in the portrayal of such roles or parts as may be designated by the Producer in such photoplays as may be designated by the Producer, and further employs the Artists to render their services in consulting, advising, collaborating with and assisting the Producer in the preparation of stories and screen plays upon which such photoplays are to be based and in otherwise performing such services as many be required of them pursuant to the provisions of this agreement.

[ . . .]

> *FIFTH*: The Artists agree to furnish and make available to the Producer all literary and dramatic material and routines heretofore used by the Artists either on the radio or otherwise and now owned by the Artists, and the Producer shall have the right to use said material and routines to such extent as the Producer may desire in connection with any photoplay in which the Artists render their services hereunder and in connection with the advertising and exploitation of such photoplay. The Artists warrant that they know of no claims that the use of said material and routines or any part thereof as herein permitted will violate or infringe any copyright or any other right or rights of any other person, firm or corporation whatsoever.

(Rachman Decl. Ex. A at 1, 5; *see* Am. Compl. ¶ 43.) While Plaintiffs did not append the November 1940 Contract to the Amended Complaint, they clearly referenced the agreement in the Amended Complaint. As such, this Court may look to the November 1940 Contract as incorporated by reference. *See Hayes*, 1991 WL 220963, at *1 ("Papers outside a complaint may be incorporated by reference into the complaint when such papers are referred to within the body of the complaint.").

¶¶ 43-44.)  According to Plaintiffs, *One Night* was the first publication of the Routine relevant to copyright registration under the 1909 Copyright Act.  (*See* Am. Compl. ¶ 42.) In 1945, Abbott and Costello then expanded the *One Night* version of the routine in another UPC film, *The Naughty Nineties*.  (*See id.*)

Plaintiffs further allege that as the assignees of the rights to the Routine, UPC registered *One Night* in 1940[4] and *The Naughty Nineties* in 1945[5] with the United States Copyright Office, and then timely renewed those two copyrights.  (*See* Am. Compl. ¶¶ 43-45, Exs. 1-2; Opp'n at 12-17.) According to Plaintiffs, the 1970 Copyright Act and Sonny Bono Copyright Term Extension Act, 17 U.S.C. §§ 108, 203(a)(2), 301(c), 302, 303, 304(c)(2), extended the protection afforded to the Routine as performed in the two movies another ninety-five years until 2035 and 2040, respectively.  (*See* Am. Comp. ¶¶ 47-48.)

Continuing along the chain of title, Plaintiffs allege that on March 12, 1984, Universal Pictures ("Universal"),[6] quitclaimed "all rights, title, and interest, under copyright or otherwise, in and to the *Who's on First* performance scenes in both *One Night* and *The Naughty Nineties* . . ." to Abbott & Costello Enterprises ("ACE"), a general partnership formed by the duo's heirs.  (*Id.* ¶ 50.) The quitclaim assignment, which Plaintiffs maintain made ACE the sole owner of the two copyrights at issue, can be found in Copyright Office Volume 3437 at page 851.  (*See id.* ¶ 51; Ex. 3 at 2-3.)  Upon ACE's dissolution, 50% of the copyrights' ownership was assigned to TCA, a corporation formed by Costello's heirs, 25% to Abbott's daughter, Vickie Abbott Wheeler, and

---

[4] *One Night in the Tropics'* initial copyright registration number was LP 10042.  (*See* Am. Compl. ¶ 44.) The 1967 renewal number was R 423759.  (*See id.* ¶ 45).

[5] *The Naughty Nineties'* initial copyright registration number was LP 13337.  (*See id.* ¶ 44.)  The 1972 renewal number was R 532048.  (*See id.* ¶ 45).

[6] According to Plaintiffs, Universal is a division of Universal City Studios, Inc., the "successor to UPC." (Am. Compl. ¶ 50.)

25% to Abbott's son, Bud Abbott, Jr. (*See id.* ¶¶ 50, 54; Ex. 4.) After Bud Abbott, Jr.'s death in 1997, his daughter, Diana Abbott Colton, inherited his 25%. (*See* Am. Compl. ¶ 56.) Plaintiffs allege that Vickie Abbot Wheeler also transferred her 25% to her company, Hi Neighbor. (*See id.*) Plaintiffs thus contend that a chain of title to the Routine's copyright has continuously existed, and that they are now its owners.

