UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - :
TCA TELEVISION CORP., HI NEIGHBOR, : 15 Civ. 4325 (GBD) (JCF)
and DIANA ABBOTT COLTON, :
                                    :      REPORT AND
                    Plaintiffs,     :    RECOMMENDATION
                                    :
     - against -                    :
                                    :
KEVIN MCCOLLUM, THE ENSEMBLE STUDIO :
THEATRE, INC., MANHATTAN CLASS      :
COMPANY INC., ROBERT ASKINS, HAND   :
TO GOD LIMITED LIABILITY COMPANY,   :
and DOES and ABC COMPANIES 1-10,    :
                                    :
                    Defendants.     :
- - - - - - - - - - - - - - - - - - :

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/5/17

TO THE HONORABLE GEORGE B. DANIELS, U.S.D.J.:

     The plaintiffs in this action, successors-in-interest to the
estates of William "Bud" Abbott and Lou Costello (collectively, the
"Abbott and Costello Successors") -- who together became known as
the comedy duo Abbott & Costello -- claimed that the defendants,
producers of the Tony-nominated play Hand to God (collectively, the
"Hand to God Producers"), infringed the copyright in the comedy
routine known as "Who's on First?" (also called the "Routine").
The defendants prevailed before the Second Circuit and now seek
attorneys' fees pursuant to the Copyright Act's fee-shifting
provision, 17 U.S.C. § 505 ("Section 505"). I recommend granting
the motion and awarding the Hand to God Producers $50,123.04 in
attorneys' fees and costs.

Background

     I will dispense with the details of the skit, the play, and
the skit in the play, which are amply recounted elsewhere. See TCA
Television Corp. v. McCollum ("TCA II"), 839 F.3d 168, 172-77 (2d

1

Cir. 2016), <u>cert. denied</u>, __ S. Ct. __, 2017 WL 1408798 (U.S. 2017); <u>TCA Television Corp. v. McCollum</u> ("<u>TCA I</u>"), 151 F. Supp. 3d 419, 426-32, 434-37 (S.D.N.Y. 2015). It should suffice here to say that two characters in <u>Hand to God</u> -- one a human, the other a puppet -- "perform, almost verbatim, a little over a minute of <u>Who's on First?</u> [sic]"[1] and that a video clip of that performance was included in promotional materials for the play. <u>TCA II</u>, 839 F.3d at 175-77 & n.8. The plaintiffs base their infringement claims on these uses.

A. <u>Performance History and Complaints</u>

<u>Hand to God</u> was first performed in workshop from late October 2011 until April 2012; it opened off-Broadway in mid-February 2014 and played until late March of that year. (First Amended Complaint ("Amended Complaint"), ¶ 59). Approximately one year later, on March 4, 2015, the play had its first performance on Broadway at the Booth Theatre. (Amended Complaint, ¶ 60). On April 13, 2015, counsel for plaintiff TCA Television Corp. as "the owner of various proprietary material related to the estate of Lou Costello," together with a representative of the estate of Abbott, sent a cease-and-desist letter to the Booth Theatre accusing the play of infringing on copyrights owned by the estates. (Letter of Greg S. Bernstein dated April 13, 2015, attached as Exh. 4 to Declaration of Mark J. Lawless dated Jan. 12, 2017 ("Lawless 1/12/17 Decl."),

---

[1] <u>The Chicago Manual of Style</u> states that the titles of shorter works should be placed in quotation marks rather than underlined (or italicized). <u>See</u> <u>The Chicago Manual of Style</u> § 8.161 (16th ed. 2010) ("[T]itles of articles, chapters, and other shorter works are set in roman and enclosed in quotation marks.").

at 1).  On May 29, 2015, an attorney from the same firm, now acting as "litigation counsel for the successors in interest to the estates of Lou Costello and Bud Abbott," sent a letter to counsel for the defendants expressing the intent "to file a Complaint and Motion for Preliminary Injunction no later than June 4th unless the dispute is settled prior to that date." (Letter of Marc J. Rachman dated May 29, 2015, attached as Exh. 5 to Lawless 1/12/17 Decl.), at 1).

The Complaint was filed on June 4, 2015, as threatened.  The original complaint named eighteen defendants -- sixteen individuals and entities identified as "producers" of Hand to God, along with the playwright and Key Brand Entertainment Inc., the owner of the website Broadway.com, which "feature[d] video clips of the infringing scene." (Complaint, ¶¶ 9-26).  The Complaint, which was filed the day before the 69th Annual Tony Awards ceremony, at which Hand to God was nominated for five awards, received some attention from the press.  (Lawless 1/12/17 Decl., ¶ 6; Andrew R. Chow, "Hand to God" Play Sued by Abbott and Costello Heirs Over Use of "Who's on First?", N.Y. Times, June 4, 2015, attached as Exh. 6 to Lawless 1/12/17 Decl.; Lawsuit Filed by Abbott & Costello Heirs Against Acclaimed Hand to God Play Claims Infringement of Famous "Who's on First?" Routine, Business Wire, June 5, 2015, attached as Exh. 7 to Lawless 1/12/17 Decl.).

Four days later, the Amended Complaint was filed against the same defendants, except that Key Brand Entertainment was replaced by Hand to God LLC, "a producer, advertiser and/or owner" of Hand

<u>to God</u>. (Amended Complaint, ¶¶ 9-26). The Amended Complaint identifies the plaintiffs as "heirs to Abbott & Costello" who own valid copyrights in "Who's on First?" (Amended Complaint, ¶ 1), and reviews the history of the copyrights at issue. According to the Amended Complaint, the Routine was first performed in 1938 on a television show. (Amended Complaint, ¶ 32). It was "first published for the purposes of registration pursuant to the 1909 [Copyright] Act" in 1940 in the Universal Pictures Co. ("UPC") film <u>One Night in the Tropics</u>, and an expanded version was later published in 1945 in the UPC film <u>The Naughty Nineties</u>. (Amended Complaint, ¶ 42). Pursuant to a work-for-hire agreement dated November 6, 1940 (the "November 1940 Agreement"), the rights to the performances in these two movies were granted to UPC, which registered each film in the year it was released. (Amended Complaint, ¶¶ 43-44; Copyrights dated Nov. 15, 1940, and June 29, 1945, attached as Exh. 1 to Amended Complaint). UPC timely renewed both copyrights (Amended Complaint, ¶ 45; Applications for Registration of a Claim to Renewal Copyright dated Dec. 7, 1967, and date illegible, attached as Exh. 2 to Amended Complaint), which, after amendments to the Copyright Act, resulted in protection for the works until 2035 and 2040. (Amended Complaint, ¶¶ 46-48). In 1984, Universal Pictures ("Universal"), a division of the successor to UPC, executed a quitclaim agreement with Abbott & Costello Enterprises ("ACE"), a partnership formed by the heirs of Abbott & Costello. (Amended Complaint, ¶ 50; Quitclaim dated March 12, 1984 ("1984 Quitclaim"), attached as part of Exh. 3 to

4

Amended Complaint). That partnership was dissolved in 1992, and, through assignments and inheritance, each of the three plaintiffs in this action allegedly owned a percentage of the copyrights at the time the Amended Complaint was filed. (Amended Complaint, ¶¶ 54-57). The Amended Complaint also alleges a non-statutory -- that is, common law -- copyright in a radio performance of the routine in 1947. (Amended Complaint, ¶¶ 35, 101).

    B.  <u>Motion to Dismiss</u>

The defendants filed a motion to dismiss the Amended Complaint that (1) asserted that the Routine had fallen into the public domain and (2) advanced a fair use defense. The <u>Hand to God</u> Producers argued that "Who's on First?," originally performed in 1938, cannot have been a work-for-hire under the November 1940 Agreement, because it pre-existed that agreement, which "specifically excluded pre-existing comic routines . . . from work for hire status or other ownership by [UPC]." (Memorandum in Support of Defendants' Joint Motion to Dismiss the First Amended Complaint for Failure to State a Cause of Action ("Def. MTD Memo.") at 14). They further cited the following provision from the November 1940 Agreement to support their position that UPC had "a mere license to incorporate the Routine in its movie" (Def. MTD Memo. at 7):

> <u>FIFTH:</u> The Artists [Abbott and Costello] agree to furnish and make available to the Producer [UPC] <u>all literary and dramatic material and routines heretofore used by the Artists either on the radio or otherwise and now owned by the Artists</u>, and the Producer shall have the right to use said material and routines to such extent as the Producer may desire in connection with any photoplay in which the Artists render their services hereunder and in connection

5

with the advertising and exploitation of such photoplay.
. . . The Artists expressly agree that they will not use
or license, authorize or permit the use of any of the
material and/or routines referred to in this paragraph in
or in connection with motion pictures for any person,
firm or corporation other than the Producer, at any time
prior to the termination of the employment of the Artists
under this agreement or one year after the general
release of the photoplay in which used, whichever is
greater.