### 1.  The Routine as Performed in *The Kate Smith Hour*

Plaintiffs correctly contend that none of Abbott and Costello's pre-1940 radio and vaudeville performances of the Routine, including the *Kate Smith Hour* performance of the Routine, "were deemed a 'publication' for copyright purposes." (Opp'n at 9; Am. Compl. ¶ 42.) As this District has previously found, "[p]ublic performance of a work is not considered a publication that divests an author of copyright protection." *Silverman v. CBS Inc.*, 632 F. Supp. 1344, 1350 (S.D.N.Y. 1986) (citing 1 *Nimmer* § 4.08[A]), *decision supplemented*, 675 F. Supp. 870 (S.D.N.Y. 1988), *aff'd in part, vacated in part,* 870 F.2d 40 (2d Cir. 1989). A "rendering of the performance before the microphone," such as Abbott and Costello's performance of the Routine on the radio show, *The Kate Smith Hour*, "cannot be held to be an abandonment of ownership to it by the proprietors or a dedication of it to the public at large." *Id.* at 1350 (internal quotations omitted). Thus, Abbott and Costello retained common law copyright protection of the Routine, as performed on *The Kate Smith Hour. See Shoptalk*, 168 F.3d at 590 (stating that the 1909 Act "'specifically exempt[ed] from coverage (and from preemption) the common-law right of an author of an unpublished work'") (quoting *Roy Export Company Establishment of Vaduz, Liechtenstein v. Columbia Broadcasting System, Inc.,* 672 F.2d 1095, 1101 (2d Cir. 1982) (internal quotation marks omitted)).

Defendants conjecture that the contents of the Routine as performed on *The Kate Smith Hour* are unknown, as are Abbott and Costello's rights to the Routine in relation to *The Kate Smith Hour*, where the duo made regular appearances. (*See* Tr. 3:13-25; Mem. at 5-6.) However, on a motion to dismiss, all that is required is that Plaintiffs allege facts that allow this Court to draw a reasonable inference in Plaintiffs favor. *See N.J. Carpenters Health Fund*, 709 F.3d at 119. Accordingly, the radio broadcast of the Routine did not constitute a publication and did not divest Abbott and Costello of their common law copyright in the Routine.

### 2. Assignment of the Common Law Copyright in the Routine to UPC

A valid assignment of statutory copyright requires a writing, *Martha Graham,* 380 F.3d at 643 (citing 17 U.S.C. § 204(a)); *Jasper v. Bovina Music, Inc.,* 314 F.3d 42, 46–47 (2d Cir. 2002). However, courts in this Circuit "have ruled that assignments of common law copyright need not be in writing." *See id.* (citing *Houghton Mifflin Co. v. Stackpole Sons, Inc.,* 104 F.2d 306, 311 (2d Cir. 1939) (finding that German possession of Adolf Hitler's *Mein Kampf* manuscript sufficed to imply assignment of common law copyright)); *Epoch Producing Corp. v. Killiam Shows, Inc.,* 522 F.2d 737, 747 (2d Cir. 1975) (noting that assignment need not be in writing) (citing *Dave Grossman Designs, Inc. v. Bortin,* 347 F. Supp. 1150, 1154 (N.D. Ill. 1972)); *see also Siegel v. Warner Bros. Entm't. Inc.,* 658 F. Supp. 2d 1036, 1086 (C.D. Cal. 2009) ("[D]uring the time the 1909 Act was in effect, at common law, a copyright was capable of assignment so as to completely divest the author of his rights, 'without the necessity of observing any formalities.'" (quoting *Urantia Foundation v. Maaherra,* 114 F.3d 955, 960 (9th Cir. 1997))). Thus, "[t]he assignee of an author's common law copyright might by virtue of such assignment, claim statutory copyright." *Siegel*, 658 F. Supp. 2d at 1085. Furthermore, such an assignment could be oral or could be implied from the parties' conduct. *See id.* (concluding that agreements and actions can indicate an

assignment of the initial and renewal copyright term) (citing *Jerry Vogel Music Co. v. Warner Bros., Inc.,* 535 F. Supp. 172 (S.D.N.Y. 1982); *Van Cleef & Arpels, Inc. v. Schechter*, 308 F. Supp. 674 (S.D.N.Y. 1969)).

According to Plaintiffs, Abbot and Costello "granted their pre-existing common law copyright in *Who's on First* to UPC." (Opp'n at 9.)  As alleged by Plaintiffs, "Paragraph Fifth" of the November 1940 Agreement between UPC and the duo provides:

> The Artists *agree to furnish and make available to the Producer all literary and dramatic material and routines heretofore used by the Artists either on the radio or otherwise and now owned by the Artists*, and the Producer shall have the right to use said material and routines to such extent as the Producer may desire in connection with any photoplay in which the Artists render their services hereunder and in connection with the advertising and exploitation of such photoplay.

(Rachman Decl. Ex. A at 5 (emphasis added).)  The contract language, together with UPC's subsequent registration of the copyrights for *One Night* and, later *The Naughty Nineties*, constitutes an implied assignment of the initial copyright from Abbott and Costello.  *See Siegel*, 658 F. Supp. 2d at 1086 ("Although the words 'assign' or 'transfer do not appear in the . . . agreement, such an intent was demonstrated by other language contained in the agreement . . . . Such expressed receipt of the 'original' material in question and the ability to license that material is not the language used to describe the recipient of a mere license to the material in question, but as one of an assignee.")  Furthermore, for Abbott and Costello not to register a copyright to the Routine as performed in *One Night* and *The Naughty Nineties* after executing the November 1940 contract is consistent with an assignment of the copyright to UPC.  (*See* Opp'n at 17-18.)