The Artists <u>reserve</u> the right to use on the radio and in
personal appearances authorized under the terms of this
agreement any material and routines referred to in this
paragraph; provided, however, that such material and
routines shall have been created or used by the Artists
prior to the date of this agreement or created by the
artists solely (or by writers employed by the Artists in
connection with services other than motion pictures)
during the term of this agreement . . . .

(Def. MTD Memo. at 14 (alterations in original); November 1940
Agreement, attached as Exh. A to Declaration of Mark J. Lawless
dated July 7, 2015 ("Lawless 7/7/15 Decl."), at 5-6). Indeed, the
defendants revealed that Abbott and Costello themselves registered
the script of a version of the Routine broadcast in 1944 -- a fact
"not even alluded to in the [Amended] Complaint" -- which "debases
any notion that [UPC] had acquired ownership of the text of the
Routine under the [November] 1940 Agreement." (Def. MTD Memo. at
7, 15; Certificate of Copyright Registration dated March 13, 1944
("1944 Registration"), attached as Exh. B to Lawless 7/7/15 Decl.).

Moreover, the 1984 Quitclaim "distinguish[es] the text of the
Routine from its registered performances." (Def. MTD Memo. at 15).
Specifically, the 1984 Quitclaim notes that Universal retained
rights under the November 1940 Agreement and a later 1964 agreement
(which allowed UPC to use film footage of Abbott and Costello in a
television documentary) to use (or continue to use) the pair's

6

performance of "Who's on First?" in The Naughty Nineties and in any other "photoplays . . . produced by Universal" pursuant to any agreement between the studio and the duo or their successors-in-interest. (1984 Quitclaim at 1). And the quitclaim was executed "in reliance upon the representation by Jerome E. Weinstein, attorney for ABBOTT & COSTELLO ENTERPRISES" -- a partnership of the heirs of Abbott and Costello -- that the partnership was "the owner of copyright in and to the Routine." (1984 Quitclaim at 2). In light of these facts, the Hand to God Producers contended that "Who's on First?" was "a pre-existing freestanding contribution to a collective work, licensed to [UPC] for inclusion in the work." (Def. MTD Memo. at 15). The defendants thus argued that, while the registration of One Night in the Tropics protected the Routine during the initial copyright term, UPC, as "a mere licensee," could not "register renewal in the copyright when the time came in 1968"; rather, "only Abbott or the heirs to Costello [as owners of the copyright in the Routine] could exercise the renewal right." (Def. MTD Memo. at 15-16). When they failed to do so, the Routine fell into the public domain. (Def. MTD Memo. at 17-18). The defendants' second major argument contended that, even if the plaintiffs owned the copyright in the routine, its appearance in Hand to God constituted fair use. (Def. MTD Memo. at 19-22).

The plaintiffs countered that "[u]nder the terms of the November 1940 Agreement, Abbott & Costello granted UPC all rights in the existing versions of the Who's on First? [sic] routine in connection with the motion pictures that UPC produced, in which

7

Abbott & Costello would perform." (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Pl. MTD Memo.") at 6). Like the defendants, they pointed to the fifth provision of the agreement, but supplied different emphasis in order to bolster their position that the November 1940 Agreement was no mere license, but rather was an assignment of the copyright:

> The Artists agree <u>to furnish and make available to the Producer all literary and dramatic material and routines heretofore used by the Artists</u> either on the radio or otherwise and <u>now owned by the Artists</u>, and the <u>Producer shall have the right to use said material and routines</u> to such extent as the Producer may desire in connection with any photoplay in which the Artists render their services hereunder and in connection with the advertising and exploitation of such photoplay. The Artists warrant that they know of <u>no claims that the use of said material and routines or any part thereof as herein permitted will violate or infringe any copyright or any other right or rights</u> of any other person, firm or corporation whatsoever.

(Pl. MTD Memo. at 6-7 (quoting November 1940 Agreement at 5)).

The plaintiffs also cited the first section of the November 1940 Agreement, which is the work-for-hire provision:

> [T]he <u>Producer hereby engages and employs the Artists</u>, severally and as a team . . . to <u>render to the Producer their exclusive services as actors, performers and entertainers</u> in the portrayal of such roles or parts as may be designated by the Producer in such photoplays as may be designated by the Producer, and <u>further employs the Artists to render their services in consulting, advising, collaborating with and assisting the Producer in the preparation of stories and screen plays upon which such photoplays are to be based</u> and in otherwise performing such services as may be required of them pursuant to the provisions of this agreement.

(Pl. MTD Memo. at 7 (quoting November 1940 Agreement at 1)). This provision, they argued, "sets out the services that Abbott & Costello were expected to provide -- specifically, to help prepare

the content of motion pictures, and to perform that content. Such content included a version of <u>Who's on First?</u> [sic], and as such, was prepared as a work-for-hire for UPC." (Pl. MTD Memo. at 7). Consequently, under the Copyright Act of 1909, "UPC was considered the 'author' of the version of <u>Who's on First?</u> [sic] that appeared in the 1940 Motion Picture for purposes of copyrighting the work." (Pl. MTD Memo. at 7). Returning to the fifth provision, the plaintiffs contended that the reservation of rights merely allowed Abbott and Costello "to continue to use and perform, on the radio or in personal appearances, versions of <u>Who's on First?</u> [sic] that pre-dated the 1940 Agreement, or that were created separate and apart from the motion pictures produced by UPC thereunder." (Pl. MTD Memo. at 8-9). Asserting that "[a] motion picture . . . is an integrated work," the Abbott and Costello Successors insisted, "[T]here can be no dispute that, until the 1984 execution of the Quitclaim Agreement, UPC was the <u>sole</u> owner of the federal copyright in [<u>One Night in the Tropics</u>] and [<u>The Naughty Nineties</u>] and was therefore the <u>only</u> party eligible to register or renew the <u>Who's on First?</u> [sic] routines contained therein." (Pl. MTD Memo. at 9).

The Abbott and Costello Successors then introduced an agreement from July 1940 -- not mentioned in the Complaint or the Amended Complaint because it was "discovered . . . after the filing of the Amended Complaint" (Pl. MTD Memo. at 10 n.7) -- to argue that, even if the Routine was not covered by the November 1940 Agreement, "alternatively, it certainly was covered" by the prior

9

agreement, in which Abbott and Costello "g[a]ve and grant[ed] to
[UPC] the sole and exclusive right to photograph and/or otherwise
reproduce any and all of their acts"; "furnish[ed]" UPC with "the
material and routines heretofore used and now owned by [Abbott and
Costello] for use by [UPC] in the photoplay [One Night in the
Tropics] . . . and for which [UPC] shall have exclusive motion
picture rights"; and "g[a]ve and grant[ed] to [UPC] solely and
exclusively all rights of every kind and character whatsoever in
and to the same" (Pl. MTD Memo. at 10 (emphasis omitted) (quoting
Agreement dated July 24, 1940 ("July 1940 Agreement"), attached as
Exh. B to Declaration of Marc J. Rachman dated July 31, 2015, at 3-
4)).  Those rights survived the execution of the November 1940
Agreement.  (Pl. MTD Memo. at 11).

The plaintiffs stated that language in the 1984 Quitclaim that
ACE was the owner of the copyright in the Routine refers to the
common law copyright rather than statutory copyrights.  (Pl. MTD
Memo. at 11-12).  Moreover, if UPC did not own the rights to the
Routine, it would not have had the power to grant them to ACE, and
"the [1984] Quitclaim [] would have been [] pointless."  (Pl. MTD
Memo. at 12).

The Abbott and Costello Successors asserted that these facts
established that UPC was the only entity that could have renewed
the copyright in One Night in the Tropics and consequently protect
the Routine.  (Pl. MTD Memo. at 12).  They countered the
defendants' position that "Who's on First?" was a freestanding
contribution to a collective work merely licensed to UPC by

10

arguing, again, that the movie was "an integrated work where the component elements are indivisible from each other," rather than a composite work. (Pl. MTD Memo. at 14). They then addressed the 1944 Registration, calling the defendants' argument that it registered the script of "Who's on First?" in the names of Abbott and Costello for a radio performance "utter speculation." (Pl. MTD at 18).