Defendants contend that Abbott and Costello did not assign or grant UPC all of their rights in the Routine, but rather gave UPC a license.  (*See* Mem. at 14.)  Defendants support their argument with contractual language stating that Abbott and Costello "reserve[d] the right to use on the radio and in person appearances authorized under the terms of this agreement." (Rachman

Decl., Ex. A at 5; Tr. at 14:14-16:8.)   Defendants also argue that "Abbott and Costello's personal registration of the script of the 1944 Radio Version fortifies the conclusion that no ownership of the Routine or of other preexisting [Abbott and Costello] routines had vested in Universal Studios." (Mem. at 14-15; Tr. at 14:16-15:19, 32:17-33:1.)

The language of the November 1940 contract does not explicitly state that Abbott and Costello were keeping ownership of the copyright. (*See* Rachman Decl., Ex. A at 5-6.) Retaining a "right to use" material is not the equivalent of retaining a copyright. *See Jim Henson Prods., Inc. v. John T. Brady & Assocs.*, 16 F. Supp. 2d 259, 277 (S.D.N.Y. 1997). Courts in this District have contemplated this difference, noting that "there [i]s the strongest presumption that even when an author transferred the copyright in a work in which a character was fully delineated, the author retained the right to use the character in sequels or other works." *Id.*

Defendants also attempt to introduce a purported 1944 copyright registration of an unspecified "Abbott and Costello Baseball Routine," made in the name of the artists, as proof of behavior inconsistent with an assignment of the copyright to UPC. (Lawless Decl., Ex. B; Tr. at 18:5-22., 34:25-35:2.)   Even if this Court were to take judicial notice of the purported 1944 Copyright Registration, its existence does not render Plaintiffs' factual allegations implausible. As this Court noted during oral argument, Abbott and Costello could have mistakenly believed they owned the copyright to the Routine when (and if) they registered the Routine in 1944, even though they gave up the copyright ownership with the November 1940 Agreement. (*See* Tr. at 19:5-12.) As this Court must accept the Amended Complaint's factual allegations as true and draw all reasonable inferences in the non-moving party's favor, it is certainly plausible and is sufficiently alleged that Abbott and Costello assigned their common law copyright in the Routine to UPC. *See N.J. Carpenters Health Fund*, 709 F.3d at 119.

10

### 3.  First Publication in a Derivative Work, the 1940 Film, *One Night in the Tropics*

As previously noted, "publication occurs when by consent of the copyright owner, the original or tangible copies of a work are sold, leased, loaned, given away, or otherwise made available to the general public . . . ." *Shoptalk*, 168 F.3d at 590 (quoting *Bartok v. Boosey & Hawkes, Inc.*, 523 F.2d 941, 945 (2d Cir. 1975) (internal quotations omitted)).  Release of a motion picture is indeed a well-recognized form of publication for purposes of copyright law.  *See, e.g.*, *Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*, 531 F.3d 962, 972 (9th Cir. 2008) (finding that an unpublished movie treatment was "published by virtue of the release and distribution of the Motion Picture" based upon that treatment).[7]  In this case, *One Night* and *The Naughty Nineties* constitute publications of derivative works.  Derivative works are "[c]ompilations or abridgments, adaptations, arrangements dramatizations, translations, or other versions of works in the public domain or of copyrighted works." *Shoptalk*, 168 F.3d at 591.

When a previously unpublished work is "embodied in a [derivative] motion picture, so much of the [underlying work] as is disclosed in the motion picture is published when the motion picture is published." *Shoptalk*, 168 F.3d at 592.  Therefore, when, as Plaintiffs allege, UPC released *One Night* in 1940 for public consumption, *see id.*, it was also "the first time that [the Routine] was published." (Opp'n at 9; Am. Compl. ¶ 42).

Viewing the alleged facts in the light most favorable to the Plaintiffs, UPC's registration of the initial copyrights in *One Night* in its name was "therefore the first time that it obtained [statutory] copyright under the 1909 Act[,] upon UPC's registration with the Copyright Office." (Opp'n at 9; Am. Compl. ¶ 42).  Specifically, the portion of the pre-existing Routine published in *One Night* was covered by the copyrights owned and registered by UPC. *See Shoptalk*, 168 F.3d

---

[7] Neither Plaintiffs' nor Defendants' briefing explicitly addressed the underlying common law copyright in the 1938 broadcast of the Routine and the effects of publication upon the common law protection.

at 592.  The publication of the Routine within the film, therefore, extinguished whatever common

law copyright Abbott and Costello had in the unpublished version of the Routine and had later

assigned to UPC.  *See Shoptalk*, 168 F.3d 586, 590, 591-92 (2d Cir. 1999) (holding that "because

'a single work cannot be protected from copying under both federal and state law'" simultaneously,

"the securing of a statutory copyright, either by general publication with a proper notice or by

registration of the work, ended the common-law protection") (quoting *Roy Exp.*, 672 F.2d 1095,

1101 n.13 (2d Cir. 1982)); *see also, Sanga Music, Inc. v. EMI Blackwood Music, Inc.*, 55 F.3d 756,

758 (2d Cir. 1995).