The Abbott and Costello Successors went on to oppose the defendants' argument that <u>Hand to God</u>'s quotation of the Routine was fair use, and asserted that the 1947 radio performance "remain[ed] protected under common law copyright."[2] (Pl. MTD Memo. at 20-25).

C.  <u>The District Court Opinion</u>

The Honorable George B. Daniels, U.S.D.J., granted the defendants' motion, agreeing only with their fair use argument. Judge Daniels noted that, "[a]s a threshold matter, a federal infringement claim requires that Plaintiffs allege they possessed a valid copyright at the time of the alleged infringement." <u>TCA I</u>, 151 F. Supp. 3d at 426.  He found that Abbott and Costello "retained common law copyright protection" of "Who's on First?" as performed on the radio in 1938; additionally, the November 1940 Agreement, which "furnish[ed] and ma[de] available to [UPC] all . . . routines heretofore used by [Abbot and Costello] . . . and

_____

[2] After oral argument on the motion to dismiss, the plaintiffs voluntarily dismissed without prejudice claims against all defendants other than Mr. McCollum, Ensemble Studio Theatre Inc., MCC Theater, Robert Askins, Hand to God LLC, and the Doe defendants. (Memorandum Endorsement dated Sept. 18, 2015).

now owned by [them]" in connection with UPC's later registration of the copyrights in One Night in the Tropics and The Naughty Nineties, "constitute[d] an implied assignment of the initial [common law] copyright from Abbott and Costello."[3] Id. at 428-29 (quoting November 1940 Agreement). He discounted the 1944 Registration, saying "its existence does not render Plaintiffs' factual allegations implausible," because Abbott and Costello could have been mistaken about their ownership of the copyright. Id. at 429-30. The initial publication of "Who's on First?" within One Night in the Tropics, to which UPC held the copyright, "extinguished whatever common law copyright Abbott and Costello had in the unpublished version of the Routine." Id. at 430. Finally, Judge Daniels held that

> [b]ecause as much of the 1938 Routine as was disclosed in the motion picture was published when the motion picture was published, and because the law treats motion pictures as unitary works, the copyrights in One Night [in the Tropics] and The Naughty Nineties that UPC registered "merged" the Routine with the film.

Id. at 431. "Thus, Plaintiffs [] sufficiently alleged a continuous chain of title" over "Who's on First?" Id.

Judge Daniels then analyzed the use of the routine in Hand to God applying the "four nonexclusive factors" of 17 U.S.C. § 107. See id. at 433-37. He found that the routine was "clearly a creative work" and that the proportion of the routine used was substantial; however, he also ruled that the use of the routine in Hand to God did not affect the market for the original and that,

---

[3] Assignment of a common law copyright does not require a writing. See id. at 428 (collecting cases).

most importantly, its use in the play was transformative.  <u>See</u> <u>id.</u>
He therefore found that the defendants were protected by the fair
use doctrine and that the plaintiffs had failed to state a claim.[4]
<u>Id.</u> at 437.

D.  <u>Appellate Arguments</u>

The plaintiffs appealed the judgment, arguing that Judge
Daniels misapplied the fair use factors.  (Brief and Special
Appendix for Plaintiffs-Appellants, attached as Exh. A to
Declaration of Jonathan D. Reichman dated Feb. 9, 2017 ("Reichman
Decl."), at 16-18).  The <u>Hand to God</u> Producers did not cross-
appeal.  Instead, they opposed the Abbott and Costello Successors'
fair use argument and additionally contended that pursuant to the
so-called "Right for Any Reason Rule,"[5] the Second Circuit could
affirm the District Court's judgment if it found that "no valid
copyright exists for the text" of the Routine.  (Brief for
Defendants-Appellees ("Appellee Br."), attached as Exh. B to
Reichman Decl., at 8-10, 28-29).  The <u>Hand to God</u> Producers argued
that the district court's opinion was flawed "by three leaps of
faith."  (Appellee Br. at 31).  The first was that Abbott and
Costello in 1940 signed away "all of their existing comedic

---

[4] In addition, Judge Daniels held that the any common law
copyright in pre-1972 radio recordings had been extinguished.  <u>See</u>
<u>id.</u> at 437.

[5] "An appellee who does not take a cross-appeal may 'urge in
support of a decree any matter appearing before the record,
although his argument may involve an attack upon the reasoning of
the lower court.'"  <u>Jennings v. Stephens</u>, __ U.S. __, __, 135 S.
Ct. 793, 798 (2015) (quoting <u>United States v. American Railway</u>
<u>Express Co.</u>, 265 U.S. 425, 435 (1924)).

birthright" to UPC in exchange for a possible multi-picture deal. (Appellee Br. at 31). The second was that Abbott and Costello "and their successors' lawyers continuously erred and betrayed" that agreement "by making separate filings in the Copyright Office reflecting [that] Abbott & Costello's copyright ownership of the text arose from their 1944 registration." (Appellee Br. at 31). In support of this contention, the Hand to God Producers pointed out that Abbott and Costello's heirs "repeatedly referred to the 1944 registration" for the "A&C Baseball Routine" in "subsequent registrations for variations of the Routine." (Appellee Br. at 32; see TCA II (No. 16-0134), Joint Appendix at 240, 242-43, 245). The third was "that the heirs' written representation to Universal Studio that they were 'the owner[s] of copyright in and to the Routine,' which was made to induce the Quitclaim . . . , actually referred to an extinguished common law copyright and not to federal copyright in the Routine itself." (Appellee Br. at 31).

The Hand to God Producers went on to argue that the Routine cannot have been a work made for hire under the November 1940 Agreement because it pre-existed that agreement; that the 1940 Agreements were not assignments of copyright, but rather licenses; and that there is no evidence of an oral or implied assignment as suggested by Judge Daniels. (Appellee Br. at 34-39). Thus, the copyright protection of the 1940 version of the Routine could not be extended by UPC through its renewal of the copyright to the film, but rather had to be renewed by Abbott and the heirs of Costello when the original copyright in One Night in the Tropics

14

expired in 1968. (Appellee Br. at 40).

The Abbott and Costello Successors' reply insisted that the copyright in the Routine was assigned to UPC and thus UPC's ownership was not dependent on a work-for-hire arrangement, but that, if it were, the 1940 work-for-hire provision confirmed a previously agreed-to work-for-hire arrangement. (Reply Brief for Plaintiffs-Appellants ("Appellant Reply"), attached as Exh. C to Reichman Decl., at 22-23). Addressing the 1944 Registration, the Abbott and Costello Successors noted that it was not accompanied by a deposit of the script, "which would be necessary for determining to what extent the . . . 'script' contained 'new matter' not included in the earlier 1940 [] [m]ovie." (Appellant Reply at 24). Therefore, although the 1944 Registration was not renewed, "it would not have injected into the public domain those portions of the Routine contained in the earlier . . . [m]ovie." (Appellant Reply at 24). The statement about ownership of "Who's on First?" in the 1984 Quitclaim merely "confirm[ed] that [Universal] was returning certain rights in the Routine to the proper persons." (Appellant Reply at 25). Finally, the Abbott and Costello Successors contended that the district court properly found that "so much of the Routine as was used in the [m]ovies 'merged' with the [m]ovies to become a 'unitary whole' with a single copyright owner, UPC." (Appellant Reply at 27-28).

E.    The Second Circuit Opinion and Subsequent Submissions

The Court of Appeals affirmed the District Court's dismissal, agreeing with the Hand to God Producers' argument that the Routine

15

had fallen into the public domain when Abbott and Costello's heirs failed to renew the copyright in 1968. In particular, the Second Circuit held that dismissal was not proper based on fair use, finding that "all four statutory factors weigh[ed] in favor of plaintiffs and against a defense of fair use." TCA II, 839 F.3d at 187. However, the court "identif[ied] no merit in any of the theories relied on by plaintiffs to support their copyright claim," -- that is, assignment, work for hire, or merger –- and therefore "affirm[ed] dismissal of the amended complaint for failure to plead a valid copyright." Id.

Regarding assignment of the copyright, the Court or Appeals examined both the November 1940 Agreement, which was a multi-year and multi-picture agreement, and the July 1940 Agreement by which Abbott and Costello agreed to appear in Night in the Tropics. Id. at 173. The court found Judge Daniels' conclusion that the language of the November 1940 Agreement could be construed as an implied assignment of the initial copyright "flawed in two respects." Id. at 188. First, each of the two relevant agreements "clearly express[es] the parties' intent for Abbott and Costello to license the use of, not assign copyrights in, their existing comedy routines." Id. Second, "requiring no further discussion in the face of clear contract language," the court found that "UPC's registration (and renewal) of copyrights in its movies says nothing about what Abbott and Costello intended to convey in the two agreements," reasoning that, whether or not UPC had rights in the Routine, it would have renewed the films' copyrights in order to

16

protect its rights in the films themselves.  Id. at 188.