### 4.  Portions of the Routine Covered by the *One Night* and *the Naughty Nineties* Copyrights

Under the 1909 Act, "derivative works are explicitly included in the subject matter of

copyright by the 1909 Copyright Act." *Tempo Music, Inc. v. Famous Music Corp.*, 838 F. Supp.

162, 168 (S.D.N.Y. 1993) (citing 17 U.S.C. § 7).  However, to extend protection to derivative

works, "[f]irst, the original aspects of a derivative work must be more than trivial.  Second, the

scope of protection afforded a derivative work must reflect the degree to which it relies on

preexisting material and must not in any way affect the scope of any copyright protection in that

preexisting material." *Id.* at 167-168 (citing *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905,

909 (2d Cir. 1980); 17 U.S.C. § 7).  "Absent a genuine difference between the underlying work of

art and the copy of it for which protection is sought, the public interest in promoting progress in

the arts—indeed, the constitutional demand . . . could hardly be served." *Id.* at 170.

Defendants concede that Plaintiffs have established a chain of title "to the newly created

material" added to the Routine in *One Night* that differed from the *Kate Smith Hour* performance.

(*See* Tr. at 27:19-25.)  However, Defendants argue that the original aspects of the derivative

work—the version of the Routine in *One Night*—are trivial.  (*See* Mem. at 9-10).  Because the

12

Routine did not change substantially between the 1938 and 1940 performances, according to Defendants, the Routine remained protected by either the underlying copyright in the Routine or UPC's copyright registration of *One Night* only "for the initial term of copyright through 1968 . . . ." (Mem. at 9, 15.) Defendants contend that after 1968 Abbott and Costello's heirs were required to register a renewal of the copyright to the Routine. (*Id*. at 15.) Given the plausible allegation that Abbott and Costello assigned their common law copyright in the Routine to UPC with the 1940 Agreement, Defendants argument that the duo's heirs had to register a renewal of the copyright is unavailing.

Because as much of the 1938 Routine as was disclosed in the motion picture was published when the motion picture was published, and because the law treats motion pictures as a unitary works, the copyrights in *One Night* and *The Naughty Nineties* that UPC registered "merged" the Routine with the films. *See 16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 257-58 (2d Cir. 2015) (holding that because "[f]ilmmaking is a collaborative process typically involving artistic contributions from large numbers of people," statutory copyright in the film itself could be undermined if "copyright subsisted separately in each of their contributions to the completed film" (citing *Richlin*, 531 F.3d at 975 ("A motion picture is a work to which many contribute; however, those contributions ultimately merge to create a unitary whole."))); *see also Garcia v. Google, Inc.*, 786 F.3d 733, 743 (9th Cir. 2015) ("Untangling the complex, difficult-to-access, and often phantom chain of title to tens, hundreds, or even thousands of standalone copyrights [in a film] is a task that could tie the distribution chain in knots."). Thus, Plaintiffs have sufficiently alleged a continuous chain of title encompassing the Routine.

## B.  Infringing Use

The second element of a copyright infringement claim that Plaintiffs must allege is that Defendants "cop[ied] constituent elements of the work that are original."  *Perrin*, 2009 WL 855693, at *4. "To demonstrate unauthorized copying, the plaintiff must first 'show that his work was actually copied'; second, he must establish 'substantial similarity' or that 'the copying amounts to an improper or unlawful appropriation.'" *Cooley v. Penguin Grp. (USA) Inc.*, 31 F. Supp. 3d 599, 605-06 (S.D.N.Y. 2014), as corrected (July 14, 2014) (quoting *Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 131 (2d Cir. 2003)) (internal quotation marks omitted)).