The July 1940 Agreement, in which the duo agreed to appear in Night in the Tropics, merely "furnish[ed] UPC with 'routines heretofore used and now owned by [Abbott and Costello] for use by [UPC] in the photoplay in which they appear hereunder and for which [UPC] shall have the exclusive motion picture rights.'" Id. (quoting July 1940 Agreement at 4).  Similarly, the November 1940 Agreement

> states that the team would furnish UPC with all "routines
> heretofore used by [Abbott and Costello] either on the
> radio or otherwise and now owned by [Abbott and
> Costello]," and that UPC would "have the right to use
> said material and routines to such extent as [UPC] may
> desire in connection with any photoplay in which the
> Artists render their services hereunder."

Id.  This quoted language from the two agreements "makes plain[] [that] Abbott and Costello furnished UPC with their routines for a limited purpose: use in any movies in which the team appeared under the respective agreements.  This is unmistakably the language of an exclusive, limited-use license, not the assignment of copyright." Id. at 188-89.  The court further concluded that the Routine was not a work-for-hire owned by UPC because "it is not plausible to infer that the Routine as performed in 1938," which predated the work-for-hire provision in the November 1940 Agreement, "did not already contain" the parts of the routine appropriated in Hand to God.  Id. at 190.  Finally, the argument that a copyright in the Routine could not be registered separately from the films because the routine merged with the films failed.  Id. at 191.  "Who's on First?" was a freestanding work, pre-existing the films and

17

performed by Abbott and Costello for years after, as contemplated in the July 1940 Agreement and the November 1940 Agreement. Id. at 191-92. The 1984 Quitclaim's "representation that plaintiffs' predecessors-in-interest still owned the Routine's copyright in 1984 [was] also at odds with the argument that the Routine had so merged with [One Night in the] Tropics as to admit a single copyright owned by UPC." Id. at 191. The court concluded:

> In sum, because plaintiffs fail plausibly to allege that (1) Abbott and Costello assigned their common law copyright in Who's on First? [sic] to UPC; (2) the Routine, as appropriated by defendants in Hand to God, was first created for UPC as a work-for-hire; or (3) the Routine so merged with the UPC movies in which it was performed as to become a unitary whole, we conclude that plaintiffs did not plead their possession of a valid copyright in the Routine, as required to pursue their infringement claim.

Id. at 192.

Based on the Second Circuit's opinion affirming the dismissal, the Hand to God Producers filed a motion for attorneys' fees. When the Abbott and Costello Successors filed a petition for a writ of certiorari,[6] I denied that motion without prejudice to renewal in

---

[6] The petition argued only that the Routine merged into the films in which it appeared and pressed a variation of the theory they presented to Judge Daniels and the Second Circuit. (Petition for a Writ of Certiorari ("Cert. Petition"), attached as Exh. to Letter of Jonathan D. Reichman dated April 19, 2017, at 13-14, 20-21). The Abbott and Costello Successors contended that UPC's renewal of the copyright of One Night in the Tropics prevented the Routine from falling into the public domain because, prior to its appearance in the film, it was not protected by statutory copyright (because it had not been "published" as that term is understood under the 1909 Copyright Act). (Cert. Petition at 24, 28). They distinguished cases rejecting the theory of merger for freestanding works appearing in longer works like films by noting that, in those cases, the non-integrated material had previously been protected by copyright by operation of law. (Cert. Petition at 27). Under this argument, what is determinative is not whether the relevant work is

the event that the petition was denied, as it was on May 22, 2017.
The <u>Hand to God</u> Producers thereafter renewed the motion. (Order
dated May 23, 2017).

<u>Discussion</u>

    A.  <u>Legal Standard</u>

According to Section 505, a district court may in its
discretion "award a reasonable attorney's fee to the prevailing
party." 17 U.S.C. § 505. "Fee awards, however, are not
'automatic' or given 'as a matter of course.'" <u>Beastie Boys v.
Monster Energy Co.</u>, 112 F. Supp. 3d 31, 39-40 (S.D.N.Y. 2015)
(quoting <u>Fogerty v. Fantasy, Inc.</u>, 510 U.S. 517, 533 (1994)).
Rather, awards under this section "should encourage the types of
lawsuits that promote" the Copyright Act's aims of "encouraging and
rewarding authors' creations while also enabling others to build on
that work." <u>John Wiley & Sons, Inc. v. Kirtsaeng</u>, No. 08 Civ.
7834, 2016 WL 7392210, at *2 (S.D.N.Y. Dec. 21, 2016) (quoting
<u>Kirtsaeng v. John Wiley & Sons, Inc.</u> (<u>Kirtsaeng II</u>), __ U.S. __,
__, 136 S. Ct. 1979, 1986 (2016)).[7]

---

freestanding and separable, but whether it was protected by
statutory copyright prior to its inclusion in a motion picture.

    [7] The Supreme Court first addressed <u>Kirtsaeng v. John Wiley &
Sons, Inc.</u> in 2013, with a majority of the Court finding that "the
'first sale' doctrine applies to copies of a copyrighted work
lawfully made abroad," reversing the judgment in favor of
plaintiff-appellee John Wiley & Sons, Inc. ("John Wiley"), and
remanding the case. <u>Kirtsaeng v. John Wiley & Sons, Inc.</u>
(<u>Kirtsaeng I</u>), __ U.S. __, __, __, 133 S. Ct. 1351, 1355-56, 1371
(2013). On remand, the district court denied the defendant's
motion for attorneys' fees under Section 505, and that issue
eventually came before the Supreme Court in <u>Kirtsaeng II</u>.
<u>Kirtsaeng II</u>, __ U.S. at __, 136 S. Ct. at 1983-84.

The Supreme Court recently provided "additional guidance" in the form of "governing standards and principles" to prevent "utterly freewheeling inquiries" under Section 505. Kirtsaeng II, __ U.S. at __, 136 S. Ct. at 1979, 1985-86. While the Court held that "substantial weight" should be given "to the objective (un)reasonableness of a losing party's litigation position," id. at __, 136 S. Ct. at 1986, it also cautioned that this factor "can be only an important [one] in assessing fee applications -- not the controlling one," id., __ U.S. at __, 136 S. Ct. at 1988. That is, a finding of reasonableness should not "raise a presumption against granting fees" or become the de facto dispositive factor in the analysis. Id. at __, 136 S. Ct. at 1989. So a district court must also take into account "all other relevant factors," id. at __, 136 S. Ct. at 1989, including "the frivolousness of the non-prevailing party's claims or defenses; [] [the] party's motivation; . . . and [the goals of] compensation and deterrence," Bryant v. Media Right Productions, Inc., 603 F.3d 135, 144 (2d Cir. 2010) (citing Fogerty, 510 U.S. at 534 n.19). The inquiry may analyze conduct other than the legal and factual positions that caused the non-prevailing party ultimately to fail. See, e.g., BMG Rights Management (US) LLC v. Cox Communications, Inc., No. 14-cv-1611, 2017 WL 600093, at *4 (E.D. Va. Feb. 14, 2017) (examining defendants' discovery abuses), appeal docketed, Nos. 17-1352, 17-1353 (4th Cir. March 20, 2017).

B.  Analysis

    1.  Objective Unreasonableness

The plaintiffs argue that their litigation position should not be found objectively unreasonable because (1) the Second Circuit determined that their arguments against the defendants' fair use defense were "in fact entirely valid" and (2) Judge Daniels found merit in the plaintiffs' position on the copyright ownership issue (which the plaintiffs call the "standing" issue).  (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Attorneys' Fees ("Pl. Fees Memo.") at 8-9).

The fact that the plaintiffs' position on the fair use issue was ultimately vindicated does not require a determination that their litigation position was objectively reasonable.  Rather, if a claim "is clearly without merit on any determinative issue, then it is objectively unreasonable."  Torah Soft Ltd. v. Drosnin, No. 00 Civ. 5650, 2001 WL 1506013, at *5 (S.D.N.Y. Nov. 27, 2001). Here, the Abbott and Costello Successors may have won the fair use battle, but they lost the war -- and on a fundamental issue: the existence of a valid copyright in the material used by the defendants.  The Second Circuit's decision that the routine had fallen into the public domain eviscerated the plaintiffs' standing to bring suit.  See Creazioni Artistiche Musicali, S.r.l. v. Carlin America, Inc., No. 14 Civ. 9270, 2016 WL 7507757, at *2 (S.D.N.Y. Dec. 30, 2016) ("[I]n order to have standing to sue, a plaintiff must be 'the legal or beneficial owner of an exclusive right under a valid copyright at the time of the alleged infringement.'"