Here, Defendants concede that they use part of the Routine in *Hand to God*, characterizing the use as "part of a sophisticated artistic expression." (Mem. at 2.)  Specifically, Jason, the play's shy and repressed main character, finds a creative escape from his religious small-town life through his hand sock-puppet, named Tyrone. (*See* Am. Compl. ¶ 58.)  Initially, Jason used Tyrone for his church's "Christian Puppet Minstry," led by his mother. (*See id.* ¶ 61 (citing Marilyn Stasio, *Broadway Review: Hand to God*, VARIETY (Apr. 7, 2015), http://variety.com/2015/legit/ reviews/hand-to-god-review-broadway-1201467612/.))  Over the course of the play, Tyrone, the puppet, begins to develop a life of its own, possibly due to demonic possession. (*See* Mem. at 4.) About fifteen minutes into the play, Jason attempts to impress his crush, Jessica, by performing about one minute and seven seconds of the Routine, with Tyrone as Costello and Jason as Abbott. (*See* Am. Compl. ¶¶ 65-66, 75.)  Impressed, Jessica asks Jason if he made up the dialogue himself, and he says "yes." (*See id.*)  The audience is intended to recognize the famous Abbott and Costello sketch and find humor when Tyrone, the puppet, calls Jason a liar and tells Jessica that the sketch "is a 'famous routine from the Fifties.'" (*See id.* at 64, Ex. 5 at 22-24; Mem. at 3.)  The puppet

proceeds to insult Jessica, saying, "You'd know that if you weren't so stupid," and then exposes Jason's feelings for Jessica. (Mem. at 3; Am. Compl. Ex. 5 at 24 ("It doesn't matter because he thinks you're hot.").)    Providing a contrast with the soft-spoken Jason, the puppet Tyrone's outrageous and subversive behavior escalates over the course of the play, and its post-Routine outburst provides a starting point for the gradual exposure of the darker side of Jason's personality. (*See* Mem. at 3-4.)

### 1. Fair Use Defense

Given Defendants' concession that they used part of the Routine, as performed in *One Night* and *The Naughty Nineties*, the relevant inquiry is whether the scene in *Hand to God* is nonetheless a noninfringing "fair use" of the Routine.

Congress passed the Copyright Act "'[t]o promote the Progress of Science and useful Arts,' U.S. Const. art. I, § 8, cl. 8, 'by granting authors a limited monopoly over (and thus the opportunity to profit from) the dissemination of their original works of authorship.'" *BWP Media USA, Inc. v. Gossip Cop Media, LLC*, 87 F. Supp. 3d 499, 504-05 (S.D.N.Y. 2015) (citing *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 95 (2d Cir. 2014)).  However, Congress also recognized that giving authors total control over their own works might not always expand public knowledge, but in fact limit it. *See Authors Guild v. Google, Inc.*, 804 F.3d 202, 212 (2d Cir. 2015).  Thus, the doctrine of fair use developed, and was eventually reflected in § 107 of the Copyright Act of 1976, authorizing the public to draw upon copyrighted materials without the permission of the copyright holder in certain circumstances. *See BWP Media USA*, 87 F. Supp. 3d at 504-05.[8]

---

[8] As to whether the fair use inquiry is appropriate for a motion to dismiss, under certain circumstances, it is sometimes possible to resolve this mixed question of law and fact at this stage of the proceedings. *BWP Media USA, Inc.,* 87 F. Supp. 3d at 505. In such circumstances, "the only two pieces of evidence needed to decide the question of fair use . . . are the original version and the allegedly infringing work."

Determining fair use is "an open-ended and context-sensitive inquiry," *id.* (internal quotations omitted), requiring this Court to weigh four nonexclusive factors to determine whether a given use is fair:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.  It is well-established in this Circuit that fair use analysis always "calls for a case-by-case analysis." *Bill Graham Archives, LLC. v. Dorling Kindersley Ltd.*, 386 F. Supp. 2d 324, 328 (S.D.N.Y. 2005), *aff'd sub nom. Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006) (internal quotation marks omitted) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994)).

### a.  The Nature of the Copyrighted Work

"[T]he nature of the copyrighted work[,] focuses on the value of the materials used." *Adjmi*, 97 F. Supp. 3d at 532 (internal quotation marks omitted).  This factor distinguishes between creative or factual original works. *See id.*  While both types of work are covered by copyright protection, creative works are "closer to the heart of copyright." *Id.*

The Routine as performed in *One Night* and *The Naughty Nineties* is clearly a creative work.  Indeed, it has reached iconic status as *Time* magazine's "Best Comedy Routine of the Twentieth Century" in 1999. (*See* Am. Compl. ¶¶ 36-39.)  The instantly recognizable nature of

---

*Id.* (internal quotations omitted); *see also Adjmi v. DLT Entm't Ltd.*, 97 F. Supp. 3d 512, 527 (S.D.N.Y. 2015), appeal withdrawn (June 25, 2015) ("Courts in this Circuit have resolved motions to dismiss on fair use grounds in this way: comparing the original work to an alleged parody, in light of applicable law.").

the Routine is further highlighted by the American Film Institute's designation of only one line

of the play, "Who's on first?" as one of the "100 Greatest Movie Quotes of All Time." (*See id.* ¶

38.)  In fact, Tyrone, the sock puppet, acknowledges how well-known the Routine is when he

says to Jessica, "You'd know [Jason didn't make it up] if you weren't so stupid." (Am. Compl.,

Ex. 5 at 23.)  Overall, this factor weighs in favor of the Plaintiffs, but "assumes less importance

in the overall fair use analysis relative to the other three factors." *See Adjmi*, 97 F. Supp. 3d at

532; *Cariou*, 714 F.3d at 710 (citing *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d

605, 612 (2d Cir. 2006)).