(quoting Hutson v. Notorious B.I.G., LLC, No. 14 Civ. 2307, 2015 WL 9450623, at *3 (S.D.N.Y. Dec. 21, 2015))); Pannonia Farms, Inc. v. USA Cable, No. 03 Civ. 7841, 2006 WL 2872566, at *5 (S.D.N.Y. Oct. 5, 2006) (holding that there was no legal basis for plaintiffs' copyright claims where subject of suit was "clearly in the public domain"). Without standing to sue, the plaintiffs' positions on whether Hand to God's use of the routine was transformative, commercial, substantial, or affected the market for the original were, at most, of academic interest.

The plaintiffs' second proposition -- that the fact that Judge Daniels found that they owned a valid copyright precludes a finding that their position on this issue was objectively unreasonable -- is also problematic. First, it is not unusual for courts to disagree, even on such fundamental issues as whether a particular position is reasonable or not.[8] Second, and more fundamentally, it

---

[8] For example, courts regularly disagree on whether a statute is ambiguous, that is, whether it is "susceptible to two or more reasonable meanings." Rabin v. Wilson-Coker, 362 F.3d 190, 196 (2d Cir. 2004) (quoting Natural Resources Defence Council v. Muszynski, 268 F.3d 91, 98 (2d Cir. 2001)). In that situation, the court finding the statute unambiguous must necessarily find that at least one of the other courts' potential interpretations is unreasonable. Similarly, we have been cautioned that "language . . . does not automatically become ambiguous every time two courts disagree as to its meaning." United States v. Leal-Felix, 625 F.3d 1148, 1158 (9th Cir. 2010) (Bennett, J., dissenting), rev'd en banc, 665 F.3d 1037 (9th Cir. 2011); see also Moskal v. United States, 498 U.S. 103, 108 (1990). That is, each of two (or more) courts may find a different position reasonable, but that does not necessarily mean all of those positions must always be considered reasonable. See, e.g., Carr v. United States, 560 U.S. 438, 444, 456-57 (2010) (finding statute's meaning plain although circuits were split on proper interpretation); see also In re Philadelphia Newspapers, LLC, 599 F.3d 298, 313 (3d Cir. 2010) ("[A]s Justice Thomas has observed, '[a] mere disagreement among litigants over the meaning of a statute does not itself prove ambiguity; it usually means that

22

focuses on Judge Daniels' opinion attention that more properly should be trained on the Abbott and Costello Successors' litigation positions -- specifically, on the reasonableness of the Abbott and Costello Successors' litigation positions in light of the outcome of the case.[9]  The question to be answered, then, is whether it was objectively reasonable for the Abbott and Costello Successors to argue that (1) the 1940 Agreements assigned the copyright in the Routine to UPC rather than licensing it, (2) the Routine was a work-for-hire and therefore originally owned by UPC, or (3) the Routine merged with the film <u>One Night in the Tropics</u>, the copyright to which UPC registered and renewed.

Although each of these issues exhibits some complexity, ultimately none is a particularly close call.  Indeed, the Second Circuit's opinion calls the positions of the Abbott and Costello Successors meritless, <u>TCA Television</u>, 839 F.3d at 187, and implausible, <u>id.</u> at 190; and finds the facts and legal principles supporting the defendants' positions clear, <u>id.</u> at 188-89; plain,

---

one of the litigants is simply wrong.'  The same is true of disagreements among courts." (second alteration in original) (internal citation omitted) (quoting <u>Bank of America National Trust & Savings Association v. 203 North LaSalle Street Partnership</u>, 526 U.S. 434, 461 (1999) (Thomas, J., concurring))).

[9] To be sure, Justice Kagan supported her statement that John Wiley's (unsuccessful) position in <u>Kirtsaeng I</u> was reasonable by noting that "several Courts of Appeals and three Justices of the Supreme Court had agreed with it."  <u>Kirtsaeng II</u>, __ U.S. at __, 136 S. Ct. at 1984.  I do not, however, read that dictum to indicate either that the fact that one or more judges (or justices) have sided with a non-prevailing party (or other litigants similarly situated to that non-prevailing party) requires a finding of reasonableness or that those jurists' opinions, rather than the non-prevailing party's positions, are the proper target of the inquiry.

id. at 189-90; and unmistakable, id. at 189.  As further discussed below, I agree with these characterizations and further find that, notwithstanding any intricacy arising from the interpretation of interrelated documents created over a period of decades, the Abbott and Costello Successors' arguments were objectively unreasonable.

a.  Assignment

As noted, the Second Circuit found that the language of the July 1940 Agreement and the November 1940 Agreement "plain[ly]" furnished a mere license to UPC to use the Routine in movies, with Abbott and Costello retaining the right to exploit "Who's on First?" in other ways and in other media.  TCA II, 839 F.3d at 188-89.  That is the only reasonable reading of the agreements.  Each one clearly grants UPC the right to use the Routine only in one or more motion pictures.  Indeed, as the Second Circuit noted, counsel for the plaintiffs "acknowledged as much in the district court when they argued that the agreements' language 'represented a clear grant of rights to UPC in all previous acts and routines created by Abbott and Costello . . . if used in any motion pictures produced by UPC in which Abbott & Costello provided their services."[10]  Id.

_____

[10] Similarly, although the Abbott and Costello Successors emphasized language from the July 1940 Agreement granting UPC "solely and exclusively all rights of every kind and character whatsoever in and to the same," it is clear from the context that "the same" comprises only the team's routines as used "in the photoplay in which they appear hereunder," that is, One Night in the Tropics.  (Pl. MTD Memo. at 10 (quoting July 1940 Agreement at 4)).  Again, the plaintiffs acknowledged this when they argued, "This language conveys an absolute grant of all rights in all of Abbott & Costello's acts and performances thereof in motion pictures produced under the July 1940 Agreement for UPC."  (Pl. MTD Memo. at 10 (emphasis added)).

24

at 189 n.16 (quoting Pl. MTD Memo. at 7). Moreover, the November 1940 Agreement limited Abbott and Costello's "ability to use or license specific material (i.e., material created before the agreements) only 'in connection with motion pictures' and only for a limited time" -- until the termination of the duo's employment or one year after the release of the film in which their material was used -- which "plainly indicates the parties' understanding that the team retained ownership of the copyright in their pre-agreement material and granted UPC only a license." Id. at 189. This is confirmed by the fact that, under the 1909 Copyright Act, which was in effect in 1940, "copyrights were 'indivisible,' meaning that the bundle of rights that accrued to a copyright owner could only be assigned as a whole, and the transfer of anything less than all rights was deemed a license rather than an assignment." Jim Henson Productions, Inc. v. John T. Brady & Associates, Inc., 16 F. Supp. 2d 259, 288 (S.D.N.Y. 1997); see also Goodis v. United Artists Television, Inc., 425 F.2d 397, 400 (2d Cir. 1970).