### b.  The Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work

Another statutory fair use factor considers "whether 'the amount and substantiality of the

portion used in relation to the copyrighted work as a whole' . . . are reasonable in relation to the

purpose of the copying." *Adjmi*, 97 F. Supp. 3d at 532-33 (quoting 17 U.S.C. § 107(3); *see also*

*Campbell*, 510 U.S. at 586).  Courts in this Circuit "consider the proportion of the original work

used, and not how much of the secondary work comprises the original." *Cariou*, 714 F.3d at

710.  Furthermore, this factor employs a "sliding scale: the larger the volume (or the greater

importance of the original taken), the less likely the taking will qualify as a fair use." *Adjmi*, 97

F. Supp. 3d at 533.

The play *Hand to God* runs for one hour and fifty-five minutes.  According to Plaintiffs,

the play uses about one minute and seven seconds of the Routine.  (Am. Compl. ¶ 66.)  The

Routine performed in *One Night* runs about three minutes, while *The Naughty Nineties*

performance lasts almost nine minutes.  (Mem. at 21; Lawless Decl., Ex. C).  Defendants use a

hybrid of the first thirty-seven seconds of *One Night* and the first minute and six seconds of the

Routine as performed in *The Naughty Nineties*.[9]  (Am. Comp. ¶ 66.)  While Plaintiffs argue that

the amount taken is substantial, the number of minutes used is not the only consideration when

assessing the third factor.  As the *Adjmi* court noted, "the greater the importance of the original

taken [], the less likely the taking will qualify as a fair use."  *Adjmi*, 97 F. Supp. 3d at 533.

"If a challenged work appropriates what amounts to 'the heart' of an original work, even

if only in a few words, then such an appropriation is substantial for purposes of the fair use

inquiry."  *Castle Rock Entm't v. Carol Pub. Grp., Inc.*, 955 F. Supp. 260, 269 (S.D.N.Y. 1997),

*aff'd sub nom. Castle Rock Entm't, Inc. v. Carol Pub. Grp., Inc.*, 150 F.3d 132 (2d Cir. 1998)

(citing *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 564 (1985)).  The

fact that even only one line of the play, "Who's on first?" is instantly recognizable, (*see* Am.

Compl. ¶ 38.), and that Defendants use more than merely "the introductory premise" of the

Routine, (*see* Mem. at 21.), tips this factor slightly in favor of the Plaintiffs.  However, the highly

transformative nature of the new use ultimately outweighs this comparatively less important

factor.  *Adjmi*, 97 F. Supp. 3d at 534.

### c. The Effect of the Use Upon the Potential Market for or Value of the Copyrighted Work

Another statutory factor of the fair use analysis looks to "the effect of the use upon the

potential market for or value of the copyrighted work." 17 U.S.C. § 107(4).  "The copyright law

is primary concerned with protecting the ability of a copyright holder to exploit the market for

his work. Use of a copyrighted work which does not usurp the market for the copyrighted work

leans the fourth factor favorably towards fair use." *Bill Graham Archives, LLC. v. Dorling*

*Kindersley Ltd.* (*Bill Graham Archives I*), 386 F. Supp. 2d 324, 331 (S.D.N.Y. 2005) (citing

---

[9] Plaintiffs allege that *Hand to God* "uses about 25% of the entire [R]outine from the 1940 Motion Picture," *One Night*, and "about 20% of the entire routine from the 1945 Motion Picture[,]" *The Naughty Nineties*. (Am. Comp. ¶ 66.)

*Campbell*, 510 U.S. at 593), *aff'd sub nom. Bill Graham Archives v. Dorling Kindersley Ltd.*
(*Bill Graham Archives II*), 448 F.3d 605 (2d Cir. 2006).

Plaintiffs' argue that Defendants' use of part of the Routine without paying any fees
diminishes its' potential licensing and royalty market.  (Opp'n at 24).  However, this factor
applies mainly to the market for the original work.  *See Cariou*, 714 F.3d at 708 ("[T]he
application of this factor does not focus principally on the question of damage to Cariou's
derivative market.").  It is unlikely that a reasonable observer of the new work would find that
Jason and his puppet's reenactment of the Routine could usurp the market for the original Abbott
and Costello performance of the Routine.  *See Bill Graham Archives I*, 386 F. Supp. 2d at 331.
Furthermore, Defendants' transformative use of the Routine could arguably broaden the market
for the original work, as it exposes a new audience of viewers to the work of the classic
American comedy duo.  *See Cariou*, 714 F.3d at 708 ("Our court has concluded that an accused
infringer has usurped the market for copyrighted works, including the derivative market, where
the infringer's target audience and the nature of the infringing content is the same as the
original.")  This factor, therefore, weighs in favor of the defendants.  *Cariou*, 714 F.3d at 708.