The 1984 Quitclaim does not help the plaintiffs. As noted above, the Second Circuit found that the language of the document undermined the notion that Universal owned the copyright in the Routine. TCA II, 839 F.3d at 191. Additionally, the plaintiffs' arguments regarding the quitclaim are logically and legally unsound. First, the Abbott and Costello Successors insist (without further elucidation) that the recital that Abbott and Costello Enterprises owned the copyright "clear[ly] . . . refer[s] to ACE as the owner of the common law copyright" in the Routine rather than

the federal copyrights. (Pl. MTD Memo. at 11). But that is not at all apparent from the language of the document. Indeed, the only way I can see that such an interpretation would be "clear" is if one had already accepted the premise that Universal owned the statutory copyrights, in which case that common law copyright would be the only interest left. That is circular reasoning. Second, the plaintiffs contend that had Universal not owned the rights to "Who's on First?" the 1984 Quitclaim "would have been utterly pointless." (Pl. MTD Memo. at 12). But that misapprehends the purpose of a quitclaim, which does not warrant that the grantor has any ownership interest in the property at issue; rather, it merely "transfers whatever present right or interest the grantor has." Westlake v. Silva, 49 Cal. App. 2d 476, 478, 121 P.2d 872, 873 (1942); see City of Manhattan Beach v. Superior Court, 13 Cal. 4th 232, 239, 914 P.2d 160, 165 (1996) ("[A quitclaim] deed does not imply any precedent interest . . . ."); see also In re Marriage of Gioia, 119 Cal. App. 4th 272, 280, 14 Cal. Rptr. 3d 362, 368 (2004) ("By issuing the quitclaim deed, [the grantor] was only transferring whatever interest the estate possessed at the time of conveyance, if any. As quitclaim deeds contain no implied warranty of title, [the grantor] was not representing that the estate had an interest in the property.").[11]

---

[11] I have assumed that the 1984 Quitclaim is governed by California law, as that is the place it was executed. (1984 Quitclaim at 2). But a quitclaim has the same attributes in New York and elsewhere. See, e.g., Ebenstein v. Pritch, 275 A.D. 256, 259, 89 N.Y.S.2d 282, 284-85 (1st Dep't 1949) ("[A] quitclaim deed . . . does not set forth that the grantor is the owner of any interest in the property transferred."); 23 Am. Jur. 2d Deeds § 276

The Abbott and Costello Successors' position that the limited license was actually an assignment, which appears to ignore the plain language of the agreements as well as controlling law, was therefore objectively unreasonable.

b.  Work Made for Hire

The Second Circuit also ruled that the Amended Complaint failed to plead sufficiently that the Routine was a work made for hire under the 1940 agreements such that authorship inhered in UPC. TCA II, 839 F.3d at 190.  A work is a work for hire if it "is made at the hiring party's 'instance and expense'" and the hiring party has the right "to direct and supervise the manner in which the writer performs his work." Playboy Enterprises v. Dumas, 53 F.3d 549, 554 (2d Cir. 1995) (quoting Brattleboro Publishing Co. v. Winmill Publishing Corp., 369 F.2d 565, 567 (2d Cir. 1966), and Picture Music, Inc. v. Bourne, Inc., 457 F.2d 1213, 1216 (2d Cir. 1972)).  But here the Abbott and Costello Successors admit that the Routine pre-existed the 1940 agreements by "more than two years." TCA II, 839 F.3d at 190; (Amended Complaint, ¶ 32).  Therefore, the comedy team "plainly did not create the Routine at UPC's 'instance and expense.'"  TCA II, 839 F.3d at 190.

The court made short shrift of the Abbott and Costello Successors' counter-arguments, which misapplied (or misunderstood) the pleading burden.  The plaintiffs suggested that the Routine as it appeared in One Night in the Tropics contained material written specifically for the film under the work-for-hire provision in the

_____

(2017 update).

November 1940 Agreement, and they complained that the <u>Hand to God</u>
Producers failed to establish the "scope of protectible expression
of the 1938 radio broadcast." <u>Id.</u> Without that information, it
was not possible to determine what parts of "Who's on First?" pre-
existed the film's version of the Routine.  The problem with this
argument should be obvious: it is the <u>plaintiffs'</u> burden to allege
"1) which specific original works are the subject of the copyright
claim, 2) that plaintiff owns the copyrights in those works, 3)
that the copyrights have been registered in accordance with the
statute, and 4) by what acts during what time the defendant
infringed the copyright." <u>Warren v. John Wiley & Sons, Inc.</u>, 952
F. Supp. 2d 610, 616 (S.D.N.Y. 2013) (quoting <u>Kelly v. L.L. Cool
J.</u>, 145 F.R.D. 32, 36 (S.D.N.Y. 1992)).

Finally, the Abbott and Costello Successors' contention that
the November 1940 work-for-hire provision "confirmed" a pre-
existing agreement (Appellant Reply at 22-23) is unsupported by any
allegation in the Amended Complaint.  Indeed, it is arguably
contradicted by the allegation that the work-for-hire provision
itself constituted the grant to UPC of "all rights to the duo's
performances" of the Routine in <u>One Night in the Tropics</u> and <u>The
Naughty Nineties</u>.  (Amended Complaint, ¶ 43).

        c.   <u>Merger</u>

"[A]uthors of <u>freestanding</u> works that are incorporated into a
film . . . may copyright these 'separate and independent works.'"
<u>TCA II</u>, 839 F.3d at 191 (quoting <u>16 Casa Duse, LLC v. Merkin</u>, 791
F.3d 247, 259 (2d Cir. 2015)).  That is, when a "freestanding work"

28

like "Who's on First?" appears in a movie, it does not become part
of an "integrated 'work of authorship'" such that it cannot be
separately copyrighted. <u>16 Casa Duse</u>, 791 F.3d at 259.  Here,
then, the question is whether it was objectively unreasonable for
the plaintiffs to argue that "the Routine so merged with the UPC
movies in which it was performed as to become a unitary whole."
<u>TCA II</u>, 839 F.3d at 192.

The Abbott and Costello Successors' litigation position was
marked by a failure to acknowledge the governing legal principle
stated above.  The principle was not a novel one; the <u>16 Casa Duse</u>
Court found support for it in the statutory definition of a
collective work.[12]  791 F.3d at 259 (quoting 17 U.S.C. § 101).  In

_____

[12] To the extent that <u>16 Casa Duce</u> contradicts the statement
of the Copyright Office Board of Appeals that "[t]he Copyright
Office generally regards a motion picture as a work of authorship
which evidences a common design and is meant to exist as an
integrated whole," (Letter of Nanette Petruzzelli, Chief, Examining
Division for the Appeals Board, United States Copyright Office,
dated May 14, 2002 ("<u>Husbands</u> Decision"), attached as Exh. 1 to Pl.
MTD Memo., at 4), that decision would give way to the Second
Circuit's <u>16 Casa Duce</u> opinion.  <u>See, e.g.</u>, <u>Morris v. Business
Concepts, Inc.</u>, 283 F.3d 502, 505 (2d Cir. 2002) (stating, "We
recognize that 'the Copyright Office has no authority to give
opinions or define legal terms, and [that] its interpretation on an
issue never before decided should not be given controlling
weight,'" but deferring to interpretation to extent of its
persuasiveness (alteration in original) (quoting <u>Bartok v. Boosey
& Hawkes, Inc.</u>, 523 F.2d 941, 946–47 (2d Cir. 1975))).  Moreover,
the <u>Husbands</u> Decision goes on to describe a "composite work," that
is, a work that does not "merge into a unitary whole," as "an
original publication relating to a variety of subjects to which a
number of different authors have contributed distinguishable and
separable sections." <u>Husbands</u> Decision at 4.  This description is
echoed in the Abbott and Costello Successors' own description of
<u>One Night in the Tropics</u>: "[t]he <u>Who's on First?</u> [sic] routine that
appears therein is only a small segment of the 1940 [film], the
majority of which contents Abbott & Costello had no part in
creating and made no contribution." (Pl. MTD Memo. at 12).

the plaintiffs' opposition to the motion to dismis, the Abbott and Costello Successors doggedly insisted that a motion picture is necessarily a "unitary work." (Pl. MTD Memo. at 1-2, 6, 9, 14). They persisted in that stand in their unitary work argument on appeal. (Appellant Reply at 18, 20, 27). Moreover, as the Second Circuit noted, the two cases on which the plaintiffs principally relied -- Garcia v. Google, 786 F.3d 733 (9th Cir. 2015) (en banc), and Richlin v. Metro-Goldwyn-Mayer Pictures, 531 F.3d 962 (9th Cir. 2008) -- did not support this position. TCA II, 839 F.3d at 191-92. Rather, Garcia was factually not analogous, and Richlin's reasoning "undermine[d] rather than support[ed] the plaintiffs' merger theory." Id. Indeed, Richlin (like 16 Casa Duce) notes that the component parts of a motion picture may be separately copyrightable. See Richlin, 531 F.3d at 976.