### d.  The Purpose and Character of the Allegedly Infringing Use

The determinative statutory factor in this fair use inquiry, which has been described as
"[t]he heart of the fair use inquiry," *Cariou v. Prince*, 714 F.3d 694, 705 (2d Cir. 2013), *cert.
denied*, 134 S. Ct. 618 (2013), (alterations in original) (quoting *Blanch v. Koons,* 467 F.3d 244,
251 (2d Cir. 2006)) (internal quotation marks omitted), examines the purpose and character of
the allegedly infringing work.  *See Adjmi*, 97 F. Supp. 3d at 529.  *Hand to God* is an artistic
work with a commercial purpose because "the user stands to profit" from use of the Routine
without paying licensing fees—this weighs against fair use. *See id.*; *BWP Media USA*, 87 F.

Supp. 3d at 506 ("The greater the private economic rewards reaped by the secondary user (to the exclusion of broader public benefits), the more likely the first factor will favor the copyright holder and the less likely the use will be considered fair."). As Plaintiffs note, the scene using the Routine is highlighted as part of an online video clip to promote the show and sell tickets. (*See* Am. Compl. ¶ 69.) Defendants made an affirmative decision to use that particular clip in promoting the play because it is representative of its plot and "specifically mentioned in many articles and reviews of the play." (*Id.*) "However, the Supreme Court has discounted the force of commerciality in applying a fair use analysis, noting 'no man but a blockhead ever wrote, except for money.'" *Kane v. Comedy Partners*, No. 00 CIV. 158, 2003 WL 22383387, at *3 (S.D.N.Y. Oct. 16, 2003) (citing *Campbell*, 510 U.S. at 584), *aff'd*, 98 F. App'x 73 (2d Cir. 2004). Therefore, the for-profit secondary use is not determinative as to this statutory factor.

Rather, the heart of the "purpose and character" inquiry is whether the new work "merely 'supersede[s] the objects' of the original . . . or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning or message." *Adjmi,* 97 F. Supp. 3d at 529 (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994); *see also Castle Rock Entm't. Inc. v. Carol Publ'g Grp. Inc.*, 150 F.3d 132, 141 (2d Cir. 1998)). That is, whether the use of the original is "transformative," *id.*, based on a "reasonable perception" of the new work. *Cariou*, 714 F.3d at 707. "The use must be productive and must employ the quoted matter in a different manner or for a different purpose from the original." *Blanch v. Koons*, 396 F. Supp. 2d 476, 480 (S.D.N.Y. 2005) (quotation marks omitted) (quoting Pierre Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1111 (1990)), *aff'd*, 467 F.3d 244 (2d Cir. 2006).

The Second Circuit has specifically rejected the contention that commentary is necessary to the fair use defense, holding that "[t]he law imposes no requirement that a work comment on the original or its author in order to be considered transformative." *Cariou*, 714 F.3d at 706. Courts have found that use of the original work, "in furtherance of the creation of a distinct visual aesthetic and overall mood" for the audience, is transformative. *See Sandoval v. New Line Cinema Corp.*, 973 F. Supp. 409, 413 (S.D.N.Y. 1997) *aff'd,* 147 F.3d 215 (2d Cir. 1998) ("The use of plaintiff's Photographs was transformative, in the sense that defendants used the visual images created in plaintiff's work in furtherance of the creation of a distinct visual aesthetic and overall mood for the moviegoer watching the scene in the killer's apartment."). When a work is transformative, it deserves protection so that "the goal of copyright, to promote science and the arts, is generally furthered." *Blanch*, 396 F. Supp 2d at 480 (citing Campbell, 510 U.S. at 579; Leval, *supra* at 1111).

Although Plaintiffs contend that Defendants' use of the Routine does not "add[] anything materially new or provide[] a different aesthetic," and claim that the actor playing Jason "merely re-enact[s] the [R]outine as Abbot and Costello performed it," the tone of the new performance is markedly different. (*See* Opp'n at 21.)   *Hand to God* uses the Routine to create context and "a background for the ever more sinister character development of Tyrone, the alter-ego sock puppet." (Mem. at 20.)  On the other hand, simply because the Routine occurs in a different time period, a different setting, and between a teenage boy and his sock puppet does not necessarily make the Routine's use transformative.  *See Adjmi*, 97 F. Supp. 3d at 530 ("'It is hardly parodic to repeat [the] same exercise . . . just because society and the characters have aged.").