Perhaps it is not surprising that the plaintiffs avoided articulating this precept considering that a number of their factual allegations and legal arguments turn out to support the conclusion that "Who's on First?" was a separate, independent work that appeared in UPC's films. The plaintiffs continually discussed the Routine as a separate work -- with its own title -- in which the rights protected by copyright inhere. Thus, for example, the Abbott and Costello Successors could contend that the November 1940 Agreement "represented a clear grant of rights to UPC in all previous acts and routines created by Abbott & Costello, including . . . their most famous routine, Who's on First? [sic]," and that the Routine "was prepared as a work-for-hire" pursuant to that same

30

agreement.  (Pl. MTD Memo. at 7, 12).  As the Second Circuit

recognized, the plaintiffs admitted that the Routine pre-existed

the films in which it appeared and was performed independently of

those films countless times after their release.  TCA II, 839 F.3d

at 191-92.  Moreover, as noted above, the plaintiffs acknowledged

that the "Who's on First?" routine "is only a small segment of [A

Night in the Tropics], the majority of which contents Abbott &

Costello had no part in creating and made no contribution" (Pl. MTD

Memo. at 12), recalling the Copyright Office's description of a

"composite work," Husbands Decision at 4.  Indeed, other than the

Abbott and Costello Successors' ipse dixit that movies are always

integrated wholes (which is itself unreasonable in light of cases

like Richlin and 16 Casa Duce), they made no apparent attempt to

explain why the Routine should be considered as having merged with

the films.  Given the legal principles and their own factual

allegations, the plaintiffs' argument on this issue was simply not

reasonable.

    2.   Other Factors

        a.  Frivolousness

Objective unreasonableness is not the same as frivolousness.

See, e.g., Kirtsaeng II, __ U.S. at __, 136 S. Ct. at 1985  ("[The

Supreme Court has] noted with approval 'several nonexclusive

factors to inform a court's fee-shifting decisions: 'frivolousness,

motivation, objective unreasonableness[,] and the need in certain

circumstances to advance considerations of compensation and

deterrence.'" (second alteration in original)(quoting Fogerty, 510

U.S. at 534 n.19)); <u>Agence France Presse v. Morel</u>, No. 10 Civ. 2730, 2015 WL 13021413, at *5 (S.D.N.Y. March 23, 2015) (noting that objective unreasonableness and frivolousness are not necessarily "coextensive" (quoting <u>Gordon v. McGinley</u>, 11 Civ. 1001, 2013 WL 1455122, at *2 (S.D.N.Y. March 28, 2013))), <u>aff'd sub nom. Presse v. Morel</u>, 645 F. App'x 86 (2d Cir. 2016). The line separating them is not, however, well-defined. An argument "is frivolous when there is indisputably absent any factual or legal basis' for it." <u>Hallford v. Fox Entertainment Group, Inc.</u>, 12 Civ. 1806, 2013 WL 2124524, at *1 (S.D.N.Y. April 18, 2013). Of course, that is the same way objective unreasonableness tends to be described. <u>See, e.g.</u>, <u>Canal+ Image UK Ltd. v. Lutvak</u>, 792 F. Supp. 2d 675, 681 (S.D.N.Y. 2011) ("'Objective unreasonableness' is generally used to describe claims that have no legal or factual support." (quoting <u>Viva Video, Inc. v. Cabrera</u>, 9 F. App'x 77, 80 (2d Cir. 2001))). Cases indicate, however, that frivolousness is a particularly intense form of objective unreasonableness. <u>See, e.g.</u>, <u>CK Co. v. Burger King Corp.</u>, No. 92 Civ. 1488, 1995 WL 29488, at *1 (S.D.N.Y. Jan. 26, 1995).

Here, assuming that the plaintiffs' major positions should not be characterized as frivolous, some of their subsidiary arguments were sufficiently without basis to be so impugned. <u>See Kirtsaeng II</u>, __ U.S. at __, 136 S. Ct. at 1988-89 (cautioning that courts must take into account all relevant circumstances in analyzing Section 505 fee applications). The persistent assertion that motion pictures are <u>per</u> <u>se</u> integrated works is frivolous,

especially where legal support that the plaintiffs garnered for that mistaken notion actually undermines it. The baseless suggestion that the work-for-hire provision in the November 1940 Agreement was actually the confirmation of an understanding from more than two years earlier is similarly flawed. And the argument that the 1984 Quitclaim related only to the common law copyright is sufficiently impaired both logically and legally to exceed even objective unreasonableness.

### b. Motivation

Here, the defendants are on shakier ground. They assert that the infringement claim was frivolous and that, "in turn calls [the] [p]laintiffs' motivation into question." (Defendants' Joint Memorandum of Law in Support of Motion for Attorneys' Fees and Costs ("Def. Memo.") at 17). There are two problems with this assertion. First, although I have found certain subsidiary arguments frivolous, I have not found that the entire claim was, itself, frivolous. Second, if frivolousness sufficed to impute an ill motive, there would be no need to analyze these factors separately.

The Hand to God Producers also point to the timing of the Complaint and the "engineered publicity" that accompanied it as evidence of bad faith. (Def. Memo. at 18; Defendants' Reply Memorandum of Law in Support of Motion for Attorneys' Fees and Costs ("Reply") at 8). This strikes me as sheer speculation. Finally, the defendants complain about the "naming and shaming" in the Complaint of investors who had no control over the content of

33

the play.  (Reply at 7).  While it seems clear that neither the
Complaint nor the Amended Complaint included sufficient details
about certain "producer" defendants who were really just investors
in the production, see, e.g., Carell v. Shubert Organization, Inc.,
104 F. Supp. 2d 236, 271 (S.D.N.Y. 2000) (finding allegation that
defendant is "producer" who invested in production insufficient to
identify actionable conduct committed by individual and dismissing
claims against him) -- and, indeed, these producers were later
voluntarily dismissed (Order dated Sept. 18, 2015) -- I do not find
that this conduct establishes an improper motive for filing the
Complaint.

c.   Compensation and Deterrence

Awarding fees in this case would be faithful to the Copyright
Act's purpose of enabling authors to build on the work of others,
see John Wiley, 2016 WL 7392210, at *2; see also Fogerty, 510 U.S.
at 156 ("[T]he ultimate aim [of the Copyright Act] is . . . to
stimulate artistic creativity for the general public good."
(quoting Twentieth Century Music Corp. v. Aiken, 422 U.S. 151, 156
(1975))), by deterring claimants from filing infringement actions
when the arguments supporting their ownership of a copyright are
weak to the point of unreasonableness.  Moreover, it will serve to
compensate the Hand to God Producers for their defense of an action
that should not have been brought in the first place because the
plaintiffs lacked standing.  See, e.g., Assessment Technologies of
WI, LLC v. WIREdata, Inc., 361 F.3d 434, 437 (7th Cir. 2004) ("[A]n
award of attorneys' fees may be necessary to enable the party

34

possessing the meritorious claim or defense to press it to a successful conclusion rather than surrender it because the cost of vindication exceeds the private benefit to the party. The best illustration is in fact a case like this, where the party awarded the fees, being the defendant, could not obtain an award of damages from which to pay his lawyer no matter how costly it was for him to defend against the suit."). In sum, the balance of factors warrants the granting of attorneys' fees and costs to the defendants.

    C.   <u>Fees</u>

Analysis of an application for attorneys' fees should begin with the court's determination of a "presumptively reasonable fee." <u>Sandoval v. Materia Brothers Inc.</u>, No. 11 Civ. 4250, 2013 WL 1767748, at *3 (S.D.N.Y. March 5, 2013) (quoting <u>Arbor Hill Concerned Citizens Neighborhood Association v. County of Albany</u>, 522 F.3d 182, 189 (2d Cir. 2008)). That amount is calculated using the lodestar method, multiplying a "reasonable hourly rate" by the "reasonable number of hours required by the case." <u>Millea v. Metro-North Railroad Co.</u>, 658 F.3d 154, 166 (2d Cir. 2011); <u>accord</u> <u>Sandoval</u>, 2013 WL 1767748, at *3. The fee applicant bears the burden of establishing that the requested hourly rates and number of hours worked are reasonable. <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 433 (1983); <u>Rozell v. Ross-Holst</u>, 576 F. Supp. 2d 527, 544 (S.D.N.Y. 2008).

The <u>Hand to God</u> Producers seek reimbursement of $60,780 in attorneys' fees and $289.74 in costs. Mark J. Lawless, their

attorney of record, charged for 110.8 hours, largely at a rate of $400 per hour,[13] for a total of $43,180. (Invoices from Mark J. Lawless dated Aug. 12, 2015, Nov. 6, 2015 ("11/6/15 Inv."), Jan. 25, 2016 ("1/25/16 Inv."), April 13, 2016 ("4/13/16 Inv."), July 30, 2016, attached as exhibits to Lawless 2/28/17 Decl.; Declaration of Mark J. Lawless dated May 23, 2017, ¶¶ 4-5). He also seeks $111 in costs. (11/6/15 Inv.; 1/25/16 Inv.). The law firm of Levine, Plotkin & Menin, LLP (the "Levine Firm"), counsel for the <u>Hand to God</u> production, charged attorneys' fees of $17,600, at rates of $275 per hour, $325 per hour, and $800 per hour, and incurred costs of $178.74. (Def. Fees Memo. at 19; Client Ledger, attached as Exh. to Lawless 2/28/17 Decl.). The Abbot and Costello Successors object to the hours insofar as they were expended on the appeal (but not on work in connection with the petition for certiorari, which the defendants chose not to oppose) and on a potential claim in the United Kingdom. (Plaintiffs' Response to Defendants' Belated Reply Declaration of Mark J. Lawless in Support of Defendants' Motion for Costs Including Attorneys' Fees ("Pl. Sur-Reply") at 2-3). They also complain that the invoices provided, particularly those from the Levine Firm, are not sufficiently detailed to determine whether the time is reimbursable, and they argue that the hourly fee of $800 charged by the Levine Firm is unreasonably high. (Pl. Sur-Reply at 3).