It is the performance through the anti-hero puppet, Tyrone, that, according to Defendants, creates new aesthetics and understandings about the relationship between horror and comedy that

are absent from Abbott and Costello's performances of the Routine in *One Night* and *The Naughty Nineties*. *See Cariou,* 714 F.3d at 706. (*See also* Mem. at 4 (citing Jason Zinoman, Hand to God *Melds Gore and Giggles, Each Often Elicited by a Puppet,* N.Y. TIMES, May 26, 2015, http://www.nytimes.com/ 2015/05/27/theater/theaterspecial/hand-to-god-melds-gore-and-giggles-each-often-elicited-by-a-puppet.html?_r=0).) Whereas the original Routine involved two actors whose performance falls in the vaudeville genre, *Hand to God* has only one actor performing the Routine in order to illustrate a larger point. The contrast between Jason's seemingly soft-spoken personality and the actual outrageousness of his inner nature, which he expresses through the sock puppet, is, among other things, a darkly comedic critique of the social norms governing a small town in the Bible Belt. Thus, Defendants' use of part of the Routine is not an attempt to usurp plaintiff's material in order to "avoid the drudgery in working up something fresh." *Campbell,* 510 U.S. at 580. Nor is the original performance of the Routine "merely repackaged or republished." *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 97 (2d Cir. 2014) (quoting Leval, *supra* at 1111).

Furthermore, Plaintiffs' contention that "the scene in the Play is performed . . . for the same exact purpose—for audience laughs"— cannot defeat the transformative use argument. (*See* Opp'n at 21; Tr. at 53:21-54:7.)[10] While the Routine, as performed in the play, also results in comic relief for the audience, it does so for reasons different from why audiences found the

---

[10] During Oral Argument, Plaintiffs shed further light on their argument:

> Mr. Rachman: [The Routine] is performed by Jason and his puppet for the very purpose of eliciting laughs, which is the purpose of that original work, and it creates those laughs in the play.

> The Court: I have never heard an argument that how this is the same [is] because it was funny then and it is funny now. That is not the analysis. (Tr. at 53:21-54:2.)

original sketch humorous.  (*See* Mem. at 19; Tr. at 29: 7-19.)  Tyrone, the sock puppet, breaks

the "fourth wall" with the audience when he says to Jessica, "You'd know [Jason didn't make

the Routine up] if you weren't so stupid," sharing with them an inside joke.  (Am. Compl., Ex. 5

at 23.)  The audience laughs at Jason's lie, not, as Plaintiffs claim, simply the words of the

Routine itself.  *See HathiTrust*, 755 F.3d at 96 ("Added value or utility is not the test: a

transformative work is one that serves a new and different function from the original work and is

not a substitute for it.").  For the lie to be apparent, the play requires that the audience be able to

recognize the original source of Jason's sock puppet performance.  *See Authors Guild v. Google,*

*Inc.*, 804 F.3d 202, 215 (2d Cir. 2015) ("A taking from another author's work for the purpose of

making points that have no bearing on the original may well be fair use, but the taker would need

to show a justification.").  This statutory factor, therefore, weighs strongly in favor of

Defendants.  "The more transformative the new work, the less will be the significance of other

factors, like commercialism, that may weigh against a finding of fair use."  *Cariou*, 714 F.3d at

708 (citing *Campbell*, 510 U.S. at 579).

Based upon the allegations in the Amended Complaint and the materials incorporated by

reference therein, Plaintiffs, therefore, fail to state a claim upon which relief can be granted.

Defendants' motion to dismiss Plaintiffs' federal claim of direct infringement is therefore

GRANTED.[11]

## II. Plaintiffs' New York Common Law Copyright Infringement Claims

Plaintiffs argue that to the extent "all pre-1972 radio broadcast performances" of the

Routine remain unpublished, they remain protected by New York's common law copyright.  (*See*

---

[11] Because Defendants have made a showing of fair use to defeat Plaintiffs' direct infringement claim, this
Court need not consider Plaintiffs' federal vicarious and contributory infringement claims.

Opp'n at 25; Am. Compl. ¶ 63.)  However, this Circuit has held that "because 'a single work cannot be protected from copying under both federal and state law at the same time,' . . . where the author of a previously unpublished work consented to its inclusion in a published collection, that publication extinguished the common-law copyright in the underlying work." *Shoptalk*, 168 F.3d at 591 (quoting *Roy Exp.,* 672 F.2d at 1101 n. 13, and then citing *Sanga Music, Inc.*, 55 F.3d at 758).  Therefore, Defendants' motion to dismiss Plaintiffs' common law infringement claims is also GRANTED.

## CONCLUSION

Plaintiffs' federal and New York common law copyright claims are DISMISSED.  Because Plaintiffs have insufficiently alleged a copyright infringement by Defendants of the Abbott and Costello Routine, the Complaint doesn't get past first base.

The Clerk of Court is directed to close the motion at ECF No. 55.

Dated: New York, New York
December 17, 2015

SO ORDERED.

George B. Daniels

GEORGE B. DANIELS
United States District Judge