---

[13] Mr. Lawless spent 12.85 hours on the fee motion, but the fee was capped at $4,000, which works out to an hourly rate of approximately $311 for that work. (Invoice dated Jan. 25, 2016, attached as Exh. to Declaration of Mark Lawless dated Feb. 28, 2017 ("Lawless 2/28/17 Decl.").

1.  <u>Work on the Appeal</u>

The Abbott and Costello Successors argue that this Court should not award fees on appeal because the Second Circuit, itself, did not order attorneys' fees on appeal, but only "some limited costs." (Pl. Sur-Reply at 2).  The <u>Hand to God</u> Producers agree that the Second Circuit awarded only "its rule-imposed maximum on reproduction costs" under Rule 39 of the Federal Rules of Appellate Procedure, but counter the plaintiffs' argument by citing the Second Circuit's decision in <u>L-3 Communications Corp. v. OSI Systems, Inc.</u>, 607 F.3d 24 (2d Cir. 2010).  (Letter of Mark J. Lawless dated March 15, 2017).

In <u>L-3</u>, the Second Circuit addressed whether a district court can assess costs under Rule 39(e) of the Federal Rules of Appellate Procedure in a situation where the Court of Appeals had awarded costs (under Rule 39(a) of the Federal Rules of Appellate Procedure) to the appellant who had prevailed in part on the appeal, but had not "directed taxation of costs under Fed. R. App. P. 39(e)."  607 F.3d at 26-27.  The Second Circuit held that the district court could award costs under subsection (e).  <u>Id.</u> at 30-31.  However, as should be clear, <u>L-3</u> deals only with taxation of costs under Fed. R. App. P. 39.  And most Courts of Appeals to have addressed the question have held that costs under that rule do not include attorneys' fees.  <u>See</u> <u>Family PAC v. Ferguson</u>, 745 F.3d 1261, 1266-67 (9th Cir. 2014) (agreeing with First, Third, Fifth, Sixth, and Seventh Circuits that Rule 39 costs do not include attorneys' fees, and disagreeing with D.C. Circuit); <u>cf.</u> <u>Adsani v.</u>

<u>Miller</u>, 139 F.3d 67, 74-75 (2d Cir. 1998) (indicating that, whereas Section 505 provides authority to award attorneys' fees on appeal, Rule 39 does not).  Thus, neither party's submissions are relevant here.[14]

Attorneys' fees on appeal are recoverable under Section 505. <u>See, e.g.</u>, <u>Adsani</u>, 139 F.3d at 75 (noting, in discussion of attorneys' fees on appeal, that such fees are available under Section 505).  As the Honorable Denise L. Cote, U.S.D.J., noted in her opinion after the second <u>Kirtsaeng</u> remand, in awarding such fees, a court should "look[] at [the litigation] holistically and in light of the Copyright Act's goals."  <u>John Wiley</u>, 2016 WL 7392210, at *2.  I have performed that exercise above and recommended an award of attorneys' fees.  I see no reason to exclude those expended on the appeal.

### 2. <u>Work on Potential U.K. Claim</u>

As both sides recognize, this claim is merely a "potential" claim.  (4/13/16 Inv.; Pl. Sur-Reply at 2).  These fees, which total $2,140 (5.35 hours at $400 per hour (11/6/15 Inv.; 1/25/16

---

[14] To the extent that the Abbot and Costello Successors intended to argue that fees on appeal should not be awarded because the Second Circuit did not itself award fees pursuant to Rule 38 of the Federal Rules of Appellate Procedure, which governs fee awards for frivolous appeals, that argument would fail.  A grant of attorneys' fees under Rule 38 is not a prerequisite for a fee award under Section 505.  <u>See, e.g.</u>, <u>Fantasy, Inc. v. Fogerty</u>, 94 F.3d 553, 561 (9th Cir. 1996) ("While we see no basis for awarding attorney's fees under FRAP 38, we conclude that fees are warranted under § 505 inasmuch as it served the purposes of the Copyright Act for Fogerty to defend an appeal so that the district court's fee award would not be taken away from him.").

Inv.; 4/13/16 Inv.)), are not recoverable.

     3.  <u>Detail</u>

A motion for attorneys' fees must be accompanied by "contemporaneous time records indicating, for each attorney, the date, the hours expended, and the nature of the work done." <u>New York State Association for Retarded Children, Inc. v. Carey</u>, 711 F.2d 1136, 1154 (2d Cir. 1983). The records should be "sufficiently detailed to allow a court to determine if the time and labor expended was reasonable." <u>Serin v. Northern Leasing Systems, Inc.</u>, No. 06 Civ. 1625, 2011 WL 1467560, at *6 (S.D.N.Y. April 19, 2011), <u>aff'd</u>, 501 F. App'x 39 (2d Cir. 2012). In addition, a determination of what constitutes a reasonable hourly rate involves "a case-specific inquiry into the prevailing market rates for counsel." <u>Farbotko v. Clinton County</u>, 433 F.3d 204, 209 (2d Cir. 2005). The hourly rates must be "in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." <u>Reiter v. MTA New York City Transit Authority</u>, 457 F.3d 224, 232 (2d Cir. 2006) (alteration in original) (quoting <u>Blum v. Stenson</u>, 465 U.S. 886, 896 n.11 (1984)). The document provided by the Levine Firm reflects, as noted, over $17,000 in attorneys' fees. However, the entries are unreasonably vague, with descriptions such as "p/c Lawless copyright issue," "[v]ideo and misc.; p/c Mark," and "[v]arious w/Lawless." (Client Ledger at 1). Moreover, it provides no information about the attorneys performing the work -- not even their names.

"While vague descriptions . . . are not fatal to a fee application, unspecific or vague records are generally removed. This can be accomplished through excision of the vague entries or reducing the total hours by a flat percentage." Serin, 2011 WL 1467560, at *6 (internal citation omitted). Although this is "a somewhat arbitrary process," Tucker v. City of New York, 704 F. Supp. 2d 347, 357 (S.D.N.Y. 2010), it is an efficient way to trim a fee application that is so devoid of detail as to make analysis of its reasonableness impossible. I therefore recommend discounting the fees charged by the Levine Firm by 50%, to $8,800.

Mr. Lawless' fee records are, on the other hand, sufficiently detailed. Moreover, the Abbott and Costello Successors do not object to Mr. Lawless' hourly rate of $400, which is within the realm of reasonableness. See, e.g., BWP Media USA Inc. v. Uropa Media Inc., No. 13 Civ. 7871, 2014 WL 2011775, at *3 (S.D.N.Y. May 16, 2014) (recommending approval of hourly rates of $525 and $450 for law firm partners in copyright infringement litigation).

4.   Costs

Mr. Lawless claims $111 in costs for research and messenger services. (11/6/15 Inv.; 1/25/16 Inv.). The Abbott and Costello Successors do not challenge these charges. The Levine Firm appears to seek $178.74 in costs. Of that amount, $172.04 appears to be for postage and FedEx charges. (Client Ledger). It is unclear what the remaining amount relates to. I therefore recommend that the Hand to God Producers be awarded $283.04 in costs.

<u>Conclusion</u>

For the foregoing reasons, I recommend granting the <u>Hand to God</u> Producers' motion for attorneys' fees and costs pursuant to 17 U.S.C. § 505, and awarding them $49,840 in attorneys' fees and $283.04 in costs.

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable George B. Daniels, Room 1310, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully Submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE.

Dated: New York, New York
       June 5, 2017

Copies transmitted this date:

Jonathan D. Reichman, Esq.
Jonathan W. Thomas, Esq.
Andrews Kurth Kenyon LLP
One Broadway
New York, NY 10004-1007

Mark J. Lawless, Esq.
156 W. 56th St., #1102
New York, NY 10019